# EXHIBIT B

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CROSS ATLANTIC CAPITAL<br>PARTNERS, INC. | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.: 07-CV-02768 |
| | : | |
| vs. | : | HON. JOHN R. PADOVA |
| | : | |
| FACEBOOK, INC. and THE FACEBOOK,<br>LLC | : | |
| | : | |
| Defendants. | : | |

## DECLARATION OF GLENN T. RIEGER
## IN SUPPORT OF PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION TO TRANSFER VENUE

I, Glenn T. Rieger, declare the following:

1.      I am over eighteen years of age, and am competent to testify to the matters set

forth in this declaration.  The following statements set forth in this declaration are based upon my

personal knowledge.

2.      I am currently a General Partner with New Spring Capital located in Radnor,

Pennsylvania.

3.      I was one of the founders and original General Partners in Cross Atlantic Capital

Partners, Inc. ("XACP").

4.      XACP's corporate headquarters is (and for all times relevant to above-captioned

action was) located in Radnor, Pennsylvania.

5.      XACP is (and for all times relevant to above-captioned action was) an active

company that employs about twelve people, ten of which work (and have worked) in its Radnor,

Pennsylvania office.

6.    I am currently an investor with fiduciary interests in XACP's Cross Atlantic Technology Fund ("XATF") and "The Co-Investment 2000 Fund" ("CI2K").

7.    In or about 1999, a company was formed called iKimbo, Inc. ("iKimbo") to develop and commercialize the novel and ground-breaking technology conceived in large part by Jamie Harvey ("Harvey"). This technology includes, *inter alia*, systems and methods for creating an on-line community for users with common interests.

8.    As with most start-up companies, iKimbo needed capital.

9.    XACP managed the XATF and CI2K funds. iKimbo sought capital from those funds to finance its efforts to develop, market and commercialize aspects of Harvey's novel inventions.

10.    Beginning in or about 2000, XACP, through the two funds it managed, became an active and significant investor in iKimbo and its efforts to commercialize aspects of the technology disclosed and claimed in United States Patent No.6,519,629 B2 ("'629 Patent"), entitled System for Creating a Community for Users with Common Interests to Interact In.

11.    Through XATF and CI2K, XACP also made a series of secured loans to iKimbo.

12.    In addition, other organizations, including then Philadelphia, Pennsylvania-based PECO (Exelon) also invested in iKimbo during that time.

13.    After XACP's investment in iKimbo, XACP began to play an integral role in iKimbo's daily operations.

14.    I was on iKimbo's board of directors in my capacity as an XACP General Partner. I also served on various committees at iKimbo, including the compensation committee and the audit committee. Eventually, I was named Chairman of iKimbo's Board of Directors.

2

15.     Throughout this process, various XACP partners were also involved in iKimbo's operations, including its efforts to commercialize aspects of the technology disclosed and claimed in the '629 Patent. iKimbo's business was addressed at weekly XACP's partners' meetings in its office in Radnor, Pennsylvania. Further, other XACP non-equity personnel (virtually all of whom are still at XACP's Radnor, Pennsylvania office) were also involved in iKimbo's operations.

16.     Richard Fox ("Fox"), a key XACP witness in this case, is an XACP partner. Fox works at XACP's corporate headquarters in Radnor, Pennsylvania. Fox was very involved in iKimbo's operations and efforts to commercialize aspects of its technology. The subject matter of Fox's testimony in this case will relate to that those operations and efforts to commercialize aspects of this technology.

17.     Brian Adamsky ("Adamsky"), another key XACP witness in this case, is XACP's controller. Adamsky works at XACP's corporate headquarters in Radnor, Pennsylvania. Adamsky is intimately familiar with iKimbo's financials (as were many of the ten employees at XACP's Radnor, Pennsylvania office). The subject matter of Adamsky's testimony in this case will relate to this financial information and iKimbo's operations and efforts to commercialize aspects of its technology.

18.     In 2004, XATF and C12K were assigned iKimbo's rights in the '629 Patent, as well other assets, when iKimbo failed to repay certain secured loans. XAFT and C12K subsequently assigned those rights to XACP.

19.     At this time, any existing documents of iKimbo are located at XACP's office in Radnor, Pennsylvania.

3

20.    Any existing documents of XACP regarding its involvement in iKimbo and iKimbo's efforts to commercialize aspects of the technology disclosed and claimed in the '629 Patent are also located at XACP's office in Radnor, Pennsylvania.  Witnesses having knowledge regarding these facts, and those set forth in the complaint are also located at XACP's office in Radnor, Pennsylvania.

21.    Many of the operative facts concerning the above-captioned case have occurred in Pennsylvania, in this judicial district.  For example:

•    Facebook has targeted and continues to directly target the Facebook® website to, and knowingly interact with, residents of Pennsylvania, including, but not limited to, students at the approximately 125 colleges and universities and the hundreds of high schools in this judicial district.

•    Facebook has entered and continues to enter into commercial agreements, collaborations, joint ventures and/or partnerships relating to the use and operation of the Facebook® website with residents of Pennsylvania, including, but not limited to, Comcast Interactive Media, LLC, which is principally located at 1500 Market Street, Philadelphia, Pennsylvania 19102.

•    Acts which constitute direct infringement, inducement of infringement and contributory infringement by defendants of some or all of the claims of the '629 Patent have taken place and are taking place within this judicial district on a daily basis each time a resident of this judicial district logs into and uses the Facebook® website.

4

• In this judicial district, Facebook has been and is in the business of, *inter alia*, owning, making, operating, maintaining, marketing, selling advertising for, and generating income and profits from the Facebook® website which facilitates the creation of online communities by its registered users through the use of systems and methods covered by one or more claims of the '629 Patent.

• In this judicial district, Facebook through the Facebook® website, has induced and continues to actively induce on a daily basis others, including residents of this judicial district, to infringe one or more claims of the '629 Patent.

• In this judicial district, Facebook, through the Facebook® website, has and continues to aid and abet on a daily basis residents of this judicial district to infringe one or more claims of the '629 Patent.

22.    The acts of patent infringement by Facebook of one or more claims of the '629 Patent has deprived XACP of revenues which it otherwise would have made or caused to be made in this judicial district, and has in other respects, injured XACP, a resident of this judicial district, and will cause XACP added injury and loss of revenues unless enjoined by this Court.

23.    It would be inconvenient for XACP to litigate this case in the Northern District of California.

Pursuant to 28 U.S.C. § 1746, I, Glenn T. Rieger, declare under penalty of perjury that the foregoing statements are true and correct.

Executed on  Sept. 24 , 2007 in Radnor, Pennsylvania.

_____
GLENN T. RIEGER

5

# EXHIBIT C

**Email:**

**Password:**

Login

Forgot Password?

**Sign Up**
Everyone can join.

login   sign up   tour

## Press Room

Blog | About |    Press Releases RSS

Press Room Home

### Facebook Factsheet

**About Facebook**

Founded in February 2004, Facebook is a social utility that helps people communicate more efficiently with their friends, family and coworkers. The company develops technologies that facilitate the sharing of information through the social graph, the digital mapping of people's real-world social connections. Anyone can sign up for Facebook and interact with the people they know in a trusted environment. Facebook is a part of millions of people's lives and half of the users return daily.

**Product**

Facebook's simplified navigation gives users easy access to core site functions and applications. Profile, Friends, Networks and Inbox – pages core to the user experience on Facebook – have a prominent place at the top of the user's profile page. Facebook applications – Photos, Notes, Groups, Events and Posted items – are displayed on the left side bar, along with any third-party applications a user has added to their account.

**Technology**

Facebook is the second most-trafficked PHP site in the world, and one of the largest MySQL installations anywhere, running thousands of databases. Facebook has built a lightweight but powerful multi-language RPC framework that allows the company to seamlessly and easily tie together subsystems written in any language, running on any platform. The company is the largest user in the world of memcached, an open-source caching system, and has created a custom-built search engine serving millions of queries a day, completely distributed and entirely in-memory, with real-time updates.

**Platform**

Facebook Platform is a development platform that enables companies and engineers to deeply integrate with the Facebook website and gain access to millions of users through the social graph. More than 50 percent of Facebook users return to the site each day, providing unparalleled distribution potential for applications and the opportunity to build a business that is highly relevant to people's lives. More information can be found at

**Company**

Factsheet
Statistics
Timeline
Executives
Product
Platform
Images
Video
Press Releases &
Announcements
What's New?

**PR Contacts**

Interview Requests
Speaker Requests

Sze (Greylock Partners)

**Employees**
300+

**Users**
42 million active (users who have returned to the site in the last 30 days)

**Offices**
Palo Alto, Calif. (headquarters); New York

Facebook © 2007                    about    developers    jobs    advertisers    polls    terms    privacy    help

# EXHIBIT D

**Microsoft and Facebook Team Up for Advertising Syndication**

**PALO ALTO, Calif., and REDMOND, Wash. — Aug. 22, 2006** — Facebook and Microsoft Corp. today announced a strategic alliance in which the two companies will collaborate to bring relevant advertising to the more than nine million registered users of Facebook, the Internet's leading social utility. Microsoft's advanced advertising technology and Facebook's unique social network make possible the multi-year collaboration grounded in the two companies' commitment to technological innovation.

As part of the relationship, Microsoft will be the exclusive provider of banner advertising and sponsored links on Facebook using Microsoft's digital advertising solutions and the Microsoft® adCenter platform. The two companies also agreed to work together on future technology and advertising initiatives.

"Our collaboration with Facebook is about joining our cutting-edge advertising technology and sales force with a true innovator in social networking," said Steve Berkowitz, senior vice president of the Online Services Group at Microsoft. "We believe that the combination of Microsoft and Facebook strengths will be incredibly attractive to advertisers as they forge more meaningful connections with one of the largest, most engaged audiences on the Internet. The consumer assets brought to bear by this relationship will be very hard to match."

Advanced technology from Microsoft and Facebook will help connect advertisers with Facebook users in more relevant, innovative ways through a combination of graphical ad placements, as well as automated text-based advertisements targeted to content and, over time, aggregate user behavior on an anonymous basis.

"We're excited to be innovating with Microsoft to build a world-class advertising solution that allows Facebook to deliver the best advertising experience in social media," said Owen Van Natta, chief operating officer at Facebook. "We chose Microsoft because it, like Facebook, is a technology company at its core and is committed to taking a fresh approach to targeting advertising to social media. We're committed to providing a great user and advertiser experience together."

The two companies began talks about the relationship only last week and expect the new advertising experiences to appear in the early fall. Microsoft and Facebook have expressed an interest in moving quickly to implement the terms of the deal.

**About Microsoft**
Founded in 1975, Microsoft (Nasdaq: "MSFT") is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

- **Company**
- Factsheet
- Statistics
- Timeline
- Executives
- Product
- Platform
- Images
- Video
- Press Releases & Announcements
- What's New?
- **PR Contacts**
- Interview Requests
- Speaker Requests

# EXHIBIT E

<u>Not for Publication</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

GARVEY CORPORATION,

        Plaintiff,

    v.                             Civil No. 02-3886 (RBK)

BLUE CHIP ENGINEERING, INC.,
NERCON ENGINEERING and
MANUFACTURING, INC.,

        Defendants.

**Appearances:**

Anthony J. DiMarino, Esq.
McShea Tecce P.C.
Mellon Bank Center
1735 Market Street, 16th Floor
Philadelphia, PA 19103
  Attorney for Plaintiff

David A. Dorey, Esq.
Blank, Rome, Comisky & McCauley
Woodland Falls Corporate Park
210 Lake Drive East
Suite 200
Cherry Hill, NJ 08002
  Attorney for Defendant Blue Chip Engineering, Inc.

John B. Kearney, Esq.
Kenney & Kearney
Woodland Falls Corporate Park
220 Lake Drive East, Suite 210
P.O. Box 5034
Cherry Hill, NJ 08034-0421
  Attorney for Defendant Nercon
  Engineering and Manufacturing,
  Inc.

## O P I N I O N

**KUGLER**, United States District Judge:

       In this patent infringement action that was filed almost a year and a half ago

but that has yet to get off the ground because of months stalled in unsuccessful mediation,

the parties now bring a motion to dismiss for improper venue, to transfer, and to amend

the complaint. For the reasons discussed below, this Court will deny all the motions.

## I. <u>BACKGROUND</u>

      The plaintiff, Garvey Corporation, is a New Jersey corporation with a

principal place of business in Blue Anchor, New Jersey. Garvey Corp. manufactures and

markets conveyor systems, along with other types of equipment. Defendant Blue Chip

Engineering is an Idaho corporation with offices in Idaho and Wisconsin. Defendant

Nercon Engineering and Manufacturing, Inc. is a Wisconsin corporation with a principal

place of business in Wisconsin.

      Garvey Corp. alleges that it is an assignee of United States Patent No.

5,161,678 ("'678 Patent") and that Defendants Blue Chip and Nercon have, since 1999,

"marketed, sold, offered for sale, installed and specified for installation by others"

products that infringe the claims of the '678 Patent, (Compl., ¶12), and have induced

infringement by others. The '678 Patent, entitled "Accumulator Cover," protects a

particular component of a conveyor or accumulator system.

      Plaintiff Garvey Corp. designs, manufactures and sells conveyor and

accumulator systems, including components protected by the '678 Patent. Defendant

Nercon also designs, manufactures and sells materials handling and conveying

equipment. Blue Chip does not design or manufacture any equipment itself, but instead is

in the business of consulting engineering, system design and specification of equipment

for installation in its clients' production facilities. As a consulting engineer, Blue Chip

contracts with clients to facilitate and oversee the design and construction of production

line conveyor systems. Blue Chip locates appropriate vendors to supply design,

engineering, and equipment manufacturing services for Blue Chip's clients, and then the

clients and the vendors contract with each other.

       This dispute originated with a telephone call in December 1999. Michael J.

Keough, Blue Chip's vice-president, telephoned Michael Earling, Garvey Corp.'s vice-

president of sales, at Garvey Corp.'s office in Blue Anchor, New Jersey. The two

companies had worked with each other in the past. The parties disagree on the nature of

the telephone call. According to Garvey Corp., Keough asked Earling for certain design

drawings to assist Blue Chip in a project that Blue Chip was working on for General

Mills-Yoplait Company. For that project, General Mills had retained Blue Chip to oversee

a new production line conveyor system for General Mills' Reed City, Michigan factory.

After Earling reminded Keough that various aspects of the product depicted in Garvey

Corp.'s drawings were protected by the '678 Patent, Earling forwarded the requested

drawings to Keough in Wisconsin.

       Garvey Corp. claims that what Blue Chip really did with the drawings was

copy them and pass them off as Blue Chip's own in a Blue Chip bid package that Blue

Chip sent out to several vendors (one of which was Garvey Corp. itself). In this bid

package, Blue Chip solicited bids for the manufacture and installation of the new

production line conveyor system at General Mills' Reed City, Michigan factory.

According to the drawings that were part of the bid package, the system would include

use of Garvey Corp.'s technology covered by the claims of the '678 Patent. Garvey Corp.

claims that it never gave permission to Blue Chip to use Garvey Corp.'s patented

technology in a bid package sent to other vendors.

According to Blue Chip, it did not use Garvey Corp.'s patented technology

in the bid proposals it sent to vendors for the General Mills project. The design drawings

that Keough requested from Earling were from a past project that Garvey Corp. had

completed for General Mills—the "Line 5" production line conveyor system that Garvey

Corp. had previously designed and manufactured. Keough asked Earling for a copy of the

"Line 5" drawings in anticipation of a proposed move of "Line 5." Keough says that he

did not request Garvey Corp.'s drawings "to use them in any bid solicitation package at

issue in the present case." (Keough Second Aff., ¶7). Rather, the illustrations that went

out in the bid package were provided by General Mills, based on General Mills' own

master layout drawings for its production lines at the Reed City factory, and General

Mills gave Blue Chip permission to use them.

General Mills decided to hire Nercon for the new project, and the two

companies entered into a contract. Pursuant to that contract, at Nercon's Wisconsin

facility, Nercon manufactured the conveying equipment for General Mills, which

included the accumulator cover that Garvey Corp. claims infringes on its patent.

Garvey Corp. sued Blue Chip and Nercon on claims of patent infringement

and inducing infringement.

Blue Chip now moves to dismiss for improper venue or, in the alternative,

to transfer venue to the Western District of Wisconsin. Nercon moves to transfer to the

Eastern District of Wisconsin. Garvey Corp. moves to amend its complaint to add a claim

of breach of contract against Nercon and to add a claim of tortious interference with

prospective contractual relations against Blue Chip.


## II. MOTIONS TO DISMISS FOR IMPROPER VENUE AND TO TRANSFER

### A. *Dismissal for Improper Venue: 28 U.S.C. §1406(a)*

28 U.S.C. §1406(a) provides: "The district court of a district in which is

filed a case laying venue in the wrong division or district shall dismiss, or if it be in the

interest of justice, transfer such case to any district or division in which it could have been

brought." Of the statute's two alternatives for when venue is improper, Blue Chip here

seeks only dismissal, not a transfer. (In the event this Court finds that venue is proper,

then Blue Chip seeks a transfer under 28 U.S.C. §1404(a)).

In its motion to dismiss for improper venue, Blue Chip argues that the

Western District of Wisconsin is the proper venue for this dispute, not the District of New

Jersey. Wisconsin is the location of one of Blue Chip's primary offices and Nercon's

principal place of business. The majority of Blue Chip's clients reside in Idaho and

Wisconsin. Blue Chip has also conducted business with clients in the states of California,

Ohio, Oregon, Maine, Tennessee, Michigan and Iowa, but Blue Chip has no current or

past clients from New Jersey, nor does it have an office or any employees in New Jersey.

According to Blue Chip, Garvey Corp.'s claims of patent infringement primarily relate to

Nercon's design and manufacture of the accumulator cover that took place in Wisconsin. Blue Chip's work with regard to the General Mills' project occurred in Wisconsin, and all of Blue Chip's relevant records and employees who worked on the project are located in Wisconsin.

In a case charging patent infringement, the special patent venue statute, 28 U.S.C. §1400(b), governs venue. Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222 (1957). Section 1400(b) provides two alternatives for venue: a civil action for patent infringement may be brought in the judicial district "where the defendant resides" or "where the defendant has committed acts of infringement and has a regular and established place of business." Both Garvey Corp. and Blue Chip agree that because Blue Chip does not have a regular and established place of business in New Jersey, the operative venue method here is the first alternative, or "where the defendant resides."

A corporate defendant resides in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. V.E. Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574 (Fed. Cir. 1990) (holding that definition of "resides" for corporate defendant in general venue statute, 28 U.S.C. §1391(c)), applies to 28 U.S.C. §1400(b)). Federal Circuit law governs the issue of personal jurisdiction in patent infringement actions. Deprenyl Animal Health, Inc. v. University of Toronto Innovations Found., 297 F.3d 1343, 1348 (Fed. Cir. 2002); Hildebrand v. Steck Mfg. Co., Inc., 279 F.3d 1351, 1354 (Fed. Cir. 2002).

A district court may exercise personal jurisdiction over a corporate

defendant in a patent infringement action if a two-step inquiry is satisfied. First, the party

must be amenable to service of process under the appropriate state long-arm statute. Akro

Corp. v. Luker, 45 F.3d 1541, 1544 (Fed. Cir. 1995). Second, "the culmination of the

party's activities within the forum state must satisfy the minimum contacts requirement of

the due process clause." Hildebrand, 279 F.3d at 1354 (citing International Shoe Co. v.

Washington, 326 U.S. 310, 316 (1945)). In jurisdictions like New Jersey, where the state

long-arm statute has been held to extend to the greatest reach consistent with due process,

see Imo Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998), the sole inquiry

becomes whether the court's exercise of personal jurisdiction over the out-of-state

defendant is consistent with due process. Akro, 45 F.3d at 1544; Deprenyl Animal Health,

Inc., 297 F.3d at 1350.

Due process requires only that an out-of-state defendant have certain

minimum contacts with the state "such that the maintenance of the suit does not offend

'traditional notions of fair play and substantial justice.'" Akro, 45 F.3d at 1545 (quoting

International Shoe, 326 U.S. at 316). Due process is satisfied if the defendant has

"purposefully directed his activities at residents of the forum and the litigation results

from alleged injuries that arise out of or relate to those activities." Akro, 45 F.3d at 1545

(quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-76 (1985)); Deprenyl

Animal Health, Inc., 297 F.3d at 1350. Jurisdiction is proper "where the contacts

proximately result from actions by the defendant himself that create a substantial

connection with the forum State." Akro, 45 F.3d at 1545. "Thus, where the defendant

deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Id.; Deprenyl Animal Health, Inc., 297 F.3d at 1350-51.

Even where the minimum contacts standard has been met, personal jurisdiction may still be inappropriate if the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable" and inconsistent with "fair play and substantial justice." Akro, 45 F.3d at 1546-47 (quoting Burger King, 471 U.S. at 476-77).

Here, although it is a close question, this Court concludes that exercising personal jurisdiction over Blue Chip is consistent with due process. Taking the facts in the light most favorable to the plaintiff (as the Court is required to do on a motion to dismiss for lack of personal jurisdiction that is decided on affidavits, see One World Botanicals Ltd v. Gulf Coast Nutritionals, Inc., 987 F. Supp. 317, 322 (D.N.J. 1997)), Blue Chip directed its activities toward New Jersey resident Garvey Corp., and Garvey Corp.'s alleged injuries resulted from those activities. Blue Chip contacted Garvey Corp. in New Jersey to request copies of drawings. Those drawings contained patented technology that allegedly ended up in a bid package that Blue Chip sent to Garvey Corp. in New Jersey, to be used as a basis for a future contract with Blue Chip's client, General

Mills. It is Blue Chip's allegedly unauthorized use of the technology from those drawings

in the bid package that was sent to vendors, including Garvey Corp. in New Jersey, that

forms the heart of Garvey Corp.'s claims of patent infringement and inducement against

Blue Chip. That is sufficient to establish minimum contacts for purposes of personal

jurisdiction. See Akro Corp., 45 F.3d at 1545-47 (holding that out-of-state defendant's

sending of patent infringement warning letters to plaintiff and entry into exclusive license

agreement with non-party located in state were sufficient minimum contacts); Inamed

Corp. v. Kuzmak, 249 F.3d 1356 (Fed. Cir. 2001) (minimum contacts established by

telephone and mail negotiations directed to California resident, one introductory visit to

California, and one cease-and-desist letter directed to California resident).

      Minimum contacts with New Jersey having been established, Blue Chip has

not demonstrated a compelling case that the exercise of jurisdiction over it would be

unreasonable or inconsistent with fair play and substantial justice. As discussed below on

the motion to transfer venue, although requiring Blue Chip to litigate in New Jersey is

burdensome, those burdens are not constitutionally unreasonable. This case does not

present an opportunity for a clash between fundamental social policies between New

Jersey and Wisconsin, since federal patent law—consistent across the country—is to be

applied. Blue Chip has not demonstrated that exercising jurisdiction over it would be

inconsistent with fairness and justice. Accordingly, because the exercise of personal

jurisdiction over Blue Chip is proper here, venue is proper in this District, and Blue

Chip's motion to dismiss for improper venue under 28 U.S.C. §1406(a) will be denied.

### B.  Transfer of Venue: 28 U.S.C. §1404(a)

Although venue may be proper in this District, the Court may still find it appropriate to transfer the action to a different venue. As an alternative to dismissal under 28 U.S.C. §1406(a), Blue Chip seeks to transfer this action, pursuant to 28 U.S.C. §1404(a), to the Western District of Wisconsin, where Blue Chip's facility is located. By its separate motion, Nercon also seeks to transfer this action to Wisconsin pursuant to 28 U.S.C. §1404(a), but to the Eastern District, not the Western District. It is in the Eastern District of Wisconsin where Nercon's corporate office is located. In the alternative, Nercon joins in Blue Chip's request to transfer to the Western District of Wisconsin.

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no dispute that this action might have been brought in Wisconsin; venue is proper in both the Western and Eastern Districts of Wisconsin, and those courts could exercise personal jurisdiction over both Blue Chip and Nercon. Wisconsin is where both defendants have principal places of business and where the allegedly infringing accumulator cover was designed, manufactured and marketed.

The Federal Circuit looks to the law of the regional circuit to determine whether a transfer of venue under 28 U.S.C. §1404(a) is proper. See, e.g., Regents of the Univ. of California v. Eli Lilly & Co., 119 F.3d 1559, 1564-65 (Fed. Cir. 1997). The objective of transfer under §1404(a) is "to prevent waste of 'time, energy and money' and

'to protect litigants, witnesses and the public against unnecessary inconvenience and

expense.'" <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 616 (1964) (quoting <u>Continental Grain</u>

<u>Co. v. Barge FBL-585</u>, 364 U.S. 19, 26-27 (1960)).

The burden of proving the need for transfer is on the moving party. <u>Jumara</u>

<u>v. State Farm Insur. Co.</u>, 55 F.3d 873, 878 (3d Cir. 1995). The §1404(a) inquiry involves

a balancing test of the relevant private and public interests, and the plaintiff's choice of

venue is given considerable weight in this balance. <u>Gulf Oil v. Gilbert</u>, 330 U.S. 501,

508-09 (1947). There is no definitive list of factors that a court must consider, but the

relevant private interests may include things such as the plaintiff's choice of venue, where

the claim arose, the ease of access to sources of proof, the availability and cost of

compulsory process for unwilling witnesses, the physical and financial conditions of the

parties as they bear upon their ability to litigate in another location, and the location of

witnesses, books and records. <u>Id.</u>; <u>Jumara</u>, 55 F.3d at 879. Public interests may include

the enforceability of the judgment, practical considerations that could make the trial easy,

expeditious or inexpensive, the relative administrative difficulty in the two courts

resulting from court congestion, the local interest in deciding local controversies at home,

the appropriateness of having the jurisdiction whose law will govern adjudicate the

dispute, and the public policies of the jurisdictions. <u>Gulf Oil</u>, 330 U.S. at 508-09; <u>Jumara</u>,

55 F.3d at 879-80.

### 1. **Public Interests**

Because federal patent law governs this action, neither New Jersey nor

Wisconsin has a stronger interest in this case with respect to the application of state law. Wisconsin has an interest in deterring acts of patent infringement that take place within its borders, but New Jersey also has an interest in protecting its residents against harm resulting from patent infringement. There has been no showing regarding the relative docket congestion between this Court and the federal courts in Wisconsin. There is no reason to conclude that either a Wisconsin or a New Jersey jury would be more connected to the events giving rise to this lawsuit. The public interests are evenly-balanced.

## 2. **Private Interests**

This dispute involves three corporate parties, all of whom, for purposes of this motion, are deemed to be equally capable of paying for the production of employee-witnesses and documentary evidence in states other than their own. Although the witnesses, documents and physical evidence regarding Nercon's design and manufacture of the allegedly infringing accumulator cover are located in Wisconsin, there has been no showing made that the number of witnesses and documents that Nercon, along with Blue Chip, plan to produce substantially outweighs the number of plaintiff's witnesses and documents, which are located in New Jersey.[1] Litigating this matter in New Jersey would require Blue Chip and Nercon to suffer the burden of producing witnesses and documents in New Jersey—including suffering concomitant business disruptions—but litigating this matter in Wisconsin would require Garvey Corp. to suffer the same burden and business

---

[1] In Blue Chip's interrogatory responses, eight witnesses are identified: three from Wisconsin, two from New Jersey, and three independent witnesses (one from Minnesota, one from New Jersey, and one whose address is unknown).

disruptions. This Court cannot say that either scenario is substantially more inconvenient.

The costs and difficulties associated with production of witnesses and documentary

evidence have not been shown to be unbalanced.

   The relative subpoena powers of the respective courts is also a factor in the

venue analysis. The only identified witnesses who are not employees of a party (and who,

therefore, would have to be subpoenaed) are a General Mills representative from

Minnesota and a representative from New Jersey National Bank in New Jersey. The New

Jersey witness clearly would be under the subpoena power of this Court, see Fed. R. Civ.

P. 45(b)(2), but there is no showing that either the New Jersey witness or the Minnesota

witness would be under the subpoena power of the Eastern or Western District of

Wisconsin. This factor thus weighs in favor of retaining this case in federal court in New

Jersey.

   Blue Chip and Nercon make much of the fact that the "center of gravity" of

this dispute is in Wisconsin, citing Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. 473,

481-82 (D.N.J. 1993). The Ricoh court explained that in patent infringement actions, "as

a general rule the preferred forum is that which is the *center of gravity* of the accused

activity." Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. 473, 481-82 and n. 17 (D.N.J.

1993) (quoting S.C. Johnson & Sons, Inc. v. Gillette Co., 571 F. Supp. 1185, 1188 (N.D.

Ill. 1983)). In finding that center of gravity, "a district court 'ought to be as close as

possible to the milieu of the infringing device and the hub of activity centered around its

*production.*'" Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. at 481 n. 17 (quoting S.C.

Johnson & Sons, Inc., 571 F. Supp. at 1188) (emphasis added by the Ricoh court).

"Appropriate considerations include the location of a product's development, testing,

research and production." Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. at 481 n. 17.

"Also relevant is the place where marketing and sales decisions were made, rather than

where limited sales activity has occurred." Id.

      Blue Chip and Nercon argue that not only do both defendants reside in

Wisconsin, but the design, manufacture and sale of the allegedly infringing accumulator

cover took place at Nercon's facility in Wisconsin. The consulting activities of Blue Chip

in disseminating the allegedly infringing drawings took place in Wisconsin. None of those

efforts took place in New Jersey. Because the "center of gravity" of this dispute lies in

Wisconsin, Defendants argue, the interests of justice warrant a transfer to Wisconsin.

      This Court does not believe, however, that the "center of gravity" inquiry

imposes any different considerations than those already set forth in the traditional

balancing of the private and public interests. As the court in Lucent Technologies, Inc. v.

Aspect Telecommunications Corp., 1997 WL 476356 (E.D. Pa. 1997), carefully

explained, those courts who use the "center of gravity" test, including the Ricoh court,

treat it only as a factor in determining what amount of weight to give to the plaintiff's

choice of forum when the plaintiff appears to have little or no contact with the chosen

forum. As explained by the Lucent Technologies court, in the usual case where the

plaintiff has brought suit in its home forum (like Garvey Corp. has done here), "[t]he

center of gravity test cannot be the predominant factor to consider in determining the

forum in patent infringement cases because the defendant would almost always be allowed to transfer the case to its home forum, thereby turning on its head the traditional notion expressed in Jumara, 55 F.3d at 879, that the plaintiff's choice of forum should not be lightly disturbed." 1997 WL 476356, *3. There are other reasons why the "center of gravity" test should not be the predominant factor in this venue analysis: (1) it gives no weight to the plaintiff's activities in inventing and licensing the patent; (2) there is no indication that in 28 U.S.C. §1400(b), Congress intended the "center of gravity" test to be the predominant factor in determining venue in patent infringement suits; (3) many courts do not refer to the "center of gravity" on venue questions in patent infringement actions; and (4) the considerations underlying the "center of gravity" test are already encompassed in a traditional §1404(a) analysis. See Id. at *2-3.

For those reasons, while the Court accepts that Wisconsin is the "center of gravity" of this lawsuit, that does not mean that transfer to Wisconsin is in the interests of justice where the plaintiff is an established business in New Jersey and has brought suit in its home forum and where the balance of the Gulf Oil and Jumara factors do not otherwise weigh strongly in favor of transfer. A transfer of venue under §1404(a) may only be granted where the defendant demonstrates that the balance of the convenience of the parties *strongly favors* the defendant. Transfer must be denied if it would simply shift the inconvenience from the defendant to the plaintiff. Shutte v. Armco Steel Corp., 431 F.2d 22, 24 (3d Cir. 1970); Clark v. Burger King Corp., 255 F. Supp. 334, 338 (D.N.J. 2003). Here, the defendants have shown only that—where venue is proper in both

locales—a transfer would shift the inconveniences to the plaintiff. That is not sufficient

for a finding that the "interests of justice" warrant a transfer to Wisconsin. Accordingly,

Blue Chip's alternative request to transfer this action to the Western District of Wisconsin

pursuant to §1404(a), and Nercon's motion to transfer this action to the Eastern District of

Wisconsin pursuant to §1404(a) will be denied.


## III. MOTION TO AMEND THE COMPLAINT

Garvey Corp. seeks to amend the complaint pursuant to Fed. R. Civ. P.

15(a) to add a claim for breach of contract against Defendant Nercon and to add a claim

for tortious interference with prospective contractual relations against Defendant Blue

Chip.

Ten years ago, on January 22, 1993, Garvey Corp. filed a lawsuit against

Nercon in this Court alleging infringement of a different patent, the "'207 Patent." The

'207 Patent protected a product accumulator, a device intended for use with a conveyor

belt. That lawsuit was resolved with the filing of a Consent Decree on October 19, 1993.

The Consent Decree required Nercon to forward drawings of any product accumulator to

Garvey Corp. before Nercon shipped the accumulator to customers, and enjoined Nercon

from making, using or selling product accumulators covered by any of the claims of the

'207 Patent. According to Garvey Corp., the Consent Decree provided that this Court

would retain jurisdiction for the purposes of enforcing and interpreting its terms.

In the proposed amendment in this litigation, Garvey Corp. claims that Nercon has violated the terms of the Consent Decree by producing a product accumulator covered by the Consent Decree without forwarding the drawings to Garvey Corp. Neither in its proposed amendment or in its briefing on the motion to amend does Garvey Corp. identify the time period during which Nercon is alleged to have engaged in this conduct.

As for Garvey Corp.'s proposed claim against Blue Chip for tortious interference with prospective contractual relations, Garvey Corp. rests this amendment on the following facts. In the spring of 2002, Yoplait (a division of General Mills, Inc.) requested that Blue Chip prepare and distribute bid packages for the manufacture of an accumulation table for Yoplait's plant in Carson, California. In April 2002, at a meeting in California between representatives of Garvey Corp., General Mills, and Blue Chip to discuss a possible contract for Garvey Corp. to manufacture additional equipment for Yoplait's California facility, Michael Keough, president of Blue Chip, allegedly falsely disparaged Garvey Corp. in front of the General Mills representative, causing Garvey Corp. to lose potential contracts with Yoplait.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given as justice so requires." Consistent with this standard, the Third Circuit has shown a strong liberality in allowing amendments under Rule 15 in order to ensure that claims will be decided on the merits rather than on technicalities. See Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000); In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). The United States

Supreme Court has stated that although the grant or denial of leave to amend is in a

court's discretion, leave should be denied only in certain circumstances, including undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by

virtue of allowance of the amendment, or futility of the amendment. Foman v. Davis, 371

U.S. 178, 182 (1962).

This Court will deny Garvey Corp's proposed amendment. Although Fed. R.

Civ. P. 18 permits litigants to join all claims they have against an opposing party in one

pleading, the addition of two completely unrelated claims to this patent infringement case

at this late date will result in undue delay and prejudice to the defendants. There appear to

be no facts, evidence or legal theories in common between the existing claims and the

proposed new claims. The time frames and locations of the occurrences vary

widely—from breach of an unrelated Consent Decree that was entered more than ten

years ago to a meeting that took place in California almost two years ago—which raise

issues of statutes of limitations and venue, the litigation of which would significantly

delay this case. Given that this case has already been stalled in unsuccessful mediation for

over a year, the delay occasioned by the insertion of these issues would be undue.

Moreover, forcing each defendant to engage in factual discovery on claims that do not

concern the other, including at least some discovery that would take place in California,

after the defendants have spent more than a year getting acquainted with the factual and

legal issues of this lawsuit, would prejudice those defendants. Such prejudice is not

justified by the liberal pleading standards of Rule 15 where the plaintiff has not explained

why it did not bring, or could not have brought, the proposed new claims at the same time

it filed the original complaint.[2]

        Accordingly, because the proposed amendments would result in undue

delay and prejudice, the Court exercises its discretion and denies Garvey Corp.'s motion

for leave to file an amended complaint.[3] This case will proceed to adjudication on the

merits.

---

   [2] Blue Chip also makes a persuasive argument that the proposed claims are not candidates for an exercise of this Court's supplemental jurisdiction under 28 U.S.C. §1367 because the new claims do not "derive from a common nucleus of operative facts," which is required to append state claims to federal claims. See MCI Telecomm. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1102 (3d Cir. 1995). However, there is no need to resort to Section 1367 if the proposed claims would otherwise be within this Court's original jurisdiction. Because there appears to be diversity of citizenship among the parties, the new claims may very well be within this Court's diversity jurisdiction under 28 U.S.C. §1332, although there is no amount in controversy stated. The Court does not explore this argument further, since it denies the proposed amendment on other grounds.

   [3] Garvey Corp. moves for leave to file a supplemental brief on its motion to amend in order to respond to the defendants' argument that Garvey Corp. lacks standing to sue for patent infringement because it assigned its patent to a New Jersey Bank. This Court finds that the issue of whether there was a valid assignment of Garvey's patent is heavily fact-laden (as demonstrated by the conflicting documentary evidence that the opposing parties submitted) and inappropriate for disposition on this motion. Because the Court has denied Garvey Corp.'s motion to amend on different grounds, the issue of whether Garvey Corp. lacks standing to bring its original claims on the grounds of patent assignment is not relevant here and will be left to future motion or trial. Thus, Garvey Corp.'s motion to file a supplemental brief on this issue will be **DISMISSED AS MOOT.**

IV.  **CONCLUSION**

        For the reasons expressed above, the motions to dismiss and to transfer venue are denied, and the motion to file an amended complaint is denied.




                                      s/Robert B. Kugler               
                                      ROBERT B. KUGLER
                                      United States District Judge

(Docket Entry Nos. 20, 22, 25, 37)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

GARVEY CORPORATION,

        Plaintiff,

      v.                       Civil No. 02-3886 (RBK)

BLUE CHIP ENGINEERING, INC.,
NERCON ENGINEERING and
MANUFACTURING, INC.,

        Defendants.

### O R D E R

THIS MATTER having been brought before the Court by the parties upon several motions; and the Court having considered the moving papers, and the opposition thereto; and for the reasons expressed in the Opinion issued this date;

IT IS this **26th day of January, 2004** hereby

**ORDERED** that Plaintiff's Motion for Leave to file an Amended Complaint [docket entry no. 20] **DENIED**; it is

**FURTHER ORDERED** that Defendant Nercon Engineering and Manufacturing, Inc.'s Motion to Transfer Venue [docket entry no. 22] is **DENIED**; it is

**FURTHER ORDERED** that Defendant Blue Chip Engineering, Inc.'s Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer Venue [docket

entry no. 25] is **DENIED**; it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File a

Supplemental Brief [docket entry no. 37] is **DISMISSED.**




s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge

cc: Hon. Ann Marie Donio