# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CROSS ATLANTIC CAPITAL | : | |
| PARTNERS, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.: 07-CV-02768 |
| | : | |
| vs. | : | HON. JOHN R. PADOVA |
| | : | |
| FACEBOOK, INC. and | : | |
| THE FACEBOOK, LLC, | : | |
| | : | |
| Defendants. | : | |

### PLAINTIFF CROSS ATLANTIC CAPITAL PARTNERS, INC.'S MEMORANDUM IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION

Thomas J. Duffy, Esquire (PA ID # 34729)
Patrick J. Keenan, Esquire (PA ID # 53775)
**Duffy & Keenan**
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, Pennsylvania 19106
(215) 238-8700
(215) 238-8710 (Fax)

Frederick A. Tecce, Esquire
**McShea\Tecce, P.C.**
The Bell Atlantic Tower - 28th Floor
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 599-0800
(215) 599-0888 (Fax)

Counsel for plaintiff
Cross Atlantic Capital Partners, Inc.

Dockets.Justia.com

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.   Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   Claim Construction Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.   The Court Should Construe The Claims
            With Reference to the Accused Product . . . . . . . . . . . . . . . . . . . . . . . 5

       C.   The Court May Consider Extrinsic Evidence . . . . . . . . . . . . . . . . . . . 6

IV.    Claim Construction Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.   Intrinsic Evidence that the Court Should Use
            to Construe the Claims of the '629 Patent is Limited
            to the Claims and the Specification . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.   The Accused Device . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       C.   XACP Proposed Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.   Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.   Creating a Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            3.   Creation Transmission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            4.   Registered User . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            5.   Create a Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

6.   Community Identification Information . . . . . . . . . . . . . . . . . . . . . 18

7.   Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8.   Application Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9.   Communications Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

10.  Created Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11.  Transmitting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

12.  User Interface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

13.  Subscribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

14.  Subscription Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

15.  Published . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

16.  Community Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

17   Community Fields . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18.  User Fields . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

19.  Vendor Fields . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

20.  Receiver Module . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

21.  Creation Module . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

22.  Subscription Module . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

23.  Subscribing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

24.  Selecting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

25.  Community is Created . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

26.  Transmitter Module . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

27.    Display Module  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

IV.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

*Digital Biometric, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Heraeus Electro-Nite Co. v. Midwest Instrument Company, Inc.,*
    WL 3274147 (E.D.Pa., Nov. 1, 2007) (Padova, J) . . . . . . . . . . . . . . . . . . . . . . . 4

*Kumar v. Ovonic Battery Co., Inc.* 351 F.3d 1364
    (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Liebel-Flarsheim Company v. Medrad, Inc.,* 358 F.3d 898 (Fed. Cir. 2004) . . . . . . . . 51

*Markman v. Westview Instrs.,* 52 F.3d 967
    (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.,*
    474 F.3d 1323 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*North American Container, Inc. v. Plastipak Packaging, Inc.,*
    415 F.3d 1335 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 38, 49

*Phillips v. AWH Corp,* 415 F.3d 1303 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
    182 F.3d 1298 (Fed. Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Smithkline Beecham Consumer Healthcare, L.P. v. Colgate Palmolive Co.,*
    No. 99-2533, 1999 WL 1246924, * 2 (E.D. Pa., Dec. 22, 1999) . . . . . . . . . . . . 6

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . 4, 5

*Wilson Sporting Goods Co. v. Hillerich & Bradsby,* 442 F.3d 1322 (Fed. Cir. 2006) . . 6

# I.    INTRODUCTION

Plaintiff Cross Atlantic Capital Partners, Inc. ("XACP") has brought this action against defendants Facebook, Inc. and Thefacebook, LLC (collectively "Facebook" or "Defendants") for their infringement of the claims of United States Patent No. 6,519,629 B2 ("'629 Patent"), entitled System for Creating a Community for Users with Common Interests to Interact In. Cmpl., at Count I ¶¶ 22-30. (A copy of the '629 Patent is attached hereto as Exhibit A). To avoid infringement, the Defendants have proposed claim constructions which: (1) unsupportably narrows the scope certain claim terms to exclude their accused device from the claim scope, and (2) unsupportably broadens other claim terms in an attempt to invalidate the claims by capturing the prior art within the claim scope.

The claims of the '629 Patent represent specific groundbreaking technology conceived almost six years before Facebook was even formed. This Court is respectfully requested to reject defendants' proposed claim constructions and adopt those proposed by plaintiff XACP as set forth herein.

# II.    BACKGROUND

## A.    Procedural Background

This case was commenced on July 3, 2007 when XACP filed its complaint for patent infringement. On July 20, 2007, the summons and complaint were served on Facebook. (D.E. # 6.). On August 15, 2007, this Court approved the parties' stipulation extending the time for Facebook to answer or otherwise plead until September 4, 2007.

(D.E. # 14.)

On September 4, 2007, Facebook answered and counterclaimed seeking a declaration of non-infringement and invalidity regarding the '629 Patent. (D.E. # 16.). On September 10, 2007, Facebook filed a motion to transfer venue. (D.E. # 23). On September 24, 2007, XACP filed its response in opposition to Facebook's motion to transfer (D.E. # 31). The Court denied Facebook's motion to transfer venue on September 28, 2007 (D.E. # 33).

On September 24, 2007, this Court conducted a Preliminary Pretrial Conference. (*See*, Report at D.E. # 32). On October 15, 2007, the Court entered its Pretrial Scheduling Order, which set a Markman hearing for January 25, 2008 at 10:00 a.m. in Courtroom 17B. (D.E. # 36).

On October 26, 2007, in accordance with the Court's 10/15/07 Schedule Order, XACP served Defendants with a copy of the claim terms which XACP contended should be construed and plaintiff's proposed definitions. A copy of XACP's proposed claim constructions are attached hereto as Exhibit B. On December 10, 2007, Defendants served plaintiff with a copy of defendants' proposed claim construction. A copy of Facebook's proposed construction is attached hereto as Exhibit C.

The Pretrial Scheduling Order also required submission of XACP's claim construction brief twenty-eight days before the hearing. 10/15/07 Scheduling Order at ¶ 4 (D.E. # 20).

## B.    Factual Background

For the purposes of claim construction, this Court need focus on the intrinsic record, *i.e.* the '629 Patent and its specification.  The following factual background places the intrinsic record in context and will be proven at trial.

In the late 1990's, iKimbo, Inc. ("iKimbo") was formed to develop and commercialize the novel and ground-breaking technology conceived in large part by James Harvey ("Harvey").  This technology includes, *inter alia*, systems and methods for creating an on-line community for users with common interests.  On September 15, 1998, the inventors filed the original application that eventually matured in United States Patent No. 6,519,629 B2 ('629 Patent").

As with most start-up companies, iKimbo needed capital.  In or about 2002, XACP managed two funds known as "Cross Atlantic Technology Fund" ("XATF") and "The Co-Investment 2000 Fund" ("CI2K").  In or about 2002, iKimbo sought capital from those funds to finance its efforts to develop, market and commercialize Harvey's novel inventions.  On February 11, 2003, the United States Patent and Trademark Office issued the '629 Patent to Harvey and the other inventors, and XACP is the present assignee of the Patent.

## III.    CLAIM CONSTRUCTION PRINCIPLES

### A.    Introduction

Construction of patent claims is a matter of law exclusively for the Court to decide.  *Markman v. Westview Insts., Inc.*, 52 F.3d 967, 977 (Fed Cir. 1995), *aff'd.,* 517

U.S. 370 (1996); *Heraeus Electro-Nite Co. v. Midwest Instrument Company, Inc.*, 2007 WL 3274147 (E.D. Pa., Nov. 1, 2007) (Padova, J).  Importantly, claims "should be so construed, if possible, as to sustain their validity." *Phillips  v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (*en banc*), *cert. denied*, 546 U.S. 1170 (2006)(citing *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)).

The Court must first look to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim construction "begins and ends in all cases with the actual words of the claim...." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248-49 (Fed. Cir. 1998).  "The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998).

The words of the claim are to be given their "ordinary and accustomed meaning," absent a special definition spelled out in the specification or prosecution history by the patent applicant.  *Renishaw,* 158 F.3d at 1248-49.  The "ordinary" meaning is determined according to an objective standard: "what one of ordinary skill in the art at the time of the invention would have understood the term to mean."  *Markman*, 52 F.3d at 986; *see also Phillips*, 415 F.3d at 1313.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*  Thus, while the claims themselves provide "substantial guidance" as to the meaning of claim

terms, the claims "must be read in view of the specification of which they are a part."

*Phillips*, 415 F.3d at 1315 (citing *Markman*, 52 F.3d at 979). The specification is

"always highly relevant to the claim construction analysis. Usually, it is dispositive; it is

the single best guide to the meaning of a disputed term." *Id.* at 1315 (*quoting Vitronics*,

90 F.2d at 1582).

    In addition to the words of the claims themselves and the specification, intrinsic

evidence on which courts rely includes the prosecution history of the patent and prior art

cited during the prosecution of the patent. *Phillips*, 415 F.3d at 1317 (courts look to the

prosecution history to inform the "ordinary and accustomed" meaning of claim terms, as

well as limit the scope of the claims); *Kumar v. Ovonic Battery Co., Inc.* 351 F.3d 1364,

1368 (Fed. Cir. 2003) ("[w]hen prior art that sheds light on the meaning of a term is cited

by the patentee, it can have particular value as a guide to the proper construction of the

term, because it may indicate not only the meaning of the term to persons skilled in the

art, but also that the patentee intended to adopt that meaning") (internal quotations and

citations omitted).

**B.    The Court Should Construe The Claims
        With Reference to the Accused Product**

    The Federal Circuit has held that "in reviewing claim construction in the context

of infringement, the legal function of giving meaning to claim terms always takes place in

the context of a specific accused infringing device or process." *Wilson Sporting Goods

Co. v. Hillerich & Bradsby*, 442 F.3d 1322, 1326 (Fed. Cir. 2006). The Federal Circuit

has further noted that knowledge of the accused product or process provides "meaningful context" for the first step of the infringement analysis - - claim construction. *Wilson Sporting Goods Co.*, 442 F.3d at 1326-27 (*citing Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476-78 (Fed. Cir. 1988)).

Although this Court's claim construction should be independent of the accused device, it is convenient for the Court to concentrate on those aspects of the claim whose relationship to the accused device is in dispute. *Wilson Sporting Goods Co.*, 442 F.3d at 1327 (citing *Pall Corp. v. Hemasur, Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999)).

## C.    The Court May Consider Extrinsic Evidence

Extrinsic evidence, such as expert testimony, technical treatises, and dictionaries, also may assist the court in construing the claims. *See Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1584 n.6 ("judges are free to consult such resources at any time... and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"); *Smithkline,* 1999 WL 1246924, at *2 ("[t]o perform claim interpretation, a court should consider: (I) the specification...; (ii) the patent's prosecution history, *i.e.*, the 'undisputed public record' of proceedings in the Patent and Trademark Office, which is of primary significance in understanding the claims; and (iii) any extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, provided that such evidence may not be used to vary or contradict the plain meaning of the terms of the claims") (citing *Markman*, 52 F.3d at 979-81) (Giles, J.).

Extrinsic evidence is most useful to bridge the gap between the judge's existing knowledge of the technology and the inventions disclosed in the patent, but it may never be used to contradict the intrinsic evidence by changing the meaning of the claims. *See Phillips,* 415 F.3d at 1318.

## IV. CLAIM CONSTRUCTION ARGUMENTS

### A. Intrinsic Evidence that the Court Should Use to Construe the Claims of the '629 Patent is Limited to the Claims and the Specification

In construing the claims at issue, the Court should consider the claims and the specification, but not the prosecution history since it is irrelevant. The prosecution history includes the complete record of proceedings before the United States Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. *Phillips,* 415 F.3d at 1317. Thus, the prosecution history represents "an ongoing negotiation between the PTO and the applicant...." *Id.* at 1317. "The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Id., quoting Chimie v. PPG Industries, Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005).

There is no substantive evidence in the prosecution history upon which this Court need rely in connection with its claim construction of the claim terms at issue since the '629 Patent was not subject to a prior art rejection. Since there was no prior art rejection, the inventors never negotiated with the PTO or disclaimed any interpretations of the claims. More specifically, the original application which eventually matured in the '629

Patent was filed on September 15, 1998 and assigned Application Serial Number 09/264,988 ("'988 Application"). Copies of the relevant portions of the '629 Patent's file history are attached hereto as Exhibit D. On February 25, 2000, the inventors filed a continuation-part application which was assigned Application Serial No. 09/513,844 ("'844 Application"). On October 2, 2001, the inventors filed a divisional patent application which eventually matured into the '629 Patent. That application was assigned Application Serial No. 09/968,386 ("'386 Application").

Thereafter, on May 18, 2002, the PTO allowed all pending claims of the '386 Application over the prior art. In doing so, the PTO stated:

> The following is an examiner's statement of reasons for allowance: None of the prior art of record taken singularly or in combination teaches or suggest receiving a creation transmission from a registered user to indicate that the user desires to create a community, receiving a selection of at least one application object from the registered user, and creating a community based on community identification information received from the registered use and the at least one application object.

Exhibit D at Notice of Allowance (D-17). Significantly, at no time did the PTO ever reject any of the originally submitted claims of the '629 Patent over the prior art.

**B.     The Accused Product**

As noted above, the Federal Circuit has held that claim construction should be in the context of the accused infringing device. By understanding how Facebook's website operates, the Court can better understand Facebook's motivation for certain claim term definitions.

Facebook's website facebook.com describes itself as "a social utility that connects

people with friends and others who work, study and live around them." Facebook further describes its website as being "made up of many networks, each based around a company, region, or school," and encourages users to "[j]oin the networks that reflect your real-life communities to learn more about the people who work, live, or study around you." Through a method, facebook.com allows registered users to create "Groups" through which users with common interests can interact in, and such interests are categorized by Facebook as including, but not limited to, business, activities, age, gardening, history, languages, philosophy, politics, science, travel, wine, geography, music, and sports and recreation. It is Facebook's Groups application that infringes the claims of the '629 Patent. Recognizing the obviousness of it infringement, Facebook has very recently changed its Groups application in a unsuccessful attempt to avoid infringement.

Facebook's method for creating Groups and inviting others to join the Group is essentially as follows:

- The Facebook user registers on facebook.com by providing, *inter alia*, his or her full name, affiliation, email address, password, and date of birth. *See* Exhibit E-1, which is a screen shot of a web page on facebook.com.

- The registered user, who desires to create a Group, clicks on a "Create a New Group" or "+Create a New Group" button on Facebook's website. *See* Exhibit E-2.

- An electronic form is displayed for the registered user to complete, and the form contains fields for the following Group identification information to be supplied by the registered user: group name, network, group description, group type, recent news, office, website, email, street, and city/town. *See* Exhibit E-3.

- Facebook receives a selection of at least one application object from the registered user through an electronic form which contains fields that permit the selection of at least one of the following application objects: "Related Groups," "Discussion Board," "The Wall," "Photos," "Videos," and "Posted Items." *See* Exhibit E-3 (since this screen shot was taken, the Videos Posted Items application objects were added). Until very recently, the user would select the application object(s) he or she wanted to include in the new Group by checking a box next to each such application object. Just recently, Facebook changed this part of its method so that the user selects the application object(s) he or she does not want to include in the new Group by un-checking a box next to each such application object.

- After setting forth the Group identification information and selecting the at least one application object in the electronic form, the registered user clicks on a "Create Group" button. The website then informs the registered user that "Your group has been created." *See* Exhibit E-4.

- After the new Group is created, the user can invite members to join the Group. Through an electronic form, facebook.com prompts the registered user to "Invite people who are not on Facebook Via Email: (Enter emails separated by commas)." After the registered user sets forth an email address in the form, Facebook prompts the registered user to click on an "Add" button. *See* Exhibit E-5.

- After the registered user clicks on the "Add" button, the website acknowledges receipt of the email address by removing the email address from the previously populated field entitled "Invite people who are not on Facebook Via Email: (Enter emails separated by commas)," informing the registered user that "1 person has not been sent an invitation yet" and displaying the designated email addressee in the "Send Invitations" field, and prompting the registered user to click on a "Send Invitations" button. *See* Exhibit E-6.

- The registered user then clicks on the "Send Invitations" button, whereupon Facebook sends to the invited user's email address an email which includes an electronic link to the created Group. Upon clicking on the link, the Group is launched and transmitted to the invited user. At the Group web page, the invited user its then promoted to click on a "Join this Group" button. *See* Exhibit E-7 & 8.

Facebook's method for creating a Group and inviting others to join the Group infringes claims 1-4, 9-12, 17-20, and 25-28 of the '629 Patent. Other aspects of Facebook's website infringe the remaining claims of the '629 Patent.

## C.  XACP's Proposed Definitions

Claim 1 of the '629 Patent reads:[1]

1.     A method for ==creating a community== for users with common interests to interact in, the method comprising the steps of:

receiving a ==creation transmission== from a ==registered user==, the creation transmission indicating that the registered user desires to ==create a community==;

receiving ==community identification information== from the registered user;

receiving a ==selection== of at least one ==application object== from the registered user;

creating a community based on the community identification information and the at least one application object;

receiving at least one ==communications address== designated by the registered user, the at least one communications address corresponding to a user to receive a ==created community;== and ==transmitting== the created community based in part on the at least one communications address.

Exhibit A at Col. 330, line 65 - Col. 31, line 17.

### 1.     Community

The term "community" is used independently or as a part of a phrase in most of

the 32 claims of the '629 Patent, including Claim 1, and should therefore be separately

construed by the Court.  As noted above, the specification is "the single best source" of

the meaning of the claim term at issue and is "usually dispositive." *Phillips,* 415 F.3d at

1315 (The specification is "always highly relevant to the claim construction analysis.

---

[1]     The specific claim elements subject to construction are hi-lighted to identify their relationship to the remainder of the claims.  *North American Container, Inc. v. Plastipak Packaging, Inc.,* 415 F.3d 1335, 1344-1345 (Fed. Cir. 2005) (terms must be construed with reference to the other words in the claim)(citations omitted).

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")(citing *Vitronics*, 90 F.2d at 1582).

The specification of the '629 Patent instructs that the term "community" means *information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.* For example, the specification states:

> According to an example, a ***community*** entitled "The XYZ Softball Team" may be created, where information about the XYZ Softball team, including a schedule of games, player statistics, and other information, is presented. A creator may determine that only members of the XYZ Softball team should be able to access the community.

Exhibit A at Col. 11, line 66 through Col. 12, line 4 (emphasis added).[2] Community is addressed in other parts of the specification:

> It is a still further object of the invention to provide a system and method for multi-user interaction and communication through a network which is directed to a specific transaction, interaction and/or interest.

Exhibit A at Col. 3, lines 15-18. The specification also notes that:

> According to an embodiment of the invention, ***community*** creating module **165** may provide the framework through which central controller module **115** interacts with a user to create a ***community***, and related applications and functions.

Exhibit A at Col. 7, lines 53-57 (emphasis added). Claims 1, 9, 17 and 25 also teach that

---

[2]     The term subject to construction will be set in bold/italic type. However, the citations will not indicate "emphasis added."

a community has at least one function.  Exhibit A at Col. 31, lines 6-10; Col. 32, lines 6-14; Col. 33, lines 7-8; Col. 34, lines 4-5.  Finally, the specification teaches that a community can be in the form of web pages on an Internet site.

> Returning to **Fig. 11**, at step **805**, the user establishes a connection to a community with central controller **805**.  This can be accomplished through the use of an invitation application as described above or through browser access to an appropriate website.

Exhibit A at Col. 29, lines 56-60; *see also* Col. 7, lines 59-60 ("According to another embodiment of the invention, community creation may comprise a web-based creation.").

Accordingly, based upon the specification's use of the term and its ordinary and recognized meaning, the Court should adopt XACP's claim construction of "community" as follows:

> Information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.

Defendants have defined the term "community" to mean:

> A virtual place or electronic medium where people having common interests can interact, which can be accessed by a computer or other device.

Exhibit C at 4.  However, the Defendants' proposed definition does not take into account the intrinsic record.  The terms "virtual place" and "electronic medium" do not appear anywhere in the '629 Patent, nor within the dictionary references that Defendants cite in their Proposed Claim Construction document (Exhibit C).  Accordingly, the Court should reject Defendants' proposed definitions for "community."

## 2. Creating A Community

The Preamble of Claim 1 indicates that the invention is a "method for creating a community." Terms in the preamble are generally not subject to interpretation unless it helps to give the claim meaning. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) ("Where that term appears in a claim preamble, it is 'necessary to give life, meaning, and vitality to the claim,' and may be used as a limitation") (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir.1999)). Here, interpretation of the phrase "creating a community" helps give meaning to the claim and should therefore be construed consistent with the above definition of "community" and the ordinary meaning of "create." Webster's New World Dictionary, Third College Edition (1994) defines the term "create" as: "To cause to come into existence; bring into being; make; originate." *See* Exhibit F at 325.[3] Accordingly, the Court should adopt XACP's claim construction of "creating a community" as follows:

<span style="color:red">The act or instance of causing to come into existence, bringing into being, making or originating information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.</span>

The Defendants have proposed the following definition:

<span style="color:blue">Bringing into being a virtual place or electronic medium where people having common interest can interact, which can be accessed by a computer or other device.</span>

---

[3]     The cover, Edition Page and relevant pages of Webster's New World Dictionary, Third College Edition (1994) is attached hereto as Exhibit F.

Exhibit C at 7.  However, the Defendants' proposed definition should be rejected by the Court for the reasons previously discussed in Section IV.C.1.

### 3. Creation Transmission

The next term to be construed ("creation transmission") is found in the first element of Claim 1 which reads:

> receiving a <mark>creation transmission</mark> from a registered user, the creation transmission indicating that the registered user desires to create a community;

Exhibit A at Col. 31, lines 1-3.   The claims and specification teach that a "creation transmission" is an electronic transmission that is provided through a communications network and indicates a desire to create a community.  *See* Exhibit A at Col. 3, lines 9-37; Col. 7, lines 26-29; Fig. 2.[4]

Accordingly, based upon the ordinary and recognized meaning of the term "creating transmission" and the specification, the Court should adopt XACP's claim construction of "creation transmission" as follows:

> An electronic transmission through a private or public communication network indicating a request to create a community.

Defendants have defined this term as:

> An electronic signal indicating a request to create a community.

Exhibit C at 7.  However, the Defendants' proposed definition improperly narrows the

---

[4] As is discussed in Section IV.C.11,  Plaintiff XACP's proposed definition for the related term "transmitting" is electronically connecting, sending out and/or communicating by any wireless or wire mechanism.  Thus, there is no need to further define the word "transmission" in "creation transmission."

form of transmission to an electronic *signal*, which is unsupported by the specification or the ordinary use of the word. The specification does not disclaim that the transmission can also be in the form of data. Even in the only dictionary reference cited by Defendants' in their Proposed Claim Construction document, a "signal" is merely used as an example. *See* Exhibit C at 7. Accordingly, the Court should reject Defendants' proposed claim construction.

### 4. Registered User

The next term to be construed from the first element of Claim 1 is the term "registered user."

The term "user" is mentioned throughout the specification. For example, the specification identifies various aspects of the user in general, and a "registered user" in particular:

> A *user* provides *registration* information (e.g. full name, address, personal information, etc.) and forwards the information to the central controller.

Exhibit A at Col. 5, lines 3-5. The specification further identifies this term:

> In either case, on the *user's* first visit, the user is prompted to *register*, and does *register* with the service via central controller at steps **535** and **540** so that information can be gathered as necessary prior to game play. A *registration* form (or other means of providing the requested information) is completed by the *user* and may be sent by client **110** to central controller module **115** at step **545**.

Exhibit A at Col. 27, lines 1-7. Accordingly, based upon the use of these terms in the specification, the Court should adopt XACP's claim construction of "registered user" as follows:

<p style="text-align:center; color:red;">A user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller.</p>

The Facebook defendants have proffered the following definition:

<p style="text-align:center; color:blue;">A user who has provided, at least once, registration information (e.g., name, address, personal information, etc.)</p>

Exhibit C at 9. However, the Defendants' proposed definition fails to account for where or to whom the registration information is provided. The specification makes clear the registration information is provided to a controller of the community. Thus, the Court should reject Defendants' proposed construction.

### 5.    Create A Community

The last term of the first element of Claim 1 of the '629 Patent which must be construed is the term "create a community."

As set forth in Section IV.C.1 above, the specification defines the term "community" as *information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.* (*See*, Exhibit A at Col. 3, lines 15-18; Col. 11, line 66 through Col. 12, line 2). Furthermore, the ordinary meaning of "create" is " to cause to come into existence; bring into being; make; originate." Webster's New World Dictionary, Third College Edition (1994) at 325. (Exhibit F at 325). Accordingly, based upon the specification and confirmed by the ordinary and

<p style="text-align:center;">-17-</p>

recognized meaning of the terms, the Court should adopt XACP's claim construction of "create a community" as follows:

<div style="color: red; text-align: center">
To cause to come into existence, bring into being, make or originate information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.
</div>

The Defendants have proposed the following definition:

<div style="color: blue; text-align: center">
To bring into being a virtual place where people having common interest can interact, which can be accessed by a computer or other device.
</div>

Exhibit C at 6. However, the Defendants' proposed definition should be rejected by the Court for the reasons previously discussed in Section IV.C.1.

### 6. Community Identification Information

The second element of Claim 1 of the '629 Patent reads:

receiving community identification information from the registered user;

Exhibit A at Col. 31, lines 4-5. This Court should construe the term "community identification information" consistent with its use in the specification.

The specification provides clear instruction on the meaning of this term:

At step **202**, a creator provides *community identification information* to a central controller module **115**. *Community identification information* may comprise a community name, description, search tags, keywords, and topline key. By way of example, a creator may name a community and provide a brief description, such as naming the community the "Omaha Sailing Club" and may describe the community as a group of sailors in the greater Omaha, Nebr. area who have an interest in sailing and following sailing events. A creator may further designate appropriate keyword(s), metatag(s), search tag(s), and/or other classifications for a community . . . *Community identification information* may further comprise information about the creator, such as name, address, personal information, and

other creator information.  ***Community identification information*** may also comprise computer information, such as electronic identifier (e.g., cookies, computer identification number, etc.) and other information about the computer.  Other ***community identification information*** may also be requested.

Exhibit A at Col. 7, line 61 through Col. 8, line 13.  Accordingly, based upon the ordinary and recognized meaning of the term "community identification information" and the specification, the Court should adopt XACP's claim construction of "community identification information" as follows:

<span style="color:red">Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information.</span>

Defendants have proposed the following definition:

<span style="color:blue">Information that identifies a community.</span>

Exhibit C at 5.  However, the Defendants' proposed definition fails to consider the context of the intrinsic record and the use of the term in the claims and specification.  The intrinsic record does not teach that "community identification information" is information being received by a registered user about ***any*** community.  To the contrary, it teaches that the information is about the community ***being created***.  Accordingly, the Court should reject Defendants' proposed claim construction.

### 7.    Selection

The next claim element in Claim 1 reads:

receiving a <mark>selection</mark> of at least one application object from the registered user;

Exhibit A at Col. 31, lines 7-8.  The parties agree that the claim term "selection" should

-19-

be defined as follows:

<p style="text-align:center; color:red;">One or more things that have been chosen.</p>

*See* Exhibit C at 10; Exhibit F – Webster's New World Dictionary, Third College Edition (1994) at 1216.

### 8. *Application Object*

The next claim element in Claim 1 reads:

receiving a selection of at least one application object from the registered user;

Exhibit A at Col. 31, lines 7-8. This Court should construe the term "application object" as it is understood in the art and consistent with its use in the intrinsic record.

The specification provides guidance regarding the term "application object:

It is another object of the invention to provide a system and method which enables creation and distribution of ***application objects*** which direct the user to specific information.

Exhibit A at Col. 3, lines 21-22. Further support is found at Col. 9, line 15, "... a configuration editor may present various standard community templates and ***application objects*** (or "functions") to build a community... ." The claims and specification identify examples of application objects, including those that enable chat or the viewing photographs. *See* Exhibit A at Col. 9, lines 15-24; Col. 16, line 65 through Col. 19, line 23; Col. 25, lines 15-16; Claims 4, 12, 20 and 28.

This intrinsic evidence is consistent with the following Webster's New World Computer Dictionary definition of the term "application":

A program that enables a user to do something useful with the computer, such as

writing or accounting (as opposed to utilities, programs that help the user maintain the computer.

Exhibit G - Webster's New World Computer Dictionary 10th Ed., 2003 at 23.[5]

Accordingly, based upon the specification's clear use of the term and its ordinary and recognized meaning, the Court should adopt XACP's claim construction of "application object" as follows:

A computer program or module that may function to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, scheduling, pledging, viewing a photo album, a shopping cart, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.

Defendants have proposed the following definition:

A computer program or module that directs a user to specific information and/or enables a user to do something useful, including but not limited to JAVA, chat, scheduling, invitations, pledging, photo albums, shopping carts, instant messaging, navigating, searching addresses, news groups, announcements, white boards, calendars, video conferencing, video chat, voice chat, e-mail lists, and/or bulleting boards.

Exhibit C at 3. Although very similar to XACP's proposed definition, the Defendants' proposed definition should be rejected by the Court since it improperly limits the function of the application object (*i.e.,* computer program) to directing a user to specific information and/or enables a user to do something useful. Such a limitation is unsupported by the specification. To the contrary, as is properly encompassed in XACP"s definition, a computer program may be an application object so long as it ***may***

---

[5]     Copies of relevant portions of the Webster's New World Computer Dictionary is attached hereto as Exhibit G.

*function* to direct a user to specific information and/or enables a user to do something useful.

### 9.    Communications Address

The last limitation of claim 1 of the '629 Patent reads:

> receiving at least one <mark>communications address</mark> designated by the registered user, the at least one communications address corresponding to a user to receive a <mark>created community;</mark> and <mark>transmitting</mark> the created community based in part on the at least one communications address.

Exhibit A at Col. 31, lines 11-15.  In connection with this last limitation, the Court must construe three terms: "communications address;" "created community;" and "transmitting."

The first of these terms is "communications address."  Again, the specification provides a clear teaching as to the meaning of this term:

> Upon creating the community, the creator designates other users to access the community.  The application accesses the creator's locally stored ***communications address*** book, such as e-mail address book, or retrieves a centrally stored ***communications address*** book from the central controller, and presents the contents to the creator.
>
> <center>* * *    * * *    * * *</center>
>
> A user may provide certain information to allow for identification.
>
> <center>* * *    * * *    * * *</center>
>
> A creator may further provide a ***communications address***, such as an e-mail address, to allow an invitation and a executable application to launch the community to be sent to one or more users.  According to an embodiment of the invention, the community client application operating on the creator's computer may access the creator's locally stored ***communications address*** book (e.g., e-mail, address book), or the central controller module **115** may access the creator's centrally stored address book.
>
> <center>* * *    * * *    * * *</center>
>
> An invitation application may be sent to an invited user via a transmission using an appropriate ***communications address***, such as an e-mail address.

Exhibit A at Col. 4, lines 48-51; Col. 12, lines 59-65; Col. 12, lines 45-46; and Col. 15, lines 36-37.

The above intrinsic evidence is consistent with the following Webster's New World Computer Dictionary definition of the term "address":

> The precise location of some type of resource (such as a file, a website, or storage space) in a computer system or network. See *memory address*; In e-mail, an e-mail address; In the Internet, the location of a host on the network. See *IP address*.

Exhibit G at 13 (defining "address"). Accordingly, based upon the use of the term in the specification and its ordinary meaning, the Court should adopt XACP's claim construction of "communications address" as follows:

> The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

Defendants have proposed the following definition:

> Information that specifies the precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

Exhibit C at 4. Defendant's proposed definition does not appear to materially differ from that proposed by XACP. Nonetheless, the specification and the ordinary meaning of the term teaches that a communication address is, for example, an actual e-mail address and not information about the e-mail address. Thus, Defendants' proposed claim construction should be rejected.

## 10. Created Community

The second term of this last element in Claim 1 which must be construed is "created community."

As set forth in Section IV.C.1 above, the specification defines the term "community" as *information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site.* (*See*, Exhibit A at Col. 3, lines 15-18; Col. 11, line 66 through Col. 12, line 2). Furthermore, the ordinary meaning of "create" is " to cause to come into existence; bring into being; make; originate." Webster's New World Dictionary, Third College Edition (1994) at 325. (Exhibit F at 325). Accordingly, based upon the specification and confirmed by the ordinary and recognized meaning of the terms, the Court should adopt XACP's claim construction of "created community" as follows:

> Information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site, that was caused to come into existence, brought into being, made or originated.

The Defendants have proposed the following definition:

> A virtual place or electronic medium where people having common interest can interact, which can be accessed by a computer or other device, which has been brought into being.

Exhibit C at 6. However, the Defendants' proposed definition should be rejected by the

-24-

Court for the reasons previously discussed in Section IV.C.1.

### 11. Transmitting

The last term to be construed from the final element of Claim 1 of the '629 Patent is the term "transmitting," *i.e.,* "transmitting the created community based in part on the at least one communications address." The intrinsic and extrinsic evidence supports the term "transmitting" being defined as *electronically connecting; sending out and/or communicating by any wireless or wire mechanism.*

The specification provides insight into the meaning of the term "transmitting," including that an electronic connection through an Internet browser between a client (e.g., a personal computer [6]) and a created community being stored by a central controller module (e.g., multiple server computers configured to appear to the client as a single resource [7]) is within the scope of the claim term. For example, the specification and Fig 1 teach that created communities "may be stored in data storage module **160**," and that a "[c]entral controller module **115** may communicate with a number of data storage modules **160**." The central controller module also administers the community that it is hosting. Col. 7, 1-24; Fig. 1.

The specification also teaches that a transmission of a created community includes users linking to a created community through an electronic connection with the hosting

---

[6] *See* Col. 5, lines 41-50.

[7] *See* Col. 6, lines 22-24.

central controller module.  More specifically, the specification provides:

> It is another object of the invention to provide a system and methodology for invoking an invitation application to simplify the creation of and allow the widespread and rapid distribution of an ***electronic connection between a plurality of users through an on-line community*** associated with a user interest.

Exhibit A at Col. 3, lines 23-29 (emphasis added).  The specification also states:

> FIG. 1 illustrates and IADS **100** according to an embodiment of the present invention.  IADS **100** comprises multiple users **110** connected to Network **150** through multiple Connector Providers (CPs) **105**.  Network **150** may be any network that permits multiple users to ***connect*** and interact.  According to an embodiment of the invention, Network **150** may be a dedicated line to ***connect*** users, the Internet, an intranet, or any other type of network.  CP **105** may be a provider that ***connects*** a user to a network, According to an embodiment of the invention, CP **105** may be an Internet service provider, a dial-up access or other manner of ***connecting*** to a network.  In actual practice, there may be significantly more users ***connected*** to IADS **100** than shown.  This would mean that there would be additional users which are ***connected*** through the same CPs shown or through other CPs.  Nevertheless, for purposes of illustration, the discussion will presume four users **110** ***connected*** to Network **150** through two CPs **105**.

Exhibit A at Col. 5, lines 23-40 (emphasis added).  Other sections of the specification

provide further support:

> Communication module **180** may enable central controller module **115** to communicate with others. According to an embodiment of the invention, communication module **180** may comprise an email transfer application such as Sendmail, Postfix, or Q-Mail or the like.  Communication module **180** may further enable central controller module **115** to interact with users via user application objects, such as instant messaging.  ***Further, communications module 180 may enable central controller module  115 to interact with an Internet browser, such as Netscape Navigator®, Microsoft Internet Explorer®, or the like***.
>
>             ***    ***    ***
>
> An executable component may assist central controller module **115** in downloading a client application upon confirmation that installation should proceed. According to an embodiment of the invention, a client application may be downloaded while an invited user watches a tutorial. When the download is

complete, a user may have a link that has been associated on the user's computer. At step **270**, a user may launch a community, such as activating a link to launch a client application for a community. ***The link may designate information necessary for the invited client to connect to central controller module 115 and initiate the user into the community***.

<div align="center">***     ***     ***</div>

***In a preferred embodiment, the user next launches the invitation application (e.g. the executable component) which establishes a connection with central controller module 115. Central controller module 115 immediately initiates the community, or "lobby," executable and the user is placed in the community chat room*** (**530**). According to another embodiment, a user may be presented a dialog box instead of being placed in a chat room. The lobby serves as the entry point into the gaming environment. Alternatively, it is possible for the verification invitation application to be designed to automatically invoke the connection and launch the application upon successful verification.

<div align="center">***     ***     ***</div>

Returning to FIG. 11, at step **805**, ***the user establishes a connection to a community with central controller 805. This can be accomplished*** through the use of an invitation application object as described above or ***through browser access to an appropriate website***.

Exhibit A at Col. 6, lines 39-49; Col. 16, lines 26-35; Col. 26, lines 56-67; and Col. 29, lines 56-60 (emphasis added).

The use of the term "transmitting" in the specification is consistent with the recognized meaning of the term. Webster's New World Dictionary, Third College Edition (1994) defines the term "transmit" as:

> To send or cause to go from one person or place to another, esp. across intervening space or distance; transfer; dispatch, convey; to pass along; impart (a disease, etc.); to hand down to others by heredity, inheritance, etc.; to communicate (news, etc.); to cause (light, heat, sound, etc.) to pass through air or some other medium [the sun *transmits* heat and light]; to allow the passage of; conduct [water *transmits* sound]; to convey (force, movement, etc.) from one mechanical part to another; to send out (radio or television broadcasts, etc.) by electromagnetic waves; to send out radio or television signals.

Exhibit F at 1421 (defining "transmit").

Accordingly, based upon the use of this term in the specification consistent with the ordinary and recognized meaning, the Court should construe the term "transmitting" as follows:

<p style="color:red; text-align:center;">Electronically connecting; sending out and/or communicating by any wireless or wire mechanism</p>

The Defendants' proposed definition of "sending" should be rejected by the Court since it is overly narrow and inconsistent with the intrinsic record. Exhibit C at 11. As is described in Section IV.B, Facebook purportedly hosts on its servers all communities (Groups) that are created using its Groups application, and its users electronically connect to the Groups on those servers through an Internet browser. Thus, in an attempt to avoid infringement, Defendants erroneously argue that the term "transmitting" should be construed so that the entire created community (content and applications) must be sent to and then reside on a user's client computer. However, this is inconsistent with the preferred embodiments which teach that created communities may reside on the servers of the central controller module and that users may establish a connection to the communities through browser access to the central controller module's website. Accordingly, the Court should reject Defendants' overly narrow proposed claim construction.

### 12.    User Interface

Claim 2 of the '629 Patent reads:

The method according to claim **1**, wherein the step of transmitting the created community further comprises transmitting the created community and a user

interface.

Exhibit A at Col. 31, lines 17-20.  In connection with this element, the Court must

construe the term "user interface."  Support for this term can be found in the intrinsic

record at Figure 4 and Col. 5, lines 11-13 which states:

> Using the ***user interface***, the user can interact with the community through the
> central controller, other users, or both at appropriate times.

Exhibit A at Col. 5, lines 11-13.  The specification further reveals:

> The preferred embodiment of this feature of IADS **100** provides access to central
> controller module **115** via a ***user interface*** or other order entry system which
> interfaces through a community with vendors' fulfillment system.

Exhibit A at Col. 30, lines 21-24.

Moreover, the specification's use and definition of the term "user interface" are

consistent with the definition provided by Webster's New World Computer Dictionary:

> All the features of a program or computer that govern the way people interact with
> the computer.

Exhibit G at 387.  Accordingly, based upon the specification and the ordinary and

recognized meaning, the Court should construe the term "user interface" as follows:

> The junction between a user and a computer program, such as a set of
> commands or menus through which a user communicates with a program.

### 13.    Subscribe

Claim 5 of the '629 Patent reads:

The method according to claim **1**, further comprising the step of receiving a
selection to subscribe to at least one subscription object, wherein the at least one
subscription object is accessed through one of the at least one application object.

Exhibit A at Col. 31, lines 41-45. The Court should construe the terms "subscribe" and "subscription object," which are initially used in Claim 5, consistent with its use in the intrinsic record (specification) and as understood by those of ordinary skill in the art.

The specification defines the term "subscribed to" as:

A subscription object may be published (e.g., made available for others to access in a community) and ***subscribed*** to (e.g., selected to be accessed in a community). A user, upon entering a community, may access subscription objects and other content objects, which form the community. A user automatically received updated content objects as appropriate.

Exhibit A at Col. 19, lines 33-39. The specification further teaches that a subscription is not limited to a single community. *See* Exhibit A at Col. 20, lines 53-55 ("The user may 'publish' the subscription object[s] by permitting users of one or more communities to access the subscription object.").

Accordingly, based upon the specification, the Court should adopt XACP's claim construction of "subscribing" as follows:

<span style="color:red">Select to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities.</span>

The Defendants have proposed the following definition:

<span style="color:blue">To designate something to be interacted with and/or accessed in one or more communities.</span>

Exhibit C at 10. However, the Defendants' proposed definition should be rejected by the Court. The definition is inconsistent with the above referenced portions of the specification that define "subscribed to"as "***selected*** to be accessed in a community" and

not "designated," as Defendants request.

### 14.  Subscription Object

The other term to be construed in Claim 5 is "subscription object."  The

specification provides a clear and unambiguous meaning for the term:

> ***Subscription objects*** may be various objects, such as chat content, a product to purchase, a photograph file, or other item, which has been published by another user.

Exhibit A at Col. 9, line 66 through Col. 10, line 2.  The specification also notes:

> A community administrator may wish to place links directly to a ***subscription object*** within another community.  A community administrator may determine that another community has a particularly active chat room that my be of interest.  The administrator may create a link directly to that chat room, rather than the entrance of the community.  Finally, an administrator may also wish to create links originating from or pointing towards World Wide Web pages, or may incorporate some or all of a World Wide Web page directly into the community application.

Exhibit A at Col. 11, lines 8-16.  In fact, the specification has an entire section dedicated

to the description of "subscription objects."  That section indicates, *inter alia*, that:

> ***Subscription objects***, as set forth above, may be various objects, such as chat content, a product to purchase, a photograph file, or other item, which has been published by another user.  Publishing a ***subscription object*** enables others to subscribe to the ***subscription object***.

Exhibit A at Col. 19, lines 26-31.

Accordingly, based upon the clear use of the term in the specification, the Court

should construe the claim term "subscription object" as follows:

<p style="color:red; text-align:center;">An object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item.</p>

The Defendants have proposed the following definition:

<span style="color:blue">An item to which a user may subscribe, which may
comprise, but is not limited to, chat content, a publication, a product
to purchase, a photograph file, web page and/or other item.</span>

Exhibit C at 11. However, the Defendants' proposed definition should be rejected by the

Court. The definition is inconsistent with the above referenced portions of the

specification that teach that "subscription objects"are "objects" (not items) and that they

are "published," as defined below.

### 15. Published

Claim 6 of the '629 Patent is a dependent claim which relies upon Claim 1 and

reads:

> 6. The method according to claim **5**, wherein the at least one subscription
> object is <mark>published</mark> by at least one of:
>
> a) at least one other community;
>
> b) at least one other user; and
>
> c) at least one vendor.

Exhibit A at Col. 31, lines 46-50. The claim term which this Court must construe from

Claim 6 is "published." The definition for the term "published" is expressly set forth in

the specification:

> A subscription object may be ***published*** (e.g., made available for others to access
> in the community) . . .

Exhibit A at Col. 19, lines 33-34. The specification also teaches that a subscription

object may be "published" so that "users in one or more communities" may access it.

-32-

Exhibit A at Col. 20, lines 53-55.  Accordingly, based upon the express definition set forth in the intrinsic record (specification), this Court should construe the term "published" as follows:

<p style="text-align:center; color:red;">Made available for others to interact with<br>and/or access in one or more communities.</p>

The Defendants have proposed the following definition:

<p style="text-align:center; color:blue;">Made available to others.</p>

Exhibit C at 8.  However, the Defendants' proposed definition should be rejected by the Court since it is inconsistent with the specification and overly narrow.

### 16.    Community Information

Claim 8 of the '629 Patent is a dependent claim which relies upon Claim 1 and reads:

8.    The method according to claim **1**, wherein community information further comprises community fields, whereby the community presents to a user at least at least one of:

a)    at least one other user having user fields;

b)    at least one other community having community fields; and

c)    at least one vendor product having vendor fields; wherein the presentation is based in part on a comparison of user fields, community fields and vendor fields.

Exhibit A at Col. 31, lines 54-64.  There are four claim terms in Claim 8 subject to construction - "community information," "community fields," "user fields" and "vendor fields."  The first claim term in Claim 1 requires construction, but not by the Court, is

"community information."  The parties agree to the following definition of this claim

term:

<p align="center" style="color:red">Information associated with a community.</p>

*See* Exhibit C at 5.

### 17.    **Community Fields**

The second term of Claim 8 of the '629 Patent that requires construction is

"community fields."  This term is clearly defined in the specification in the following

manner with reference to FIG. 2:

> Additionally, at step **208**, a creator may designate ***community fields***.  ***Community fields*** may comprise a category or categories of interest, language, location, age group, and meta-tags of interest associated with the community, and may overlap with other identification information.

Exhibit A at Col. 8, lines 59-61.  The specification further provides:

> According to an embodiment of the invention, field matching results may be presented when a user enters a community, such as when a user enters (e.g., logs into) a community.  Field matching results may be presented to the user.  By way of example, a user may enter the "Omaha Sailing Club" community and be presented with vendor fields and ***community fields***.  The vendor field may describe a book, in english, about sailing races around the world.  The ***community field*** may describe another newly created sailing community, where the membership is in Lincoln Nebr.

Exhibit A at Col. 22, lines 23-32.

The specification is consistent with the technical definition of the word "field" set

forth in Barron's Dictionary of Computer and Internet Terms (2003): "a portion of a

record in a database, containing one piece of information.  For instance, in an address list,

the zip code might be stored in a 10-character field."  (Exhibit H at 187).  Accordingly,

<p align="center">-34-</p>

based upon the clear use of the term in the specification and consistent with its ordinary and recognized meaning, the Court should construe the claim term "community fields" as follows:

<span style="color:red">Information that designates the interests and/or demographics of a community, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta-tags of interest associated with a community, which may overlap with other community identification information.</span>

The Defendants have proposed the following definition:

<span style="color:blue">Locations in which information about a community may be entered and/or stored.</span>

Exhibit C at 5. However, by construing the claim term "community fields" to mean the "locations" where information about a community may be entered or stored, and not the "information" itself, Defendants' proposed claim construction is inconsistent with the claims and the specification and should be rejected by the Court.

First, Claim 8 states that "community information further comprises community fields...." Col. 31, lines 54-55. The parties agree that "community information" means "*information* associated with a community." Exhibit C at 5. Since community fields are part of that information, they are, by definition, information themselves. Second, Claim 8 covers the method of, *inter alia*, presenting to a user another a community "based in part on a comparison of user fields, community fields and vendor fields." Obviously, such a comparison involves "information" about the community and user and not the "locations" in which that information can be entered. Finally, Defendants' definition is inconsistent with the above portions of the specification, which teach that community fields

-35-

"comprise" information, such as language or age, and "describe" things, such as "another newly created sailing community." Therefore, the Defendants' proposed definition should be rejected by the Court.

### 18. User Fields

The third term from Claim 8 of the '629 Patent subject to construction is "user fields." The term "user fields" is specifically defined in the specification as:

> According to an embodiment of the invention, a user may designate **user fields** while registering. **User fields** may comprise a user's selection of language, a category or categories of interest, age group, location, and other items to designate interests of the user. According to an embodiment of the invention, **user fields** may correspond to community fields.

Exhibit A at Col. 16, lines 3-9. This is also consistent with the technical definition of the word "field" set forth in Barron's Dictionary of Computer and Internet Terms (2003): "a portion of a record in a database, containing one piece of information. For instance, in an address list, the zip code might be stored in a 10-character field." (Exhibit H at 187). Accordingly, based upon the clear use of the term in the specification and consistent with its ordinary and recognized meaning, the Court should construe the claim term "user fields" as follows:

> Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user.

The Defendants have proposed the following definition:

> Locations in which information about a user may be entered and/or stored.

Exhibit C at 12. For the same reasons discussed above with regard to the term

"community fields," Defendants' construction is inconsistent with the claims, specification and extrinsic evidence since it limits the term "user fields" to the location of information and not the information itself . The specification teaches that "user fields" are the user's "selection of" information, and not the location where the selection is made. Exhibit A at Col. 16, lines 3-9. Accordingly, the Court should reject Defendants' proposed claim construction.

### 19. Vendor Fields

The last term of Claim 8 of the '629 Patent that must be construed is "vendor fields." This term must be construed consistent with its use and definition in the specification. Moreover, the term must be construed consistent with other related claim terms such as "community fields" and "user fields." *North American Container, Inc. v. Plastipak Packaging, Inc.,* 415 F.3d 1335, 1344-1345 (Fed. Cir. 2005), *citing CVI/Beta Ventures, Inc. V. Tura, LP,* 112 f.3d 1146, 1159 (Fed. Cir. 1997)(terms must be construed consistently with other words in the claim). The specification confirms this consistent use and definition:

> As described above, a creator may designate one or more community fields, and a user may designate a user field. According to an embodiment of the invention, a vendor may designate a *vendor field*. A vendor may have a product to sell to one or more users and/or communities. A vendor may describe the product by providing information for *vendor fields*. *Vendor fields* may comprise a category or categories of interest, language, location, age group, and meta-tags of interest associated with the product. According to an embodiment of the invention, *vendor fields,* community fields, and user fields may have corresponding information.

Exhibit A at Col. 22, lines 3-14. The specification further provides:

According to an embodiment of the invention, field matching results may be presented when a user enters a community, such as when a user enters (e.g., logs into) a community. Field matching results may be presented to the user. By way of example, a user may enter the "Omaha Sailing Club" community and be presented with *vendor fields* and community fields. The *vendor field* may describe a book, in english, about sailing races around the world. The community field may describe another newly created sailing community, where the membership is in Lincoln Nebr.

Exhibit A at Col. 22, lines 23-32.

These portions of the specification are also consistent with the technical definition of the word "field" set forth in Barron's Dictionary of Computer and Internet Terms (2003): "a portion of a record in a database, containing one piece of information. For instance, in an address list, the zip code might be stored in a 10-character field." (Exhibit H at 187). Accordingly, based upon the specific definition set forth in the specification and consistent with the ordinary and recognized meaning of the terms, this Court should construe the term "vendor fields" as follows:

<span style="color:red">Information that describes a product or service, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta-tags of interest associated with a product or service.</span>

The Defendants have proposed the following definition:

<span style="color:blue">Locations in which information about a vendor may be entered and/or stored.</span>

Exhibit C at 13. For the same reasons discussed above with regard to the terms "community fields" and "user fields," Defendants' construction is inconsistent with the claims, specification and extrinsic evidence since it limits the term "vendor fields" to the location of information and not the information itself . The specification teaches that

-38-

"vendor fields" are information describing a product or service, and not the location where the selection is made.  Accordingly, the Court should reject Defendants' proposed claim construction.

### 20.  Receiver Module

XACP has also asserted independent Claim 9 against Facebook.  Claim 9 of the '629 Patent reads:

> 9.  A system for creating a community for users with common interests to interact in comprising:
>
> a receiver module for receiving:
>
> a)  a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community;
>
> b)  receiving community identification information from the registered user;
>
> c)  receiving a selection of at least one application object from the registered user; and
>
> d)  at least one communications address designated by the registered user, the at least one communications address corresponding to a user to receive a created community;
>
> a creation module for creating a community based on the community identification information and the at least one community function;
>
> and a transmitter for transmitting the created community based in part on the at least one communications address.

Exhibit A at Col. 31, line 65 through Col. 32, lines 17.  In connection with Claim 9, this Court should construe the terms "receiver module" and "creation module."

-39-

With respect to the term "receiver module," the specification sets forth the following definition of "modules" in general and those configured to receive in particular:

> Communication application *modules* **155a** and **155b** need not be the same specific software so long as communication between them is according to the standard protocols so that messages sent and received can be recognized. Communication application *module* **155** may comprise an e-mail application such as Microsoft Beyond Mail™, Netscape Mail™, Eudora Pro™, or the like, and must also comprise an application which can establish a persistent connection to network **150**.

Col. 5, line 62 through Col. 6, line 3.

The specification's use of the term module in general, and "creation module" and "receiver module" in particular, are consistent with the ordinary and recognized meanings of the term "module." Webster's New World Computer Dictionary defines the term "module" as:

> **1.** In computer programming, a program unit or section that is set aside and differentiated from other sections so that its procedural code can be made available to more than one component of the program. For example, suppose a program has several components that need to sort data. Instead of placing code for sorting data in each of these components, it is obviously easier to isolate data sorting code in a program module (called a function) that can be called by any program component that needs its service **2.** In an integrated program, a section of the program that is devoted to one function such as word processing.

Exhibit G at 241 (defining "module").

Accordingly, based upon the intrinsic record and consistent with the ordinary and recognized meaning of the terms, this Court should construe the term "receiver module" as follows:

<span style="color:red">A section of a computer program that may</span>

<span style="color:red">provide the function of receiving data.</span>

Defendants have proffered the following definition:

<span style="color:blue">A section of a computer program that receives data.</span>

Exhibit C at 9.  Although very similar to XACP's proposed definition, the Defendants' proposed definition should be rejected by the Court since it improperly limits the function of the receiver module (*i.e.,* computer program) to receiving data.  Such a limitation is unsupported by the specification.  To the contrary, as is properly encompassed in XACP"s definition, a computer program may be a receiver module so long as it ***may function*** to receive data.

## 21.    Creation Module

The second term in Claim 9 subject to construction is "creation module."  As set forth above in Section IV.C.20, the specification provides guidance concerning the meaning of these terms (*See* Col. 5, line 62 through Col. 6, line 3); Webster's New World Computer Dictionary confirms the ordinary and recognized meaning of module (Exhibit G at 241), and Webster's New World Dictionary, Third College Edition (1994) (Exhibit F at 325) confirms the definition of "create" as being consistent with its use in the specification, *i.e.,* to cause to come into existence, bring into being, make, ordinate.

Accordingly, based upon the use of these terms in the specification, and consistent with their ordinary and recognized meanings, this Court should construe the term "creation module" as follows:

<span style="color:red">A section of a computer program that may provide</span>

<span style="color:red">the function of creating a community.</span>

Additionally, for the reasons discusses above with regards to "receiver module," the Court should reject Defendants' overly narrow definition: <span style="color:blue">a section of a computer program that creates a community.</span> Exhibit C at 7.

### 22. Subscription Module

Claim 13 of the '629 Patent has also been asserted against the Facebook defendants. Claim 13 is a dependent claim which depends upon Claim 9 and reads:

> 13. The system according to claim **9**, further comprising a <mark>subscription module</mark> for <mark>subscribing</mark> to at least one subscription object, wherein the at least one subscription object is accessed through one of the at least one application object.

Exhibit A at Col. 32, lines 41-44. Two claim terms from Claim 13 should be construed by this Court - "subscription module" and "subscribing."

With respect to the term "subscription module," the specification provides a clear and unequivocal definition of "subscription object."as is noted above in Section IV.C.14 (*See* Exhibit A at Col. 9, line 66 through Col. 10, line 2; Col. 11, lines 8-16; and, Col. 19, lines 26-31). Further, as set forth in Section IV.C.20 above, the specification provides guidance concerning the meaning of "module" at Col. 5, line 62 through Col. 6, line 3, which is consistent with the ordinary and recognized meaning of that term as defined in Webster's New World Computer Dictionary (Exhibit G at 241).

Accordingly, based upon the specification's clear use and definition of these terms and consistent with their ordinary and recognized meanings, this Court should construe the term "subscription module" as follows:

<p style="color:red; text-align:center">A section of a computer program that may provide the function of subscribing to one or more subscription objects.</p>

Additionally, for the reasons discusses above with regards to "receiver module" and "creation module," the Court should reject Defendants' overly narrow definition: <span style="color:blue">a section of a computer program that allows a user to subscribe to one or more subscription objects.</span> Exhibit C at 10.

### 23.    Subscribing

The second term from Claim 13 which must be construed is "subscribing."  The specification defines the term "subscribed to" as:

> A subscription object may be published (e.g., made available for others to access in a community) and ***subscribed*** to (e.g., selected to be accessed in a community). A user, upon entering a community, may access subscription objects and other content objects, which form the community.  A user automatically received updated content objects as appropriate.

Exhibit A at Col. 19, lines 33-39.  The specification further teaches that a subscription is not limited to a single community.  *See* Exhibit A at Col. 20, lines 53-55 ("The user may 'publish' the subscription object[s] by permitting users of one or more communities to access the subscription object.").

Accordingly, based upon the specification, the Court should adopt XACP's claim construction of "subscribing" as follows:

<p style="color:red; text-align:center">Selecting to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities.</p>

The Defendants have proposed the following definition:

<p style="text-align:center; color:blue">Designating something to be interacted with<br>and/or accessed in one or more communities.</p>

Exhibit C at 10.  However, the Defendants' proposed definition should be rejected by the Court.  The definition is inconsistent with the above referenced portions of the specification that define "subscribed to"as "*selected* to be accessed in a community" and not "designated," as Defendants request.

### 24.    Selecting

XACP has also asserted Claim 17 of the '629 Patent against the Facebook defendants.  Claim 17 is an independent claim that reads:

> 17.    A method for creating a community for users with common interests to interact in, the method comprising the steps of:
>
> transmitting a creation transmission, the creation transmission indicating the desire to create a community;
>
> transmitting community identification information;
>
> transmitting at least one communications address corresponding to a user to receive the created community; and
>
> selecting at least one application object for inclusion in the community, whereby the community is created based on the community identification information and the at least one application object.

Exhibit A at Col. 32, line 65 through Col. 33, line 11.  Two terms found in the last claim element of independent Claim 17 - - "selecting" and "community is created" – need to be construed.

With respect to the term "selecting," the parties agree that the claim term should be

defined as follows:

<p style="text-align:center; color:red">The act of choosing one or more things.</p>

*See* Exhibit C at 10; Exhibit F – Webster's New World Dictionary, Third College Edition (1994) at 1216.[8]

### 25. Community Is Created

The second claim term in Claim 17 which should be construed is "community is created."

As set forth in Section IV.C.1 above, the specification clearly defines the term "community" (*see* Exhibit A at Col. 3, lines 15-18; Col. 11, line 66 through Col. 12, line 2) and Webster's New World Dictionary, Third College Edition (1994) (Exhibit E at 325) confirms that the definition of "create" – to cause to come into existence, bring into being, make, originate – is consistent with the use of the term in the specification.

Accordingly, based upon the ordinary and recognized meaning of the term "community is created" and the specification, the Court should adopt XACP's claim construction of "community is created" as follows:

<p style="text-align:center; color:red">Information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such web pages on an a Internet site, having been caused to come into existence, brought into being, made or originated.</p>

The Defendants have proposed the following definition:

---

[8] The parties also agree that the claim term "selection," initially used in Claim 1, means <span style="color:red">one or more things that have been chosen</span>.  Exhibit C at 10.

> A virtual place or electronic medium where people having common interest can interact, which can be accessed by a computer or other device, is brought into being.

Exhibit C at 5. However, the Defendants' proposed definition should be rejected by the Court for the reasons previously discussed in Section IV.C.1.

### 26. Transmitter Module

XACP has also asserted Claim 25 of the '629 Patent against the Facebook defendants. Claim 25 reads:

> 25. A system for creating a community for users with common interests to interact in, the system comprising:
>
> a transmitter module for transmitting:
>
> a)      a creation transmission, the creation transmission indicating the desire to create a community;
>
> b)      community identification information;
>
> c)      at least one communications address corresponding to a user to receive the created community; and
>
> d)      a selection of at least one application object for inclusion in the community, whereby the community is created based on the community identification information and the at least one application object;
>
> and a display module for displaying prompts for the community identification information, the at least one communications address, and the selection of at least one application object.

Exhibit A at Col. 33, line 61 through Col. 34, line 13. In connection with Claim 25, this Court should construe the claim terms "transmitter module" and "display module."

Again, the specification uses and defines modules in general and transmitter modules (messages sent utilizing standard protocols) in particular:

-46-

Communication application *modules* **155a** and **155b** need not be the same specific software so long as communication between them is according to the standard protocols so that messages sent and received can be recognized. Communication application *module* **155** may comprise an e-mail application such as Microsoft Beyond Mail™, Netscape Mail™, Eudora Pro™, or the like, and must also comprise an application which can establish a persistent connection to network **150**.

Col. 5, line 62 through Col. 6, line 3.

As noted above is Section IV.C.20, the specification's definition and use of the term "module" is also consistent with Webster's New World Computer Dictionary's definition of that term. (Exhibit G at 241). As set forth in detail in Section IV.C.11, the specification also provides guidance regarding the meaning of the term "transmitting" and is consistent with the ordinary and recognized meaning of that term. Those arguments will not be repeated here.

Accordingly, based upon the use of the term "transmitter module" in the specification and the understood meaning of that term, the Court should adopt XACP's claim construction of "transmitter module" as follows:

<span style="color:red">A section of a computer program or device that may provide the function of transmitting data.</span>

The Defendants have proposed the following definition:

<span style="color:blue">A section of a computer program or device that transmit data.</span>

Exhibit C at 5. Although very similar to XACP's proposed definition, the Defendants' proposed definition should be rejected by the Court since it improperly limits the function of the transmitter module (*i.e.,* computer program) to transmitting data. Such a limitation

-47-

is unsupported by the specification.  To the contrary, as is properly encompassed in XACP"s definition, a computer program may be a transmitter module so long as it *may function* to transmit data.

### 27.    Display Module

The second claim term from Claim 25 which should be construed is "display module."  Based upon the use of the term in the specification and its dictionary meaning, the Court should adopt XACP's claim construction of "display module" as follows:

<p style="text-align:center; color:red">A section of a computer program or device that may<br>provide the function of displaying onscreen information</p>

Support for this construction is found in the specification, which teaches that "[e]ach of computers **110** may also include a ***display module* 140**, such as a CRT display or other device."  Exhibit A at Col. 6, lines 6-8.  Although the example used in the specification was that of a device, the use of the term "module" throughout the specification teaches that a "display module" may also include a section of a computer program (*i.e.,* software).  *See* Exhibit A at Col. 5, line 62 through Col. 6, line 3 ("Communication application *modules* **155a** and **155b** need not be the same specific *software*....").  It is axiomatic that terms should be construed consistently throughout the claims. *North American Container, Inc. v. Plastipak Packaging, Inc.,* 415 F.3d 1335, 1344-1345 (Fed. Cir. 2005), *citing CVI/Beta Ventures, Inc. V. Tura, LP,* 112 f.3d 1146, 1159 (Fed. Cir. 1997).  The parties agree that with regards to the terms "creation module," "receiver module," "subscription module," and "transmitter module," the

module includes a section of a computer program.  *See* Exhibit C at 7, 9, 10 and 11.

Thus, to be consistent, a "display module" should also include a section of a computer

program.

Additionally, construing the term "display module" to include a section of a

computer program is consistent with the ordinary meaning of "module," *i.e.,* "a program

unit or section that is set aside and differentiated from other sections so that its procedural

code can be made available to more than one component of the program;...a section of the

program that is devoted to one function such as word processing."  Webster's New World

Computer Dictionary's definition of that term.  (Exhibit G at 241).

The Defendants have proposed the following definition:

> A device that displays on-screen information, such as a CRT display.

Exhibit C at 8.  Defendants' motivation for this overly narrow claim construction is to

avoid infringement.  As is described in Section IV.B, sections of Facebook's computer

programs allow for the display of on-screen information to be viewed by users of its

website.  Facebook will apparently argue that does not use a "device" (such as a monitor)

for displaying such information.

However, the Court should reject this construction since it improperly limits a

"display module" to a device and excludes a section of computer program, which is

inconsistent with the use of the term "module" throughout the specification and claims, as

well as the term's ordinary meaning.   Moreover, to the extent that Defendants support

this construction by relying upon the specification's disclosure that "[e]ach of computers

**110** may also include a ***display module* 140**, such as a CRT display or other device," they are improperly seeking to limit the claims to a preferred embodiment. *See Liebel-Flarsheim Company v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

## IV. CONCLUSION

For the foregoing reasons, plaintiff Cross Atlantic Capital Partners, Inc.

respectfully requests that this Court construe the claims of the '929 Patent as set forth

above.

Respectfully submitted,


Dated: December 28, 2007        _/s/ Frederick A. Tecce_____
       Thomas J. Duffy, Esquire (PA ID # 34729)
       Patrick J. Keenan, Esquire (PA ID # 53775)
       **Duffy & Keenan**
       The Curtis Center, Suite 1150
       Independence Square West
       Philadelphia, Pennsylvania 19106
       (215) 238-8700
       (215) 238-8710 (Fax)



       Frederick A. Tecce, Esquire
       **MCSHEA\TECCE, P.C.**
       The Bell Atlantic Tower - 28th Floor
       1717 Arch Street
       Philadelphia, Pennsylvania 19103
       (215) 599-0800
       (215) 599-0888 (Fax)

       Counsel for plaintiff
       Cross Atlantic Capital Partners, Inc.

## CERTIFICATE OF SERVICE

This is to hereby certify that on this 28th day of December, 2007, I caused a true and correct copy of the foregoing Plaintiff Cross Atlantic Capital Partners, Inc.'s Memorandum in Support of Its Proposed Claim Construction to be served *via* this Court's Electronic Filing ("ECF") System, upon the following:

Heidi L. Keefe, Esquire
Mark R. Weinstein, Esquire
Sam C. O'Rourke, Esquire
**White & Case LLP**
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, California 94306

Alfred W. Zaher, Esquire
Dennis P. McCooe, Esquire
Joel L. Dion, Esquire
**Blank Rome**
One Logan Square
130 North 18th Street
Philadelphia, PA 19103

Counsel for defendants
Face Book, Inc. and Thefacebook, LLC

   /s/ Frederick A. Tecce
**Frederick A. Tecce, Esquire**