# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CROSS ATLANTIC CAPITAL PARTNERS, INC., | **CIVIL ACTION** |
| Plaintiff, | **NO. 07-CV- 02768-JP** |
| v. | |
| FACEBOOK, INC. and THEFACEBOOK, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>DEFENDANT FACEBOOK'S MEMORANDUM IN SUPPORT OF<br>ITS PROPOSED CLAIM CONSTRUCTION</u>

Dockets.Justia.com

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ....................................................................................... 2

III.   LEGAL PRINCIPLES ............................................................................. 2

       A.   General Tenets of Claim Construction ......................................... 3

            1.   Intrinsic Record ................................................................... 3

                 a.   The Plain Meaning and the Claims Themselves ...................................... 3

                 b.   The Specification .......................................................... 4

            2.   Extrinsic Sources .................................................................. 4

       B.   Prohibitions in Claim Construction .............................................. 5

            1.   The Claims May Not Be Construed by Reference to the Accused Product .................. 5

            2.   Importing Limitations From The Specification Into The Claims Is Forbidden ............. 7

            3.   Open-Ended Constructions Are Also Prohibited ............................................ 8

IV.    DISPUTED CLAIM TERMS ................................................................. 9

       A.   "Registered User" ..................................................................... 10

            1.   Plain Meaning of "User" and "Registered" ............................................ 10

            2.   The Specification Does Not Alter the Plain Meaning ................................... 10

       B.   "Community" ............................................................................ 11

            1.   The Plain Meaning of "Community" Is Applicable .................................... 11

            2.   The Intrinsic Record Supports Use of the Plain Meaning Applied to a Computer Environment ...................................................................... 12

       C.   "Community is Created," "Create a Community," "Creating a Community" and "Created Community" ................................................................. 13

       D.   "Community Field," "User Field" and "Vendor Field" ................................... 13

            1.   Facebook's Construction is the Plain and Ordinary Meaning ........................... 15

        2.   The Specification Supports Facebook's Construction ................................... 15

E.   "Creation Module," "Receiver Module," "Transmitter Module" and "Subscription Module" ................................................................................................................ 16

        1.   The Specification Supports Facebook's Construction ................................... 18

F.   "Display Module" ........................................................................................... 19

        1.   Facebook's Construction is the Plain and Ordinary Meaning ...................... 19

        2.   Facebook's Construction is Consistent with the Specification ..................... 19

G.   "Creation Transmission" ................................................................................. 21

        1.   The Plain Meaning of "Transmission" ......................................................... 22

        2.   The Intrinsic Record Supports Adoption of the Plain Meaning .................. 22

H.   "Transmitting" ................................................................................................. 23

I.   "Communications Address" ............................................................................. 24

        1.   The Plain Meaning of "Address" .................................................................. 24

        2.   The Specification Supports the Plain Meaning of "Communications Address" .......... 24

J.   "Application Object" ........................................................................................ 25

K.   "Subscription Object" ..................................................................................... 26

L.   "Subscribe" and "Subscribing" ....................................................................... 27

M.   "Published" .................................................................................................... 28

V.   AGREED CONSTRUCTIONS ................................................................................ 28

VI.   CONCLUSION ....................................................................................................... 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACTV, Inc. v. Walt Disney Co.*,
  46 F.3d 1082 (Fed. Cir. 2003)....................................................................4

*CVI/Beta Ventures, Inc. v. Tura LP*,
  112 F.3d 1146 (Fed. Cir. 1997)..................................................................5

*L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*,
  499 F.3d 1303 (Fed. Cir. 2007)..................................................................4

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004).....................................................................8

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
  355 F.3d 1361 (Fed. Cir. 2004)..................................................................4

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996)..........................3, 5

*Nazomi Communications, Inc. v. ARM Holdings, PLC*,
  403 F.3d 1364 (Fed. Cir. 2005)..................................................................8

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002)..................................................................6

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006)................................................................10

*Pall Corp. v. Hemasure Inc.*,
  181 F.3d 1305 (Fed. Cir. 1999)..................................................................7

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..........................................................4-6, 8-9

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001)..................................................................5

*SRI Intern. v. Matsushita Electric Corp. of America*,
  775 F.2d 1107 (Fed. Cir. 1985)...............................................................6, 7

*SafeTCare Manufacturing, Inc. v. Tele-Made, Inc.*,
  497 F.3d 1262 (Fed. Cir. 2007)................................................................22

*Scripps Clinic & Research Foundation v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991)..................................................................................7

*Teleflex, Inc. v. Ficosa North America Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002)..................................................................................8

*Texas Digital System, Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002)..................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..............................................................................4, 5

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed.Cir. 2006)..................................................................................7

## FEDERAL STATUTES

35 U.S.C. § 112 ¶ 1 .....................................................................................................23

## I.    <u>INTRODUCTION</u>

Claim construction is meant to be a straightforward exercise where the Court interprets the words of a claim, affording them their plain and ordinary meaning, as informed by a review of the intrinsic record.   Facebook's proposed constructions do just that.   For each term, Facebook has provided the plain meaning, and then explained how that meaning is supported by the specification of U.S. Patent No. 6,519,629 ("'629 patent").   The resulting definitions are clear and concise and will assist the trier of fact in understanding the issues in this case.

For most of the terms, the constructions proposed by the two parties appear to be relatively similar.   However, while similar in content, many of XACP's proposed constructions violate basic principles of claim construction.   Noticing this, Facebook offered to meet and confer with XACP to try to arrive at constructions both parties could agree with that also comply with the tenets of claim construction established by the Federal Circuit.   XACP did not respond to Facebook's overtures.   As a result, the majority of XACP's constructions violate at least one of the following three cardinal rules of claim construction:

1.    The accused product must not be considered in construing the claim terms, yet XACP asks the Court to do so;

2.    Limitations from the specification must not be imported into the claims, yet XACP's constructions incorporate direct quotes from the preferred embodiments recited in the specification; and

3.    Claim construction should provide clarity and certainty to the claims, not render them more vague and amorphous, as many of XACP's proposals do.

Facebook respectfully requests that its straightforward, consistent constructions be adopted.

## II.  BACKGROUND

Facebook is a leading social networking website that connects people with those who work, study and live around them.  Facebook was established in 2004 and has grown rapidly to service tens of millions of users throughout the world.  Facebook's success and sustained growth have occurred due to the company's own efforts and innovations, which were completely independent of the patent at issue in this case.  In fact, Facebook had no knowledge or awareness of the '629 patent prior to the filing of this action on July 3, 2007.

Cross-Atlantic Capital Partners, Inc. ("XACP"), on the other hand, is not a technology company and has no product of its own.  It is an investment company that allegedly acquired rights in the patent as the result of a failed investment in a company called iKimbo.

The '629 patent has 32 claims, all of which XACP has asserted against Facebook.  The patent began as an application for an online gaming system filed on September 15, 1998.  That application did not disclose anything about creating communities.  It was transformed into the present patent through a major revision of the specification.  More specifically, the applicants first disclosed a community creation system in a continuation-in-part application filed on February 25, 2000.  Almost all of the text in the '629 patent that is cited by both parties to support the claim terms briefed herein was added in February 2000.

## III.  LEGAL PRINCIPLES

Claim construction is an issue of law to be determined by the Court.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).  There is a well-established body of authority providing guidance to courts on the permissible sources for determining the meaning of disputed claim terms.  That body of law also contains a number of prohibitions that courts must abide by to avoid error.  The following is a

synopsis of the claim construction framework, as well as a list of prohibitions of which XACP's proposed constructions run afoul.

## A. General Tenets of Claim Construction

It is well-established that the words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). That ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002). Accordingly, the claim construction process begins with a review of the sources of interpretation a person of ordinary skill would reference – the plain meaning and the intrinsic record. *Phillips*, 415 F.3d at 1313-14.

### 1. Intrinsic Record

The intrinsic record is made up of three sources, the claims of the patent, the patent specification and the prosecution history. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1582).

#### a. The Plain Meaning and the Claims Themselves

"In construing claims we search for the ordinary and customary meaning of a claim term to a person of ordinary skill in the art." *L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007). The claim language itself provides the primary guidance. The context of the surrounding words of a claim must also be considered in determining the ordinary and customary meaning of a particular term. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d

1082, 1088 (Fed. Cir. 2003).  Further, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Phillips*, 415 F.3d at 1314; *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997).  Finally, analysis of the differences between claims can be useful for determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314 (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)).

### b.　　The Specification

The claims are not to be considered in isolation.  They "must be read in view of the specification, of which they are a part."  *Markman,* 52 F.3d at 979.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics*, 90 F.3d at 1582.  While a claim term is to be given its ordinary meaning, the patentee may use the specification to give a term a special definition that differs from that ordinary meaning, but only if it does so clearly and explicitly.  *See Phillips*, 415 F.3d at 1316.  The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  *Id*. (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).  Finally, courts "should also consider the patent's prosecution history, if it is in evidence."  *Markman,* 52 F.3d at 980.

### 2.　　Extrinsic Sources

Courts may also rely on extrinsic sources – sources external to the patent and prosecution history, such as dictionaries and treatises.  *See Phillips*, 415 F.3d at 1317.  Dictionaries and

treatises can be useful in claim construction for the purpose of allowing courts "'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." *Id*. at 1318 (citing *Vitronics*, 90 F.3d at 1584, n.6). These sources may be used "if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Id*. (citing *Markman,* 52 F.3d at 980).

### B. Prohibitions in Claim Construction

XACP has attempted to induce the Court to violate several established prohibitions of claim construction by asking the Court to: (1) construe the claim terms with reference to the accused product; (2) import limitations from the specification into the claims; and (3) adopt open-ended, vague, non-definitions of claim terms that would obscure, rather than clarify the scope of the asserted claims. Each of these improper practices is discussed in the sections below.

### 1. The Claims May Not Be Construed by Reference to the Accused Product

In its claim construction brief, XACP repeatedly asks the Court to construe the terms of the '629 patent with reference to the features of the accused facebook.com website. The Federal Circuit has expressly and emphatically rejected such a practice. As this Court recently observed, "[o]ne form of extrinsic evidence that a court may *not* use to supply limitations to the patent claim language is the accused device." *Heraeus Electro-Nite Co. v. Midwest Instrument Co., Inc.*, No. 06-355, 2007 WL 3274147, at *3 (E.D. Pa. 2007) (Padova, J.) (emphasis in original); *accord NeoMagic Corp. v. Trident Microsystems, Inc.,* 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device."). "A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original). "It is

only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." *Id.* (emphasis in original). Even the case cited by XACP for the proposition that the Court should consider the accused Facebook product in construing the claims expressly rejects that assertion:

> This court, of course, repeats its rule that 'claims may not be construed with reference to the accused device.' (citations omitted). As noted earlier, that rule posits that a court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language. Thus, the rule forbids a court from tailoring a claim construction to fit the dimensions of the accused product or process and to reach a preconceived judgment of infringement or noninfringement. In other words, it forbids biasing the claim construction process to exclude or include specific features of the accused product or process.

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330-31 (Fed.Cir. 2006).

It is only permissible to consider the accused product during claim construction in limited circumstances where such reference is needed solely to determine which aspects of a claim should be construed. *Id.*; *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute."); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("Of course the particular accused product (or process) is kept in mind, for it is efficient to focus on the construction of only the disputed elements or limitations of the claims.").

Accordingly, all portions of XACP's claim construction brief that ask the Court to refer to the accused Facebook website in construing the disputed terms of the '629 patent should be disregarded. *See* XACP Br. at 5-6, 8-9, 28.

### 2. Importing Limitations From The Specification Into The Claims Is Forbidden

Importing limitations from the specification into the claims has been referred to by the Federal Circuit as "one of the cardinal sins of patent law." *Phillips*, 415 F.3d at 1320 (quoting *SciMed Life Sys.,* 242 F.3d at 1340). Patent specifications often describe very specific embodiments of an invention, as is the case with the '629 patent. The Federal Circuit has repeatedly warned against confining the claims of the patent to those specific embodiments. *See, e.g.*, *Phillips*, 415 F.3d at 1323; *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

"Although courts should consider the specification when construing a claim, a court cannot add 'limitations appearing only in the specification.'" *Heraeus Electro-Nite*, 2007 WL 3274147, at *2 (quoting *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994)). The Federal Circuit has recognized that there is a distinction between using the specification to interpret a claim, which is permissible, and importing a limitation from the specification into the claim, which is prohibited. *See Phillips*, 415 F.3d at 1323. "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Id.* "To help locate this 'fine line,' the Federal Circuit has reminded courts that they 'look to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention, and not merely to limit a claim term.'" *Heraeus Electro-Nite*, 2007 WL 3274147, at *2.

In this case, XACP repeatedly asks the Court to commit the cardinal sin of importing limitations from the specification into the claims. Many of XACP's proposed constructions contain language quoted verbatim from preferred embodiments described in the specification,

despite an express prohibition on the practice from the Federal Circuit. *See, e.g.*, XACP's proposed constructions for "community," "creation transmission," "published," "registered user," "subscribe," "community fields," "user fields" and "vendor fields."

Further, it is clear that the '629 patentee intended the embodiments set forth in the '629 patent specification to be exemplary only, not limiting. Indeed, in many cases a patentee only uses specific embodiments as a tool to teach one of ordinary skill how to make and use the claimed invention, not to limit the scope of the claims. "[U]pon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d at 1323 (citing *SciMed Life Sys.*, 242 F.3d at 1341). In this case, the specification states that the embodiments described therein are for "the purpose of explaining the present invention" and "not intended to limit the scope of the invention." '629 patent, Col. 4, lines 24-27.

To accept XACP's constructions would clearly be erroneous and would run afoul of the Federal Circuit's prohibition on importing limitations from the specification into the claims. It would also run contrary to the patentee's express intention not to limit the scope of the claims to the exemplary embodiments described in the specification.

### 3. Open-Ended Constructions Are Also Prohibited

Many of XACP's proffered constructions state that elements of the '629 patent claims "may" perform a particular function. This type of vague, open-ended construction has been expressly rejected by the Federal Circuit. In *Cybersettle, Inc., v. National Arbitration Forum, Inc.*, the Federal Circuit rejected the trial court's claim construction whereby an accused method would infringe the claim if it was merely "capable of" a particular function. In rejecting that

construction, the Court reasoned:

> A patented method is a series of steps, each of which *must be performed for infringement to occur.* It is not enough that a claimed step be "capable" of being performed. (citation omitted). A party that does not perform a claimed step does not infringe a method claim merely because it is capable of doing so.

243 Fed. Appx. 603, 606-07 (Fed. Cir. 2007) (emphasis added) [attached as Exhibit F].[1] *See also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (rejecting an argument that a claim requiring the replacement of appliances can be performed if the appliances are merely "capable of" being replaced).

In addition, certain of XACP's proposed constructions allow for such an open ended application that, if adopted, they would result in a claim scope that vastly exceed any reasonable interpretation of the claim. For example, as detailed below, XACP's proposed construction for "application object" is so vague that if it were adopted, there would be no definitive definition for the term. This is a problem shared by many of XACP's constructions, as detailed below.

## IV. DISPUTED CLAIM TERMS

Facebook's arguments regarding the disputed claim terms are set forth below. For each disputed claim term, Facebook has provided a chart showing a side-by-side comparison of Facebook's and XACP's proposed construction. Rather than organizing the terms in alphabetical order, Facebook has ordered the disputed claim terms in a manner that groups terms that present similar issues. For the convenience of the Court, Facebook is also providing an appendix (attached as Exhibit B) identifying, in alphabetical order, each disputed claim term and providing representative claims of the '629 patent in which each term appears.

---

[1] All exhibits referenced herein are attached to Declaration of Heidi L. Keefe Attaching Exhibits to Defendant Facebook's Memorandum in Support of its Proposed Claim Construction.

## A.      "Registered User"

| Facebook's Proposed Construction | XACP's Proposed Construction |
| --- | --- |
| A person who has provided, at least once, registration information (e.g., name, address, personal information, etc.). | A person who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller. |

The main difference between the parties' constructions is that Facebook concludes its construction of "registered user" after defining who a registered user is, while XACP asks the Court to import several limitations from the specification to narrow the definition of registered user.  XACP's construction requires that the information be "requested," and after it is provided, sent to a "controller."  Neither of these limitations has anything to do with the plain meaning of "registered user" and both were improperly read in from the specification.  XACP's proposed construction should therefore be rejected.

### 1.      Plain Meaning of "User" and "Registered"

The parties agree that a "registered user" is a person who has provided, at least once, registration information (e.g. name, address, personal information, etc.).  This construction is consistent with the plain meaning of the terms "registered" and "user."  *See Webster's II New College Dictionary,* Houghton Mifflin Company, 1999, p. 933 and p. 1215 [Ex. C], respectively. Nothing more is required to define the term.

### 2.      The Specification Does Not Alter the Plain Meaning

The specification always uses the term "registered user" in a way that is consistent with the plain meaning.  XACP's attempt to import further limitations is unsupportable.  Nothing in the specification requires "registered user" to be defined to include the additional steps of registration information being "requested" from some unknown entity, or "sent to a central

controller." In fact, the very section of the specification XACP relies upon makes it clear that these steps are mere design choices of a preferred embodiment — not definitional. *See* '629 patent, Col. 27, lines 5-6 ("A registration for (or other means of providing the requested information) is completed by the user and ***may*** be sent by client 110 to central controller modules **115** at step **545**.") (italics added). The fact that these steps are optional requires that they not be imported into the construction of "registered user."

### B. "Community"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| A virtual place or electronic medium where people having common interests can interact, which can be accessed by a computer or other device. | Information and at least one function relating to a specific transaction, interaction and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communication network, such as web pages or an Internet site. |

"Community" is a commonly used term with a plain and ordinary meaning, which is captured by Facebook's proposed construction. XACP is attempting to contort this commonly understood word into a narrow reflection of the preferred embodiment in the specification. XACP's construction begins with "[i]nformation and least one function," which has nothing to do with the term "community." XACP should not be permitted to alter the plain meaning by adding litigation-inspired limitations into the construction of this term.

### 1. The Plain Meaning of "Community" Is Applicable

Webster's defines "community" as "1. a. A group of people residing in the same locality and under the same government. b. The area or locality in which such a group resides. 2. A group or class having common interests." *Webster's II New College Dictionary* 227 (Houghton

Mifflin Company ed. 1999) [Ex. C].  Since the '629 patent deals entirely in a computer

environment (see discussion below of the intrinsic record), a "community" in the context of the

patent is necessarily virtual.  Otherwise, the term should be given its plain and ordinary meaning.

> 2.    **The Intrinsic Record Supports Use of the Plain Meaning Applied to a Computer Environment**

The specification is the single best source of determining claim meaning, but only to the

extent it is used to determine if the plain meaning of a term should be utilized or if the term has

been expressly given a special meaning.  It cannot be used to read limitations from preferred

embodiments into the claims.  *See* Part III, *supra*.

The intrinsic record is clear that the plain meaning of the word "community" governs and

should only be slightly altered to be applicable to a computer environment.  The first mention of

a "community" in the specification concerns "The William Henry Harrison Historical

Preservation Society."  That "community" is described as a place on a computer (a virtual place)

where people with a shared interest in William Henry Harrsion can interact.  '629 patent, Col. 4,

lines, 27-46.  The "Omaha Sailing Club" (col. 7, line 25- col. 12, line 41), "The XYZ Softball

Team" (col. 11, line 66- col. 12, line 41) and other examples of communities are similarly

described.  The specification is clear that these "communities" exist in a computer environment

(Col. 7, lines 59-60), and even states that these communities may contain all of the applications

necessary to view and interact in the communities on the Internet.  '629 patent, Col. 14, lines 66-

67.  Thus, the specification supports the use of the plain meaning of the word "community"

altered only to the extent necessary to be applicable to a computer environment.

XACP's construction, on the other hand, improperly ignores the plain meaning of

"community" by specifying that a community is undefined "information and at least one

function."  The specification makes it abundantly clear, however, that a "community" is separate

and distinct from the functions and applications with which it interacts: "According to an embodiment of the invention, community creating module **165** may provide the framework through which central controller module **115** interacts with a user to create a <u>community, and related applications and functions</u>." '629 patent, Col. 7, lines 53-57 (emphasis added). If the community was meant to be defined to include one or more functions, the functions would not be described separately in the specification. Therefore, Facebook's proposed construction, which does not improperly read limitations in from the specification, should be adopted.

> **C.** **"Community is Created," "Create a Community," "Creating a Community" and "Created Community"**

XACP has proposed separate constructions for four closely related terms that include the word "community," *i.e.* "community is created," "create a community," "creating a community" and "created community." Facebook does not believe it is necessary to separately construe these four phrases once the terms "community" and "create" are construed.

The parties are in agreement that the word "create" means "to bring into being." *Webster's II New College Dictionary*, Houghton Mifflin Company, 1999, p. 265 [Ex. C]. "Created" is merely the past tense: "brought into being," and "creating" is the gerund form signifying present action, "bringing into being." Because all of these terms are simply different forms of the same word, "create," it is sufficient to simply construe the root word "create" according to its plain meaning.

> **D.** **"Community Field," "User Field" and "Vendor Field"**

The terms "community field," "user field" and "vendor field" appear only in four dependent claims (*i.e.* 8, 16, 24 and 32) of the '629 patent. Each of these claims is substantially the same. Claim 8 reads (with the disputed terms shown in underlining):

8.	The method according to claim **1**, wherein community information further comprises <u>community fields</u>, whereby the community presents to a user at least [sic] at least one of:

a) at least one other user having <u>user fields</u>;

b) at least one other community having <u>community fields</u>; and

c) at least one vendor product having <u>vendor fields</u>;

wherein the presentation is based in part on a comparison of <u>user fields</u>, <u>community fields</u> and <u>vendor fields</u>.

The parties' proposed constructions of these terms are set forth below:

| Claim term | Facebook's Construction | XACP's Construction |
|---|---|---|
| User field | A location in which information about a user may be entered and/or stored. | Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user. |
| Community field | A location in which information about a community may be entered and/or stored. | Information that designates the interests and/or demographics of a community, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta tags of interest associated with a community which may overlap with another community identification information. |
| Vendor field | A location in which information about a vendor may be entered and/or stored. | Information that describes a product or service, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta-tags of interest associated with a product or service. |

The primary difference between the Facebook and XACP constructions concerns precisely what the term "field" means. Facebook's constructions define the three "fields" as

locations where information about a user, community and vendor may be entered and/or stored. XACP, on the other hand, defines the "fields" by reference to the actual information represented in those fields, and improperly imports a number of limitations from the specification. As shown below, XACP's proposed constructions should be rejected.

### 1. Facebook's Construction is the Plain and Ordinary Meaning

Facebook's constructions of "user field," "community field" and "vendor field" are consistent with the plain and ordinary meaning of the term "field." As defined by Microsoft Press, a "field" is a "location in a record in which a particular type of data is stored." *Microsoft Computer Dictionary* 182-83 (4th ed. 1999) [Ex. E]. This is consistent with the dictionary cited by XACP, which defines field as "a portion of a record in a database, containing one piece of information." XACP Br. at 34 (citing *Barron's Dictionary of Computer and Internet Terms* 187 (2003)). Both of these definitions make clear that a "field" is where particular information is stored – and not the actual information itself.

### 2. The Specification Supports Facebook's Construction

This plain and ordinary meaning is consistent with the specification of the '629 patent, which likewise draws a distinction between a "field" and the information contained therein:

> A user may select Search Function **3045** to search for communities, users, vendors, and/or products. As described above, a creator may designate one or more community fields, and a user may designate a user field. According to an embodiment of the invention, a vendor may designate a vendor field. A vendor may have a product to sell to one or more users and/or communities. <u>A vendor may describe the product by providing information for vendor fields</u>. Vendor fields may comprise a category or categories of interest, language, location, age group, and meta-tags of interest associated with the product. <u>According to an embodiment of the invention, vendor fields, community fields, and user fields may have corresponding information</u>. Central controller module **115** may have a field matching function associated therein to match users, communities, and vendors based on the fields provided. <u>A user may provide information in a user field</u>.

'629 patent, col. 22, lines 2-18 (emphasis added). As this passage repeatedly makes clear, the "fields" are the locations where the information about users, communities and vendors is stored – not the information itself.

XACP's constructions should be rejected because they improperly attempt to import limitations from the specification into the claims. In fact, XACP's proposed constructions attempt to pull language verbatim from portions of the specification which make clear that they are merely identifying examples of the categories of information that can be stored in the user, community and vendor fields. *See, e.g.*, '629 patent, col. 16, lines 4-7 ("User fields may comprise a user's selection of language, a category or categories of interest, age group, location, and other items to designate interests of the user."); *id.* at col. 8, lines 56-61 ("Community fields may comprise a category or categories of interest, language, location, age group, and meta-tags of interest associated with the community, and may overlap with other community identification information."); *id.* at col. 22, lines 9-12 ("Vendor fields may comprise a category or categories of interest, language, location, age group, and meta-tags of interest associated with the product.").

E.    **"Creation Module," "Receiver Module," "Transmitter Module" and "Subscription Module"**

The terms "creation module," "receiver module," "transmitter module" and "subscription module" present common issues and thus will be addressed together. The parties' proposed constructions are set forth below:

| Claim term | Facebook's Construction | XACP's Construction |
|---|---|---|
| Receiver module | A section of a computer program that receives data. | A section of a computer program that may provide the function of receiving data. |
| Transmitter module | A section of a computer program or device that transmits data. | A section of a computer program or device that may provide the function of transmitting data. |
| Creation module | A section of a computer program that creates a community. | A section of a computer program that may provide the function of creating a community. |
| Subscription module | A section of a computer program that allows a user to subscribe to one or more subscription objects. | A section of a computer program that may provide the function of subscribing to one or more subscription objects. |

As shown in the chart above, both parties generally agree on the plain meaning of these terms as they relate to the function and purpose of the "receiver module," "transmitter module," "creation module" and "subscription module." They do not agree, however, on whether those four modules must *actually* perform their designated functions. XACP's proposed constructions are illusory and should be rejected. As stated above in Part III.B.3, *supra*, XACP's proposed constructions are also contrary to Federal Circuit authority.

XACP's proposed constructions specify "[a] section of a computer program that **may**" perform a designated function. The designated functions, under XACP's proposed constructions, are entirely optional. A "section of a computer program" could satisfy the definition of "receiver module" even if it receives nothing, or could be a "transmitter module" even if it transmits nothing, or could be a "creation module" even if it creates nothing. Because there is no required functionality under XACP's proposed construction, there is no functional difference between the receiver, transmitter, creation and subscription modules. Any "section of a computer program"

could satisfy XACP's illusory constructions, even if it never performs its designated function.

### 1. The Specification Supports Facebook's Construction

The specification makes clear that these four modules are not simply theoretical constructs with purely optional behavior. They are recited in claims 9, 13 and 25 because they perform specific, unique functions relating to the claimed community creation system. The receiver module receives information; the transmitter module transmits it; the creation module creates a community; and the subscription module subscribes to subscription objects. This is consistent with the specification, which describes the modules as actually performing their respective, specific functions:

> According to another embodiment of the invention, a computer usable medium having computer readable program code embodied therein for interaction in and creation of may be provided. For example, the computer usable medium may comprise a CD ROM, a floppy disk, a hard disk, or any other computer usable medium. One or more of the modules of a system may comprise computer readable program code that is provided on the computer usable medium such that <u>when the computer usable medium is installed on a computer system, those modules cause the computer system to perform the functions described</u>.

'629 patent, Col. 30, lines 32-41 (emphasis added); *see also* '629 patent, Col. 30, lines 42-52 ("According to another embodiment the . . . communication module **180** . . . and subscription objects module **412** may comprise computer readable code that, when installed on a computer, perform the functions described above."). The specification confirms that the four modules actually cause the computer to perform their designated functions. Nowhere in the specification does it suggest that their behavior is entirely optional. Thus, XACP's proposed constructions should be rejected.

### F. "Display Module"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| A device that displays on-screen information, such as a CRT display. | A section of a computer program or device that may provide the function of displaying onscreen information. |

There are two disagreements between Facebook and XACP as to the meaning of "display module." First, the parties do not agree on whether a display module is simply a "device" or can also include "a section of a computer program." Second, reminiscent of the terms discussed in the preceding sections, the parties do not agree on whether the display module must actually perform any function. As explained below, the intrinsic record confirms that a "display module" is a physical device used with a computer to display on-screen information, and is not a computer program.

#### 1. Facebook's Construction is the Plain and Ordinary Meaning

The dictionary definition of "display" is "[t]he visual output device of a computer, which is commonly a CRT-based video display." *Microsoft Computer Dictionary* 145 (4th ed. 1999) [Ex. E]; *Microsoft Press Computer Dictionary* 111 (1991) [Ex. D]. The term "CRT" is an acronym for "cathode-ray tube" (CRT), which simply refers to the picture tube used with televisions, computer monitors and other video display devices.[2]

#### 2. Facebook's Construction is Consistent with the Specification

Facebook's construction is also consistent with the specification, which expressly defines

---

[2]  *Microsoft Computer Dictionary* 118 (4th ed. 1999) [Ex. E] (defining "CRT" as: "Acronym for **c**athode-**r**ay **tu**be. The basis of the television screen and the standard microcomputer display screen. A CRT display is built around a vacuum tube containing one or more electron guns whose electron beams rapidly sweep horizontally across the inside front surface of the tube, which is coated with a material that glows when irradiated.") (bold in original).

the term "display module" as having its plain and ordinary meaning:

> According to an embodiment of the invention, each computer **110** may be configured as a typical home based computer. Other configurations may also be used. Each computer **110** may contain a communication application module **155**, a processor module **160** and a memory module **170**. . . Computer **110** may have at least one input device **120** for controlling the computer **110**. Input device **120** may be a keyboard, joystick, touchpad, scanner or any similar device or combination of devices. <u>Each of computers **110** may also include a display module **140**, such as a CRT display or other device</u>.

'629 patent, col. 5, line 57-col. 6. line 8 (bold in original; underlining added). The passage above from the specification makes clear that the "display module" is a CRT display "or other <u>device</u>," which does not suggest that the display module can be a computer program as XACP suggests.

XACP argues that a "display module" must be construed as including a section of a computer program because the specification refers to other types of "modules" that may be implemented as computer code. Not only is there <u>nothing</u> in the specification to suggest that a "display module" can be a portion of a computer program, the specification indicates that just the opposite is true. The specification makes clear that some "modules" may be provided as computer code, but others (such as the display module) may not:

> According to one embodiment central controller module **115**, user interface module **125**, link application module **130**, processor module **140**, memory module **170**, communication application module **155**, user interface module **25**, community creating module **165**, invitation module **175**, communication module **180** application platform **404**, session controller module **406**, governor server module **408**, application controller modules **410**, and subscription objects module **412** may comprise computer readable code that, when installed on a computer, perform the functions described above. <u>Also, only some of the modules may be provided in computer readable code</u>.

'629 patent, col. 30, line 42-53 (bold in original; underlining added).

The above-quoted passage provides a comprehensive listing of the various "modules" that may be provided as computer code, but notably, does not include "display module" as one of

them. The passage also states that "only some of the modules may be provided as computer readable code," which obviously means that other modules cannot. The "display module" is clearly one of the modules that may not be provided as computer code as it is referred to in the specification solely as a physical display device. *See SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269 (Fed. Cir. 2007) ("In explaining the importance of referring to the specification in determining and understanding the meaning and scope of a patent claim, we have stated that 'the specification 'is always highly relevant to the claim construction analysis.'") (quoting *Phillips*, 415 F.3d at 1315).

Finally, Facebook's construction is the only construction that is consistent with the manner in which "display module" is used in the claim. The term "display module" appears only in claim 25, as follows: "a display module for displaying prompts for the community identification information, the at least one communications address, and the selection of the at least one application object." '629 patent, col. 34, lines 10-13. A computer program is not physically capable of "displaying prompts," or anything else, to a user. It is simply a collection of instructions to carry out operations on data. To actually "display prompts," or anything else for that matter, a physical device is required for generating visual signals for the user to perceive.

### G. "Creation Transmission"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| An electronic signal indicating a request to create a community. | An electronic transmission through a private or public communication network indicating a request to create a community. |

The prime dispute between the parties turns on XACP's use of the word "transmission" in its proposed construction. It is improper to use the term "transmission" itself in a construction

that is supposed to define that very term – "creation <u>transmission</u>."  To do so is completely unhelpful to the fact finder.

### 1. The Plain Meaning of "Transmission"

Transmission is the noun form of "transmit."  Webster's defines "transmit" in the electronic or computer context as:  "To send (a signal), as by wire or radio."  *Webster's II New College Dictionary,* Houghton Mifflin. Company, 1999, p. 1171 [Ex. C].  The same dictionary defines a "transmission" as "[s]omething, as a voice or message, that is transmitted."  *Id.*  The plain and ordinary meaning of the term "transmission" therefore refers to the thing that has been transmitted or sent.

XACP argues that the plain meaning proposed by Facebook somehow impermissibly narrows a transmission to a "signal."  But that is exactly what a transmission is: a signal that has been sent.  Facebook is simply embracing the plain meaning of the term.  XACP's attempt to define "creation transmission" as "[a]n electronic transmission" is a circular non-definition that will not assist the trier of fact in understanding the claim term.

### 2. The Intrinsic Record Supports Adoption of the Plain Meaning

The term "creation transmission" is not used anywhere in the specification.  There are a number of mentions of "transmissions," but they are all limited to the transmission of invitations principally in the form of emails.  *See* Col. 4, lines 54-66, col. 14, lines 11-20, col. 15, lines 32-38.  Each of those references supports the plain meaning of a "transmission" as an electronic signal.  The phrase "creation transmission" is used in each of the independent claims, yet it is completely unsupported in the specification, rendering all such claims invalid for failing to meet the written description requirement of 35 U.S.C. § 112 ¶ 1.  For purposes of claim construction, because the term "creation transmission" is not used in the specification, the specification may

not be used to alter the plain meaning of the term.

### H.     "Transmitting"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| Electronically sending. | Electronically connecting; sending out and/or communicating by any wireless or wire mechanism. |

The word "transmitting" is a common and everyday term that should be given its plain and ordinary meaning. Only Facebook's proposed construction captures it. Webster's defines "transmit" in the electronic and computer context as: "To send (a signal), as by wire or radio." *Webster's II New College Dictionary*, Houghton Mifflin Company, 1999, p. 227 [Ex. C]. It is obvious that "transmitting" simply means sending.

XACP's construction, on the other hand, is a transparent attempt to redefine the everyday word "transmitting" to attempt to capture Facebook's website, by including activities that have nothing to do with transmitting. For example, XACP's construction of "transmitting" would be satisfied by merely "electronically connecting" to something, even if the act of connecting never resulted in anything being transmitted or sent. Common sense tells us that one does not "transmit" something by merely "connecting" to something else. Two things can be "connected" to one another even if nothing is being actually transmitted between them. While the act of "transmitting" may inherently require the establishment of a connection, transmitting entails the further act of actually sending something from one place to another.

XACP devotes a substantial portion of its brief to quoting portions of the specification, but those passages have nothing to do with the construction of the term "transmitting." Nothing in the specification suggests that the plain meaning of "transmitting" should be altered.

## I.  "Communications Address"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| Information that specifies the precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address. | The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Replay [sic] Chat address. |

The key difference between the competing constructions is that XACP is attempting to improperly construe "address" as a location rather than information that directs you to a location.

### 1.  The Plain Meaning of "Address"

The Microsoft Press dictionary defines "address," in the computer context, as:  "A name or token specifying a particular computer or site on the Internet or other network."  *Microsoft Press Computer Dictionary* 17 (4th ed. 1999) [Ex. E].  The name or token could be, for example, an e-mail or IP address that directs you to a location, but is not the location itself.  An address can also include an alias that is converted by the computer into a full address.   A simple example would be a street address.  A street address is information (a name or token) that specifies a physical location (*e.g.* a home) on a street.  It is not the location itself, but merely information that identifies the location.  The same is true for the "virtual" locations in a computer environment.  An e-mail address is a name or token (information) that specifies a location where e-mail can be sent – it is not the actual location itself as XACP contends.

### 2.  The Specification Supports the Plain Meaning of "Communications Address"

The specification makes it clear that a "communications address" is the information that a user provides to be used to invite others to join a community.  Whenever "communications address" is used, it is always followed by the exemplary, explanatory language "such as,"

indicating that there are many possible names or tokens that can provide the appropriate contact information. '629 patent, Col 4, lines 47-55; Col. 12, lines 58-61; Col. 13, lines 45-47; Col. 15, lines 33-37. None of the references in the specification indicate that the plain meaning of "communications address" should be altered to mean a location, rather than information leading to a location. Facebook's construction, which adopts the plain meaning, should be used.

### J. "Application Object"

| Facebook's Proposed Construction | XACP's Proposed Construction |
| --- | --- |
| A computer program or module that directs a user to specific information and/or enables a user to do something useful, including but not limited to JAVA, chat, scheduling, invitations, pledging, photo albums, shopping carts, instant messaging, navigating, searching, addresses, news groups, announcements, white boards, calendars, video conferencing, video chat, voice chat, e-mail lists, and/or bulletin boards. | A computer program or module that may function to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, scheduling, pledging, viewing a photo album, a shopping cart, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board. |

The main difference between the parties' proposed constructions of "application object" is that XACP's construction does not require that the "application object" actually do anything. It simply identifies a possible function an application object "may," but is not required to, do.

XACP's proposed construction is illusory and should be rejected for the same reason as the "creation module," "receiver module," "transmission module" and "subscription module" definitions previously addressed. There is nothing in the specification or plain meaning of the term "application object" that indicates such purely optional behavior. XACP's proposed definition is undermined by the very dictionary definition of "application" cited in its claim construction brief: "A program that enables a user to do something useful with the computer, such as writing or accounting (as opposed to utilities, programs that help the user maintain the

computer).” XACP Br. at 20-21 (citing *Webster's New World Computer Dictionary* 23 (10th ed. 2003) (emphasis added). Under XACP's proposed construction, the “application object” would become any “computer program or module,” without requiring that it perform the actual function of an application object. Such an illusory construction will aid no one and should be rejected.

### K.  “Subscription Object”

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| An item to which a user subscribes, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item. | An object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item. |

As shown above, there are only minor differences between the parties' constructions of “subscription object.”  First, Facebook defines a “subscription object” as an “item” whereas XACP defines it as an “object.”  Facebook used the term “item” to avoid having to use the word “object” to define the term “subscription <u>object</u>,” but this does not alter the meaning.  Second, XACP's proposed construction attempts to import the limitation of an object “that is published.”

As with many other terms, XACP's construction improperly imports limitations from the written description into the claims.  The specification discusses publication of subscription objects merely as a preferred embodiment.  *See* '629 patent, col. 19, lines 26-30 (“Subscription objects ***may*** be various objects, such as chat content, a product to purchase, a photograph file, or other item, ***which has been published by another user***.”) (emphasis added).  There is no basis for importing the requirement “that is published” into the definition of a subscription object.

XACP's construction is also unsupportable in light of the claims.  Claims 5 and 6, for example, state:

5.      The method according to claim **1**, further comprising the
step of receiving a selection to subscribe to at least one
subscription object, wherein the at least one subscription object is
accessed through one of the at least one application object.

6.      The method according to claim **5**, wherein the at least one
subscription object is published by at least one of: a) at least one
other community; b) at least one other user; and c) at least one
vendor.

The difference between claim 5 and 6 illustrates that the applicants knew how to specify

when they wanted to require a subscription object to be "published" and when they did not.

Under XACP's proposed construction, the "subscription object" of claim 5 would need to be

"published," even though the applicants provided an entirely separate claim to call out that detail.

Moreover, a construction of "subscription object" that requires it to be published would not make

sense as applied to Claim 6 because the subscription object would need to be published <u>again</u>

pursuant to that claim.  The absence of a reference to publication in claim 5 and its presence in

Claim 6 is further reason to reject XACP's proposed construction.

### L.      "Subscribe" and "Subscribing"

| Claim term | Facebook's Construction | XACP's Construction |
|---|---|---|
| Subscribe | To designate something to be interacted with and/or accessed in one or more communities. | Select to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities. |
| Subscribing | Designating something to be interacted with and/or accessed in one or more communities. | Selecting to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities. |

There is little substantive difference between the parties' proposed constructions of "subscribe" and "subscribing."  The primary difference is that XACP's constructions end with the text, "selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities."  The passage of the specification on which XACP relies states that the subscription system allows a user to receive "updated content objects," '629 patent, col. 19, lines 38-39, but makes no mention of receiving updated "applications, functions and/or other aspects of one or more communities."  There is no reason to import this additional language into the claim.

### M.     "Published"

| Facebook's Proposed Construction | XACP's Proposed Construction |
|---|---|
| Made available to others. | Made available for others to interact with and/or access in one or more communities. |

The parties agree that the plain and ordinary meaning of "published" includes "made available to others," but XACP is impermissibly attempting to import details from the specification into the meaning of this straightforward term.  XACP manufactured its proposed construction by combining two different examples from the specification, one using the word "interact" and another using the term "access," and improperly importing those into its proposed construction.  *See* '629 patent, Col. 19, lines 33-34, col. 20, lines 53-55.  Facebook's proposed construction should therefore be adopted.

## V.     <u>AGREED CONSTRUCTIONS</u>

The parties are in agreement on the following terms:

| Claim Term | Agreed Construction |
|---|---|
| Selecting | The act of choosing one or more things. |
| Selection | One or more things that have been chosen. |
| Community identification information | Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information. |
| Community information | Information associated with a community. |
| User interface | The junction between a user and a computer program, such as a set of commands or menus through which a user communicates with a program. |

Facebook respectfully requests that the Court adopt the agreed constructions of these terms as set forth in the chart above.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Facebook respectfully requests that the Court adopt Facebook's proposed constructions as set forth above.

Dated: January 11, 2008          By: _____/s/ Heidi L. Keefe_____

Heidi L. Keefe
Mark R. Weinstein
Sam O'Rourke
WHITE & CASE LLP
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA 94306

Alfred W. Zaher
Dennis P. McCooe
BLANK ROME LLP
130 N 18th St
Philadelphia, PA 19103

Attorneys for FACEBOOK, INC. and
THEFACEBOOK, LLC

# CERTIFICATE OF SERVICE

This is to hereby certify that on January 11, 2008, I caused a true and correct copy of the foregoing document(s): **DEFENDANT FACEBOOK'S MEMORANDUM IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION** to be served via this Court's Electronic Filing ("ECF") System, upon the following:

Frederick A. Tecce, Esq.
McShea \ Tecce, P.C.
The Bell Atlantic Tower – 28th Floor
1717 Arch Street
Philadelphia, PA  19103
ftecce@mcshea-tecce.com


Thomas J. Duffy, Esq.
Patrick J. Keenan, Esq.
Duffy & Keenan
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, PA  19106
pjk@duffykeenan.com


Counsel for Plaintiff
Cross Atlantic Capital Partners, Inc.



_____/s/ Heidi L. Keefe_____
Heidi L. Keefe