IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CROSS ATLANTIC CAPITAL | : | CIVIL ACTION |
| PARTNERS, INC., | : | |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., and | : | |
| THE FACEBOOK, LLC | : | NO. 07-2768 |

## MEMORANDUM

**Padova, J.**                                                                                    **February 29, 2008**

Plaintiff Cross Atlantic Capital Partners, Inc. ("XACP") has brought this patent infringement action concerning U.S. Patent No. 6,519,629 (the "'629 patent") entitled "System for Creating a Community for Users with Common Interests to Interact In," against Facebook, Inc., and The Facebook, LLC (collectively "Facebook"). Currently before the Court are the parties' claim construction briefs in which they seek to have the Court construe various claim terms of the patent pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). We held a Markman hearing on February 8, 2008.

## I.       PRINCIPLES OF CLAIM CONSTRUCTION

The first step in determining whether a patent has been infringed is construction of "any disputed terms and limiting expressions in the [asserted claims]." Vivid Tech., Inc. v. Am. Science & Eng., Inc, 200 F.3d 795, 803 (Fed. Cir. 1999). "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." U.S. Surgical Corp. v. Ethicon,

-1-

Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Construction of a patentee's claims is a matter of law.

Markman, 517 U.S. at 388-90.  In construing claims, a court need not construe all the claims in their

entirety.  U.S. Surgical Corp., 103 F.3d 1568 ("The Markman decisions do not hold that the trial

judge must repeat or restate every claim term in order to comply with the ruling that claim

construction is for the court. . . .  It is not an obligatory exercise in redundancy.")  Rather, only those

claim terms that are in controversy need to be construed, and only to the extent necessary to resolve

the controversy.  Vivid Tech., 200 F.3d at 803.

　　　"Claim interpretation begins with an examination of the intrinsic evidence, i.e. the claims,

the rest of the specification and, if in evidence, the prosecution history."  CCS Fitness, Inc. v.

Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citing cases).  The language of the claim

itself is of primary importance.  See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)

(noting that the Supreme Court has recognized that the claims are of primary importance); Interactive

Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (stating that "[f]irst, we

look to the claim language. Then we look to the rest of the intrinsic evidence . . .").  Words of a

claim are generally given their ordinary and customary meaning, and the ordinary and customary

meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the

art in question at the time of the invention.  Phillips, 415 F.3d at 1313.  A person of ordinary skill

in the art is deemed to read the claim terms not only in the context of the particular claim, but in the

context of the entire patent, including the specification and the prosecution history.  Id.; see also

Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the

ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the

context of the written description and the prosecution history.").  "In some cases, the ordinary

meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314.

Reliance on the specification, or written description, for guidance as to the meaning of the claims is entirely appropriate. Id. at 1317. "The specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. Id. at 1316. The specification may also reveal an intentional disclaimer, or disavowal, of claim scope by the inventor, and the inventor's intention, as expressed in the specification, is dispositive. Id. Although courts should consider the specification when construing a claim, a court cannot add "limitations appearing only in the specification." Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994); see also Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002) (stating that the district court erred by importing a limitation from the specification into the claim); Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999) (stating that claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to these sources). The United States Court of Appeals for the Federal Circuit has recognized that there is a fine line between reading a claim in light of the specification, and reading

a limitation into the claim from the specification.  See Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).  To help locate this "fine line," the Federal Circuit has reminded courts that they "look 'to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention' and not merely to limit a claim term." Interactive Gift Express, 256 F.3d at 1331 (quoting Comark Commc'ns, 156 F.3d at 1187). Additionally, the Federal Circuit has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.  Phillips, 415 F.3d at 1323 (citing Gemstar-TV Guide Int'l., Inc. v. ITC, 383 F.3d 1352, 1366 (Fed. Cir. 2004)).[1]

The Federal Circuit has also instructed that district courts may, in their discretion, admit and use extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, to determine the meaning of a claim.  Id. at 1319.  However, the Federal Circuit cautioned that extrinsic evidence in general is less reliable than the patent and its prosecution history in determining how to read claim terms unless considered in the context of intrinsic evidence.  Id. at 1319.  One form of extrinsic evidence that a court may not use to supply limitations to the patent claim language is the accused device.  See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1330-31 (Fed. Cir. 2006) (repeating the rule that "claims may not be construed with reference to the accused device") (quoting NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002)).  However, a court may consider the accused device to determine what part of the claim

---

[1]Besides consulting the specification, the Federal Circuit has instructed that intrinsic evidence includes a patent's prosecution history, if it is in evidence.  Phillips, 415 F.3d at 1317.  It is undisputed that the '629 Patent was not subject to a prior art rejection.  Since there was no prior art rejection, the inventors never negotiated with the PTO or disclaimed any interpretations of the claims.

must be construed.  Exigent Tech. v. Atrana Solutions, Inc., 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006); see also Wilson, 442 F.3d at 1331 (stating that the court is not forbidden from being aware "of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component").

The Federal Circuit has also instructed that the "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." Phillips, 415 F.3d at 1320.  Because the public must rely on the patentee to describe "just what he has invented, and for what he claims a patent," id. (quoting  Merrill v. Yeomans, 94 U.S. 568, 573-74 (1876)), the Federal Circuit has stated that "[t]he use of a dictionary definition can conflict with that directive because the patent applicant did not create the dictionary to describe the invention.  Thus, there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words." Phillips, 415 F.3d at 1321.  The Phillips Court reiterated that "[a]s we said in Vitronics, judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" Phillips at 1322-23 (quoting Vitronics, 90 F.3d at 1584 n.6). With these precepts in mind, we turn to the claims that remain in dispute following the Markman hearing.[2]

_____

[2]The claims construction briefs filed prior to the Markman hearing, disclosed that the parties agreed to the following constructions of terms that were contested in their prior submissions:

1.	Community Identification Information:  Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information.
2.	Selection:  One or more things that have been chosen.
3.	Community Information:  Information associated with a community.
4.	Selecting:  The act of choosing one or more things.

At the <u>Markman</u> hearing, the parties stipulated to the constructions of following additional terms:

5.	User Interface: The junction between a user and a computer program, such as a set of commands or menus through which a user communicates.
6.	Subscription Object: An object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item.
7.	Application Object: A computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.
8.	Published: Made available for others to interact with and/or access in one or more communities.
9.	Community Fields: Information that designates the interests and/or demographics of a community, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and /or meta-tags of interest associated with a community, which may overlap with other community identification information.
10.	User Fields: Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user.
11.	Vendor Fields: Information that describes a product or service, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta tags of interest associated with a product or service.
12.	Receiver Module: A section of a computer program that provides the function of receiving data.
13.	Creation Module: A section of a computer program that provides the function of creating a community.
14.	Subscription Module:  A section of a computer program that provides the function of subscribing to one or more subscription objects.
15.	Transmitter Module:  A section of a computer program or device that provides the function of transmitting data.
16.	Subscribe / Subscribing: Select(ing) to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more

## II.    DISCUSSION

Claim 1 of the '629 Patent, with the terms we must construe highlighted, discloses:

A method for **creating a community** for users with common interests to interact in, the method comprising the steps of:

receiving a **creation transmission** from a **registered user**, the creation transmission indicating that the registered user desires to create a community;

receiving **community identification information** from the registered user;

receiving a **selection** of at least one application object from the registered user;

creating a community based on the community identification information and the at least one application object;

receiving at least one communications address designed by the registered user, the at least one communications address corresponding to a user to receive a **created community**; and **transmitting** the created community based in part on the at least one communications address.

('629 Patent, Col. 330, line 65 - Col. 31, line 17.)  We will discuss each term, along with related terms, in the order in which they appear in the claim.

1.    "Community"

XACP argues that the term "community," which is used in claim 1 as well as most of the 32 claims in the '629 Patent, should be defined to mean:  *Information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public*

_____

communities.

17.    Communications Address: The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

*communications network, such as web pages or an Internet site.* (Pl. Br. at 12.) Facebook argues

that the term should be defined as: *A virtual place or electronic medium where people having*

*common interests can interact, which can be accessed by a computer or other device.* (Def. Br. at

11.) The dispute among the constructions is, thus, whether "community" should be defined as a

"virtual place" or as "information and at least one function, . . . and/or an expression of interest that

may be accessed . . . through a communications network."

XACP draws our attention to several parts of the specification in the Patent to support its

definition. First, in the "Summary of the Invention," the inventor states that the object of the

invention is to:

> provide a system and method which simplifies processes for interaction among
> individuals and/or entities which occur through a communications network.

('629 Patent, Col. 3, lines 15-18.) According to an embodiment of the invention specified in the

Patent, a "community creating module **165** may provide the framework through which central

controller **115** interacts with a user to create a **community, and related applications and**

**functions**." (<u>Id.</u>, Col. 3, lines 53-57 (emphasis added).) According to an embodiment of the

invention cited in the specifications,

> a community entitled "The XYZ Softball Team" may be created, where **information**
> about the XYZ Softball team, including a schedule of games, player statistics, and
> other information, is presented. A creator may determine that the only members of
> the XYZ Softball team should be able to access the community.

(<u>Id.</u>, Col. 11, lines 66 - Col. 12, line 4 (emphasis added).) XACP focuses on this language in the

specification, asserting that it incorporates the concepts of "function" and "information" into the

definition of community. It asserts that a "virtual place" – Facebook's definition of community –

finds no support in the intrinsic evidence.

Facebook argues that "community" should be defined as a "place" based upon the plain meaning of the term, which it asserts the dictionary defines as "1. a. A group of people residing in the same locality and under the same government. b. The area or locality in which such a group resides. 2. A group or class having common interest." (Def. Br. at 11, quoting *Webster's II New College Dictionary* 227 (Houghton Mifflin Co. ed. 1999.) Because the '629 Patent deals entirely in a computer environment, Facebook adds that the definition of "community" is necessarily "virtual."

We find that using Facebook's resort to a general dictionary definition, would not be appropriate given the Federal Circuit's admonition in Phillips, and, even if it were, does not support Facebook's own claimed construction. The subject of both the first and the third cited definitions are "groups," not "locations." The second proffered dictionary definition speaks of a location only in the context of the common thing that binds a group together. The extrinsic dictionary definition does not support Facebook's assertion that the term "community," as it is used in the claim, is more appropriately a reference to a specific place, rather than to the people who inhabit it.

More importantly, Facebook's citations to the intrinsic evidence of the specification to support its construction that a community is a virtual place are also unconvincing. In its first example, found in the "Detailed Description of the Preferred Embodiments" section of the '629 Patent, Facebook avers that the inventor – discussing an embodiment of the invention called the "William Henry Harrison Historical Preservation Society" – disclosed that "community" "is a **place** on a computer where people with a shared interest in William Henry Harrison can interact." (Def. Br. at 12 (emphasis added), citing '629 Patent, Col. 4, lines 27-46.) However, the cited reference to the Patent specification never mentions the word "place" or any similar real or virtual concept.

To the contrary, we find that the reference supports XACP's construction.

In the cited portion, the inventor states that a creator – someone interested in creating a community – follows several steps to accomplish the purpose: he accesses "a central controller over a network to create a community using a community creating module," which permits the creator to "create a community, and designate applications and content presented in the community by a user interface." ('629 Patent, Col. 4, lines 27-33.) The application could be, for example, a chat room application, a schedule application, an application to pledge money or a photo application. (Id. at 33-40.) Nothing in the specification alludes to any "place," virtual or real, as a definition for "community." Rather it focuses upon the application – the thing the community has in common.

Another example, the "Omaha Sailing Club," is used to describe in more detail how a community is created. The inventor states that a creator "starts creating a community," "provides community identification information," "sets a category," "determines the look and feel of a community," "sets artwork and fonts," "sets text," "determines whether to have a link in an announcements screen," "sets up a mailing list," "sets a privacy level," "invites others," and finally, "launches a community." (Id., Col. 7, lines 27-50.) The "XYZ Softball team" example is another detailed description of how a community is created, and includes the description that the creator may "provide to central controller module **115** a list of team members, along with appropriate information. Central controller module **115** may compare information provided by a user to the information provided by a creator, thereby governing access to the community." (Id., Col. 11, line 66 - Col. 12, line 4.) Again, there is no attempt to signify that a community is a specific place, either real or virtual.

Thus, we find it is clear that there is no "virtual place" requirement in the '629 Patent.

Rather, a "community" is, as XACP argues, "information and at least one function, . . . and/or an expression of interest that may be accessed . . . through a communications network."

        2.    "Creating a Community," "Create a Community," "Created Community," "Community is Created"

Claim 1 is a "method of creating a community." Other than the just discussed dispute over the term "community," the parties essentially agree on the construction of "creating a community" and its related terms "create a community," "created community," and "community is created." Both sides agree that to "create" is to bring into existence." (Pl. Br. at 14, Def. Br. at 13.) Incorporating our construction of "community," we find that "creating a community" means "to bring into existence information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site." "Creating a community" is "to cause to come into existence, bring into being, make or originate information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site." A "created community" is "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, that was caused to come into existence, brought into being, made or originated." "Community is created" is "information and at least one function relating to a specific transaction interaction, and/or expression of interest that may be accessed and/or interacted

with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, having been caused to come into existence, brought into being, made or originated."

        3.        "Creation Transmission," "Transmit"

Claim 1 requires "receiving a **creation transmission** from a registered user, the creation transmission indicating that the registered user desires to create a community." XACP argues that a creation transmission must be defined to mean: *An electronic transmission through a private or public communications network indicating a request to create a community.* (Pl. Br. at 15.) Facebook argues that the term should be defined to mean: *An electronic signal indicating a request to create a community.* (Def. Br. at 21.) The primary difference between the two constructions is that XACP's version includes the requirement of a private or public communications network as the means for creating the community, which Facebook's version does not. In addition, Facebook incorporates a construction of "transmit" into the construction of "creation transmission," limiting the term to a "signal." XACP argues that the intrinsic evidence demonstrates that the inventor included the requirement that the method for simplifying the interaction among individuals must "occur through a communications network." (See '629 Patent Col. 3, lines 10-15.) It contends that Facebook's proposed definition of "signal" improperly narrows the permissible form of transmission, and is unsupported by the specification or the ordinary use of the word. We agree.

The root word "transmit" is incorporated into the concept of "creation transmission," and also appears at the end of claim 1 in the phrase "transmitting the created community based in part on the at least one communications address." (Id., Col. 31, lines 16-17.) XACP argues that "transmitting" should be construed to mean: *Electronically connecting, sending out and/or communicating by any*

*wireless or wire mechanism.* (Pl. Br. at 25.) The construction proposed by Facebook is: *Electronically sending.* (Def. Br. at 23.) Thus, before we arrive at a construction of "creation transmission," we must decide whether the term "transmit" includes "connecting" and "communicating."

Both parties cite to dictionary definitions of the term. According to XACP, the term is defined as "to send or cause to go from one person or place to another, esp. across intervening space or distance; transfer, dispatch, convey. (Pl. Br. at 27, quoting *Webster's New World Dictionary* 1421 (3d College ed. 1994).) Facebook asserts the term means "to send (a signal), as by wire or radio." (Def. Br. at 23, quoting *Webster's II New College Dictionary* (Houghton Mifflin 1999).) Facebook argues that XACP's construction improperly redefines the term to capture Facebook's website by including activities that have nothing to do with transmitting. It contends that connecting and transmitting are distinct concepts: that two things can be connected even if nothing is transmitted between them and that, while transmitting "may inherently require the establishment of a connection, transmitting entails the further act of actually sending something from one place to another." (Def. Br. at 23.)

We do not, however, need to resort to extrinsic dictionary definitions because the specification itself requires a construction that includes the concept of "connecting" in the definition of "transmitting." The specification discloses a method for two-way communication by "interacting through a network" and allowing "widespread and rapid distribution of an electronic connection" between users. ('629 Patent Col. 3, lines 16-19; 24-29.) In the Detailed Description of the Preferred Embodiments, the inventor describes the embodiment as a "Network [that] may be any network that permits multiple users to connect and interact," which may be a an internet service provider, a dial-

-13-

up access or "other manner of connecting to a network." (Id., Col. 5, lines 26-27; 32-34.)

Numerous other parts of the specification make clear that interaction among users is the purpose of the invention. The method includes a "central controller module" with which a user must communicate to initiate the community, (id., Col. 26, lines 56-67), a "communications module" to enable communications with others (id., Col. 6, lines 39-40), a chat application object permitting users to communicate (id., Col. 18, lines 20-33), and an instant messaging application object to permit users to communicate (id., Col. 18, lines 37-54). Limiting "transmitting" to just "sending" would make these functions impossible. Accordingly, we adopt XACP's construction of "transmit" as "electronically connecting, sending out and/or communicating by any wireless or wire mechanism."

The term "creation" in "creation transmission" is a limiting modifier. Claim 1 uses the term to describe the process by which the community is initiated by the registered user to express his intention and desire to create a community, as opposed to any later transmission. Thus, we find that the proper construction of creation transmission is an electronic transmission through a private or public communications network indicating a request to create a community.

### 4. "Registered User"

Another element of claim 1 is that the creation transmission must be received from a registered user. XACP asserts that "registered user" should mean: *A user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller*. (Pl. Br. at 17.) Facebook argues that the definition of "registered user" should be: *A person who has provided at least once, registration information (e.g., name, address, personal information, etc.)*. (Def. Br. at 10.) The distinction between the two

constructions is the requirement in XACP's definition that registration information be "requested," and that the registered user "forward" the information to a controller.

In the detailed embodiment of the invention, the inventor states that, "[u]pon creating the community, the creator designates other users to access the community." ('629 Patent Col. 4, lines 47-48.) "The central controller sends a transmission, such as an e-mail, to the invited users based on the information provided by the creator." (Id., Col. 4, lines 54-56.) "Upon receipt of the transmission, a user executes the executable component," (e.g. clicking on the appropriate icon), "provides registration information," (e.g., name, address, etc.) "and forwards the information to the central controller." (Id., Col. 4, lines 65-66, Col. 5, lines 3-5.) The user can then interact with the community through the central controller, other users, or both." (Id., Col. 5, lines 11-13.) Later, the specification also states that "on the user's first visit, the user is prompted to register. . . . A registration form . . . is completed by the user and may then be sent by client **110** to central controller module **115** . . . ." (Id., Col. 27, lines 1-7.)

While Facebook argues that the "requested" element does not appear in the specification, we find that both the "request" element and the "forwarding" element are both clearly stated in the specification. (Id., Col. 5, lines 3- 5; Col 27 lines 1-7.) The requirement that the information be "requested" is embodied in the specification that the user is "prompted to register," and then "provides registration information."

Facebook also argues that the "requested" element and the "forwarded" element are limitations imported from the specification to narrow the definition of "registered user." It asserts that neither limitation has anything to do with the plain meaning of the term, and the "forwarded" element is merely a "design choice" included in the preferred embodiment and is not definitional.

(Def. Br. at 10-11.)

We cannot agree that the "forwarded" element is merely a design choice and has nothing to do with the definition of registered user. The specification states that, after the registration is completed by the user, it "may then be sent" to a central controller module. Facebook reads the word "may" to indicate that the requirement is optional or permissive. We find, however, the specification cannot be read as permissive – as in it "may or may not be" sent. Rather, we find, the inventor used the "may be sent" element as a time orientation: the registration is to be sent after it is completed by the user. If forwarding was optional, the registration would never occur. If the registration were forwarded before the registration information was completed, the registration would fail. Thus, we find, the key concept in the "may then be sent" language is the word "then," setting forth the sequence of events.

Accordingly, we find that the construction of "registered user" is "a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller."

5. Display Module

"Display Module" is a term found in claim 25 of the '629 Patent. The claim discloses a system for creating a community for users with common interests to interact in comprising a "transmitter module" containing certain features, and a "display module for displaying prompts." ('629 Patent Col. 33 line 60 - Col. 34 line 13.) As noted, the parties agree that a "transmitter module" is a section of a computer program or device that provides the function of transmitting data. XACP argues that "display module" is: *A section of a computer program or device that provides*

*the function of displaying onscreen information*. (Pl. Br. at 48.)[3] Facebook proposes that a display

module be limited to: *A device that displays on-screen information, such as a CRT display.* (Def.

Br. at 19.) XACP's construction, using the disjunctive "or," permits computer software or a device

to be alternative embodiments of the display module, while Facebook's proposed construction limits

the term to only a device. XACP argues that the Federal Circuit has instructed that terms must be

construed consistently throughout a patent; that if a construction of other "module" terms includes,

alternatively, only software with no device requirement, the construction of display module must also

be permitted to include the alternative of software with no device requirement. (Pl. Br. at 48, citing

North Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1344-45 (Fed. Cir. 2005)

(holding that, as a general rule, terms "should be construed consistently throughout the claims");

CVI/Beta Ventures, Inc. v. Tura, LP, 112 F.3d 1146, 1159 (Fed. Cir. 1997) (same).)

In North Am. Container, Inc., the Federal Circuit specifically rejected employing the general

rule cited by XACP where the prosecution history demonstrated that the plaintiff had disclaimed

consistent treatment of a term when applied to different portions of the invention. Id. at 1346

(holding that district court did not err in construing the term "generally convex" differently as it

related to the inner and outer walls of the invention where the applicant disclaimed any concavity

for the inner walls, but not the outer walls). This, we find, is the case with the '629 Patent's

treatment of the various module terms.

Where the inventor intended that a module be comprised of computer software alone,

perform its function using software and a device, or do so through a device, he so specified and

_____

[3]While XACP's original formulation of all of the "module" terms stated that each "may provide the function of . . .," at the Markman hearing, counsel agreed to strike the word "may." (Tr. 2/8/08 19:3-6.)

-17-

distinguished those functions that required a device. The specification states that:

> According to an embodiment of the invention, each computer **110** may be configured as a typical home based computer. . . . Each computer **110** may contain a communication application module **155**, a processor module **160** and a memory module **170**. Communication application modules **155**a and **155**b need not be the same specific *software* so long as communication between them is according to standard protocols. . . . Communication application module **155** may comprise an *e-mail application* such as Microsoft Beyond Mail, Netscape Mail, Eurora Pro, or the like. . . . Computer **110** may have at least one input *device* **120** for controlling the computer **110**. Input *device* **120** may be a *keyboard, joystick, touchpad, scanner or any combination of devices*. Each of computers **110** may also include a display module **140**, such as a *CRT display or other device*.

('629 Patent Col. 5, line 56 - Col. 6, line 8 (emphasis added).) Later, the inventor specified that one or more of the modules of a system "may comprise computer readable code that, when installed on a computer, perform the functions described above. Also, only some of the modules may be provided in computer readable code." (Id. at Col. 30, lines 50-53.) The entirety of the specification, we find, teaches that some modules may use software to perform their function, others require both software and a device to perform their function, and yet others perform their function using only a device. The communication application module requires only software, whereas to control the computer, a device and not software is clearly required.

The display module's ability to perform its function – displaying – is clearly articulated in the specification. A display module, if included, performs its function by a "CRT display or other device." XACP argues that the inventor's use of the words "such as" as a predicate to "CRT display or other device" indicate that the device requirement is merely a limitation that may not be imported into the claim. We cannot agree. In Figure 1 of the '629 Patent, the display module **140**, like the input device **120**, is depicted not as part of the computer **110**, but is shown outside of and connected to the computer **110**, which itself contains all of the other modules, such as the communication

application module **155** and the memory module **170**. Clearly, this is because the display module's function is distinct from any other module that performs its function through computer software. While the other modules control aspects of the computer program, the specification makes clear that the display module has a physical function to perform comparable to no other module.

We find that, to a person of ordinary skill in the computer arts, the customary meaning of "display" requires hardware. Display is "[t]he visual output of a computer, which is commonly a CRT-based video display." *Microsoft Press Computer Dictionary* 145 (Microsoft Press 1999). Because the device requirement of the display module is recognized in Figure 1 and the specification, the dictionary definition "does not contradict any definition found in or ascertained by a reading of the patent documents." Phillips at 1322-23. Because in Figure 1 the patentee has demonstrated a clear intention to limit the claim scope using an "expressions of manifest exclusion or restriction," see Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002), the proper construction of display module must be a device.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CROSS ATLANTIC CAPITAL | : | CIVIL ACTION |
| PARTNERS, INC., | : | |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., and | : | |
| THE FACEBOOK, LLC | : | NO. 07-2768 |

**<u>ORDER</u>**

**AND NOW**, this 29th day of February, 2008, upon consideration of the parties' Memoranda

on Claim Construction, and the <u>Markman</u> hearing held February 8, 2008, **IT IS HEREBY**

**ORDERED** as follows:

1. The following disputed claim terms of the '629 patent are construed as indicated:

    a.    "Community" is construed to mean "information and at least one function

relating to a specific transaction, interaction, and/or expression of interest that

may be accessed and/or interacted with by a plurality of users with common

interests through a private or public communications network, such as web

pages or an Internet site."

    b.    "Creating a community" is construed to mean "to bring into existence

information and at least one function relating to a specific transaction,

interaction, and/or expression of interest that may be accessed and/or

interacted with by a plurality of users with common interests through a

private or public communications network, such as web pages or an Internet

site."

    c.    "Create a community" is construed to mean "to cause to come into existence,

bring into being, make or originate information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site."

d.    "Created community" is construed to mean "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, that was caused to come into existence, brought into being, made or originated."

e.    "Community is created" is construed to mean "information and at least one function relating to a specific transaction interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, having been caused to come into existence, brought into being, made or originated."

f.    "Creation transmission" is construed to mean "an electronic transmission through a private or public communications network indicating a request to create a community."

g.    "Transmit" is construed to mean "electronically connecting, sending out and/or communicating by any wireless or wire mechanism."

h. "Registered user" is construed to mean "a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller."

i. "Display module" is construed to mean "a device that displays on-screen information, such as a CRT display."

2. The parties stipulate to the construction of the following terms:

a. Community Identification Information:  Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information.

b. Selection:  One or more things that have been chosen.

c. Community Information:  Information associated with a community.

d. Selecting:  The act of choosing one or more things.

e. User Interface:  The junction between a user and a computer program, such as a set of commands or menus through which a user communicates.

f. Subscription Object:  An object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item.

g. Application Object:  A computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, instant messaging,

navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.

h.      Published:  Made available for others to interact with and/or access in one or more communities.

i.      Community Fields:   Information that designates the interests and/or demographics of a community, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta-tags of interest associated with a community, which may overlap with other community identification information.

j.      User Fields:  Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user.

k.      Vendor Fields:  Information that describes a product or service, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta tags of interest associated with a product or service.

l.      Receiver Module:   A section of a computer program that provides the function of receiving data.

m.      Creation Module:   A section of a computer program that provides the function of creating a community.

n.      Subscription Module:  A section of a computer program that provides the

function of subscribing to one or more subscription objects.

o.    Transmitter Module:  A section of a computer program or device that provides the function of transmitting data.

p.    Subscribe / Subscribing:  Select(ing) to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities.

q.    Communications Address:  The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

BY THE COURT:

S/John R. Padova

_____

John R. Padova, J.