# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CROSS ATLANTIC CAPITAL PARTNERS, INC. | **CIVIL ACTION** |
| Plaintiff, | **NO.  07-CV-02768-JP** |
| v. | **ORAL ARGUMENT REQUESTED** |
| FACEBOOK, INC. and THEFACEBOOK, LLC, | **FACEBOOK MOTION NO. 3** |
| Defendants. | |

## FACEBOOK'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

Dockets.Justia.com

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................... 1
II.    THE '629 PATENT ................................................................................................ 2
   A.   The Claims of the '629 Patent ........................................................................ 2
   B.   The '629 Patent's Priority Date Is No Earlier Than February 25, 2000. ........ 3
III.   DISCUSSION ........................................................................................................ 5
   A.   Patent Is Invalid If Someone Else Invented First........................................... 5
   B.   The '629 Patent is Anticipated by U.S. Patent No. 6,223,177........................ 6
      1.    The '177 Patent Anticipates Claim 1 ...................................................... 7
      2.    The '177 Patent Anticipates Claim 2 .................................................... 12
      3.    The '177 Patent Anticipates Claim 3 .................................................... 13
      4.    The '177 Patent Anticipates Claim 4 .................................................... 13
      5.    The '177 Patent Anticipates Claim 5 .................................................... 13
      6.    The '177 Patent Anticipates Claim 6 .................................................... 14
      7.    The '177 Patent Anticipates Claim 7 .................................................... 15
      8.    The '177 Patent Anticipates Claims 9-15 ............................................. 15
      9.    The '177 Patent Anticipates Claims 17-23 ........................................... 16
      10.   The '177 Patent Anticipates Claims 25-31 ........................................... 18
   C.   The '629 Patent is Anticipated by U.S. Patent No. 6,750,881...................... 19
      1.    The '881 patent Anticipates Claim 1 ..................................................... 20
      2.    The '881 patent Anticipates Claim 2 ..................................................... 24
      3.    The '881 patent Anticipates Claim 3 ..................................................... 24
      4.    The '881 patent Anticipates Claim 4 ..................................................... 25
      5.    The '881 patent Anticipates Claim 5 ..................................................... 25
      6.    The '881 patent Anticipates Claim 6 ..................................................... 25
      7.    The '881 patent Anticipates Claim 7 ..................................................... 26
      8.    The '881 patent Anticipates Claims 9-15 .............................................. 26
      9.    The '881 patent Anticipates Claims 17-23 ............................................ 26
      10.   The '881 patent Anticipates Claims 25-31 ............................................ 27
   D.   The '629 Patent is Anticipated by U.S. Patent No. 6,608,636...................... 27
      1.    The '636 Patent Anticipates Claim 1 ..................................................... 28
      2.    The '636 Patent Anticipates Claim 2 ..................................................... 31
      3.    The '636 Patent Anticipates Claim 3 ..................................................... 31
      4.    The '636 Patent Anticipates Claim 4 ..................................................... 31
      5.    The '636 Patent Anticipates Claim 5 ..................................................... 32
      6.    The '636 patent Anticipates Claim 6 ..................................................... 33
      7.    The '636 patent Anticipates Claim 7 ..................................................... 33
      8.    The '636 patent Anticipates Claims 9-15 .............................................. 33
      9.    The '636 patent Anticipates Claims 17-23 ............................................ 34
      10.   The '636 patent Anticipates Claims 25-31 ............................................ 34
   E.   The '629 Patent Is Invalid For Obviousness................................................. 35
IV.    CONCLUSION.................................................................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agrizap, Inc. v. Woodstream Corp.*,
520 F.3d 1337 (Fed. Cir. 2008) ...........................................................35, 38

*Augustine Medical, Inc. v. Gaymar Industries, Inc.*,
181 F.3d 1291 (Fed. Cir. 1999)....................................................................4

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001)....................................................................5

*In re Chu*,
66 F.3d 292 (Fed. Cir. 1995)........................................................................4

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995)....................................................................35

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966) .......................................................................................35

*KSR Intern. Co. v. Teleflex Inc.*,
___ U.S. ____, 127 S.Ct. 1727 (2007).......................................5, 35, 36, 38

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .....................................................................................5

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .....................................................................................6

*Peters v. Active Manufacturing Co.*,
129 U.S. 530 (1889) .....................................................................................5

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)................................................................4, 5

*Schering Corp. v. Geneva Pharmaceuticals, Inc.*,
339 F.3d 1373 (Fed. Cir. 2003)....................................................................5

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001)....................................................................6

*In re Winslow*,
365 F.2d 1017 (C.C.P.A. 1966) .................................................................35

## FEDERAL STATUTES

35 U.S.C. § 102................................................................................ *passim*

35 U.S.C. § 103.............................................................................5, 35, 38

## I.    INTRODUCTION

U.S. Patent No. 6,519,629 (the '629 patent") is invalid.  The patent purports to cover a technique for creating customized on-line communities over a computer network, where a user provides: (1) identification information, such as a name, and (2) a selection of at least one application object for the community, such as chat or bulletin board applications.  The alleged invention then uses these two pieces of information to create a community that can be made available to other users *via* some form of invitation.  But by 1998, this was old.

A patent is only valid if the invention is novel.  Nothing claimed in the '629 patent was novel.  To the contrary, there were numerous prior patents, patent applications, publications, products and systems that described systems for creating on-line communities using the exact same method claimed in the '629 patent long before the patent's application was filed.  None of that prior art was brought to the attention of the Patent Office during prosecution of the '629 patent.  This motion focuses on three of those prior art references:

> U.S. Patent No. 6,223,177, entitled "Network Based Groupware System," which discloses a system that allows a user to create a community (in the form of a dedicated website) with a name and selected applications such as chat or bulletin board to which the user can invite others through e-mail;
>
> U.S. Patent No. 6,750,881, which describes a community creation system used by America Online ("AOL") which allows a user to create a customized community with a chat application, to which others can be invited; and
>
> U.S. Patent No. 6,608,636 B1, which discloses a system for creating a community (in the form of a virtual "conference room") with applications, like whiteboards, in which invited members can interact.

This case can and should be disposed of based on the invalidity of the '629 patent.  There is no dispute as to what the prior art discloses or how it applies to the claims of the '629 patent.  Each piece of prior art is straightforward and understandable and each reference invalidates the '629 patent claims so clearly that no third party or expert testimony is required.  Summary judgment should be granted for the reasons expressed below.

## II.    THE '629 PATENT

### A.    The Claims of the '629 Patent

The '629 patent includes thirty-two (32) claims, all of which are being asserted by Cross Atlantic Capital Partners, Inc. ("XACP").  Claims 1, 9, 17 and 25 are independent claims, and each is followed by seven substantially identical dependent claims.  The claims can thus be divided into four groups based on the independent claims (1-8, 9-16, 17-24, and 25-32).  Each group of claims recites either a method or system for creating a community in which users with common interests can interact.  Claims 1 through 8 provide:

```
1.    A method for creating a community for users with common interests
      to interact in, the method comprising the steps of:

      receiving a creation transmission from a registered user, the
      creation transmission indicating that the registered user desires
      to create a community;

      receiving community identification information from the registered
      user;

      receiving a selection of at least one application object from the
      registered user;

      creating a community based on the community identification
      information and the at least one application object;

      receiving at least one communications address designated by the
      registered user, the at least one communications address
      corresponding to a user to receive a created community; and

      transmitting the created community based in part on the at least
      one communications address.

2.    The method according to claim 1, wherein the step of transmitting
      the created community further comprises transmitting the created
      community and a user interface.

3.    The method according to claim 1, wherein the at least one
      communications address is an e-mail address.

4.    The method according to claim 1, wherein the selected at least one
      application object comprises at least one of: a) chat application
      object; b) an instant message application object; c) a white board
      application object; d) a shopping cart application object; e) an
      invitation application object; f) a creation application object;
      g) a photo album application object; h) a store application
      object; i) a calendar application object; j) a video conferencing
      application object; k) a voice chat application object; l) an e-
      mail list application object; m) a bulletin board application
      object; and n) a pals application object.
```

5.   The method according to claim **1**, further comprising the step of receiving a selection to subscribe to at least one subscription object, wherein the at least one subscription object is accessed through one of the at least one application object.

6.   The method according to claim **5**, wherein the at least one subscription object is published by at least one of: a) at least one other community; b) at least one other user; and c) at least one vendor.

7.   The method according to claim **5**, wherein accessing the at least one subscription object through the one of the at least one application object maintains all of the original features of the subscription object.

8.   The method according to claim **1**, wherein community information further comprises community fields, whereby the community presents to a user at least (sic) at least one of: a) at least one other user having user fields; b) at least one other community having community fields; and c) at least one vendor product having vendor fields; wherein the presentation is based in part on a comparison of user fields, community fields and vendor fields.

The other three groups of claims are substantially similar to claims 1-8. Claims 9-16 recite a "system" for creating a community with elements that generally track those recited in claims 1-8. Claims 17-24 are method claims that recite essentially the "flip side" of the community creation method in claims 1-8. In particular, while the steps of claim 1 recite "receiving" certain information, claim 17 recites a method involving "transmitting" that same information. Claims 25-32 recite a system for creating a community with elements that are similar to those of 17-32, but include the additional element of a "display module," which requires a computer monitor or other display device or hardware.

For purposes of the invalidity analysis presented in this motion, there is no material difference between claims 1-8 and the other three groups of claims. Accordingly, in the interests of brevity, this motion focuses its analysis on claims 1-8 and discusses the other claims only to the extent required.

B.     **The '629 Patent's Priority Date Is No Earlier Than February 25, 2000.**

The application for the '629 patent was filed on October 2, 2001 as a "divisional" of an earlier application filed on February 25, 2000. Both applications shared the same written description but had different claims. As explained below, the earliest priority date the '629

patent can claim is February 25, 2000, so any references that predate that date qualify as potentially invalidating prior art.

The February 25, 2000 application was a "continuation-in-part" of an earlier application filed on September 15, 1998.  *See* Weinstein Decl., Ex. A ('629 patent), front cover, item 60.  A continuation-in-part ("CIP") is a patent application that contains subject matter from a prior application and additional matter not disclosed in the prior application.  *See Augustine Medical, Inc. v. Gaymar Industries, Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999).  "Subject matter that arises for the first time in the CIP application does not receive the benefit of the filing date of the parent application."  *Id.*; *see also, In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995) ("It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.").  The Federal Circuit has held that a patent issuing from a continuation-in-part application is presumptively not entitled to the earlier application's priority date.  *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008).  Instead, a patent holder seeking to rely on an earlier application bears the burden of establishing that the earlier application disclosed each element of the claimed invention.  *See id.*

XACP cannot meet any such burden because the entire description of the community creation system was added in the February 25, 2000 application.  Figure 2 of the '629 patent and the text following the section entitled "Creating a Community" (beginning on Col. 7, line 25) describe the essential steps for creating a community that are required by all of the independent claims.[1]  The earlier 1998 application did not contain any of these disclosures, and in fact, the word "community" does not appear even once in that application.  *See* Weinstein Decl., Exs. H

---

[1]  For example, that section of the patent describes the receipt of community identification information (Col. 7, ln. 61-col. 8, ln. 65), selection of application objects for the community (beginning at Col. 9, ln. 13) and inviting other users to join the community (beginning at Col. 12, ln. 55).  These disclosures are not present in the earlier application.  The disclosures of the '629 patent relating to subscription objects (beginning at Col. 19, ln. 25), and the matching of user, community and vendor fields (beginning at Col. 22, ln. 1) were also not present in the earlier application.  *See generally* Weinstein Decl., Ex. H.

and I.)  The claims of the '629 patent are therefore entitled to a priority date of no earlier than February 25, 2000.

## III.    DISCUSSION

### A.    Patent Is Invalid If Someone Else Invented First.

The patent system was established to foster and reward new inventions.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479 (1974).  To be patentable, an invention must be novel. *See* 35 U.S.C. § 102.  Pursuant to 35 U.S.C. § 102, a patent is invalid for lack of novelty if it can be shown that a single document or prior art reference expressly or inherently discloses each element of the claimed invention.  *See, e.g., Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003).  In simplest terms, a single piece of prior art that contains each element of a patent claim is said to "anticipate" that claim, rendering it invalid.  *Id.* at 1377.

Anticipation is determined through a simple comparison between the claim language and the prior art reference, using an analysis similar to the one used to determine whether the claim is infringed.  "The principle of law is concisely embodied in the truism that: 'That which infringes if later anticipates if earlier.'"  *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2000) (quoting from *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)).  Moreover, a patent claim can be invalid even if each element of the claim is not found in a single prior art reference.  If the differences between patented subject matter and the prior art are such that the subject matter as a whole would have been "obvious" to a person having ordinary skill in the art, the claim is invalid.  *See* 35 U.S.C. § 103; *KSR Intern. Co. v. Teleflex Inc.*, ___ U.S. ____, 127 S.Ct. 1727, 1734 (2007).

A party challenging the validity of a patent bears the burden of showing invalidity by clear and convincing evidence.  *See PowerOasis, Inc.*, 522 F.3d at 1305.  Once the challenger meets this burden, the patent holder is obliged to demonstrate why its patent is valid.  *See id.*

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine dispute of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment of invalidity is proper when, as here, no reasonable jury could find the patent valid over the prior art.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

**B.      The '629 Patent is Anticipated by U.S. Patent No. 6,223,177**

Like the '629 patent, U.S. Patent No. 6,223,177 ("'177 patent"), entitled "Network Based Groupware System" and assigned to Involv International Corporation, discloses a technique for creating a community in which users with common interests can interact.  *See* Weinstein Decl. Ex. B ('177 patent) at Col. 1, ll. 11-18.[2]  The '177 patent qualifies as prior art under 35 U.S.C. § 102(e) because its application was filed on November 19, 1998, more than a year before the application that resulted in the '629 patent was filed.

As shown in Fig. 1 of the '177 patent (below), a registered user (known as a "primary user") can create a dedicated website community customized for a particular project or goal (e.g., site #4).  As explained in more detail below, the community of the '177 patent is created based upon a name and applications selected by the primary user.  The primary user can then invite other users (known as "secondary users") to join that community.  Creation of and access to a community created using the technique described in the '177 patent takes place through a conventional Internet web browser.

---

[2]  The '177 patent also claims priority to Canadian Patent No. 2 221 790, which contains an identical disclosure and was filed on November 19, 1997.  *See* Weinstein Decl. Ex. C.  For purposes of clarity and consistency, all citations in the text refer to the '177 (U.S.) patent.



FIG.1

*See also* accompanying text at '177 patent Col. 3, ll. 24-38 and Col. 4, ll. 1-4, 11-12 and 14-18.
The '177 patent discloses each and every limitation of claims 1-7, 9-15, 17-23 and 25-31 of the
'629 patent, as explained below.

### 1. The '177 Patent Anticipates Claim 1

***"receiving a creation transmission from a registered user, the creation transmission
indicating that the registered user desires to create a community"***

The Court has construed "creation transmission" to be "an electronic transmission
through a private or public communications network indicating a request to create a community."
February 29, 2008 Order at 2.

The process of creating a community disclosed in the '177 patent begins when a
registered user (known as the "primary user") requests that a new community, *i.e.* dedicated
website, be created. "Server **10** has a unique resource locator (URL) address and comprises a
means to create a <u>dedicated intranet[3] site **25** (e.g. Site#4) on the server in response to an initiate
request received from a primary user **30**</u>." ('177 patent, Col. 3, ll. 29-33 (emphasis added).) The
request to create a new community is made by the primary user connecting to the server *via* a

---

[3]  The patent makes clear that it can be used either with an "intranet" (private) or the more common
"internet" (public).  ('177 patent, Col. 4, ll. 1-4, 11-12 and 14-18).

web browser using a public or private network:

> In order to create a private office suite, a primary user uses his/her web browser **110** to contact the intranet connected server. The server confirms the identity **120** of the primary user and directs the primary user to the system homepage **130**. From the system homepage, the primary user can access his/her personal workspace **140**.

> Among other options which will be discussed below, the primary user has the option to enter an existing workgroup with a pre-defined dedicated site or to create a new workgroup with a new, unique dedicated site (**150**).

> \* \* \*

> If the primary user wishes to create a new workgroup, he/she is provided with a workgroup creation template (**170**) which permits the primary user to define parameters of the workgroup, such as the name of the workgroup and the site to be created, the scope of the project being undertaken, the number of team members, etc.

(Col. 4, ll. 43-48, 55-60.)

The primary user described above is a "registered user" under the Court's definition. The Court has construed "registered user" to mean "a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller." February 29, 2008 Order (Doc. No. 81) at 3. The primary user is a registered user because, as noted in the quoted text above, the server confirms the primary user's identity before the primary user is given access to the system. ('177 patent, Col. 4, ll. 44-46; Fig. 2A (step **120**).) Obviously, in order for the server to be able to confirm the identity of the primary user, its identity must have been provided to the server.

> ***"receiving community identification information from the registered user;"***

The registered user also provides community identification information by entering the name of the community to be created. This is accomplished by the '177 patent when the primary user enters a unique name for the dedicated website that he or she desires to create. ('177 patent, Col. 4, ll. 55-50 ("If the primary user wishes to create a new workgroup, he/she is provided with a workgroup creation template (**170**) which <u>permits the primary user to define parameters of the</u>

workgroup, such as the name of the workgroup and the site to be created, the scope of the project being undertaken, the number of team members, etc.") (emphasis added); *see also* Col. 4, ll. 61-65; Col. 2, ll. 26-29 (specifying that the dedicated site has a "unique name" based on the information received from the primary user).)

### *"receiving a selection of at least one application object from the registered user"*

The registered user also provides a selection of at least one application object that will be included in the community, *i.e.* dedicated website. The Court has construed the term "application object" as "[a] computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board." February 29, 2008 Order at 3-4.

The system disclosed in the '177 patent allows the primary user to customize a community by specifying the specific application objects that will be included with his dedicated website. As explained in the patent: "[t]he dedicated site created in response to the initiate request can be thought of as being a private office suite within the semi-public intranet." ('177 patent, Col. 4, ll. 19-21.) The patent further explains:

> The private office suite comes complete with all the application software required to permit group activity within the office. <u>The primary user can construct a private office suite to include the specific applications desired.</u> Thus, an advantage of the present system is that the user is provided with a <u>customizable</u>, secure office suite in which the user and his/her team members can access applications software without the need for each team member to have individual copies of each applications software.

('177 patent, Col. 4, ll. 25-33 (emphasis added).)

The primary user selects the desired applications for his dedicated site by using the same web-based user interface used to provide the other information: "[d]uring completion of the template, the primary user is prompted to <u>identify</u> the number and contact addresses of the group members, <u>the types of user applications which are to be utilized during the project</u> and to provide

a name for the dedicated site to be created." ('177 patent, Col. 4, ll. 61-65 (emphasis added); *see also* Col. 7, ll. 42-45 ("Fig 3*d* shows an application menu (Tab 320*d*) which can be utilized by a user to create dedicated sites and add users to a workgroup.").)  The patent identifies these user applications as follows:

> Preferred workgroup activity applications of the present system include bulletin board, chat room, calendar, contact database, change control, event planner, group discussion, issue management, project collaboration, presentation library, decision survey in a box, NGS proposal development, document manager, and You[r] Own Custom Application.

('177 patent, Col. 6, ll. 14-19.)  The patent goes on to describe these (and other) applications in detail.  (Col. 6, ln. 21-col. 7, ln. 12.)

These applications clearly meet the definition of an "application object" because each is a "computer program or module that functions to direct a user to specific information and/or enables a user to do something useful."  In fact, at least three of the applications identified in the '177 patent (*e.g.* chat, bulletin board, calendar) are specifically identified in the Court's construction as exemplary application objects.

### *"creating a community based on the community identification information and the at least one application object"*

The '177 patent states that the dedicated website is created after the user completes the creation template.  This template, as noted above, prompted the primary user to provide identification information (*e.g.,* name) and a selection of applications to be used with the dedicated site.  ('177 patent, Col. 4, ll. 61-65.)  The patent discloses that: "[o]nce this template has been completed, the server creates a dedicated site (180) having the name chosen by primary user."  ('177 patent, Col. 4, ln. 66-col. 5, ln. 1.)

The Court has construed the term "community" as "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site."  February 28, 2008 Order (Doc.

No. 81) at 1.[4]  The dedicated site created under the '177 patent is a "community" that was created based on both the community identification information (*e.g.* name) and the application object(s) selected by the user (chat, bulletin board, etc.).  (*See, e.g.*, '177 patent, Col. 4, ll. 27-28 ("The primary user can construct a private office suite to include the specific applications desired."); Col. 6, ll. 13-19 ("Preferred workgroup activity applications of the present system include . . . event planner . . . project collaboration . . . document manager . . . ."); Col. 7, ll. 44-46 ("Different styles of sites can be created, depending on the function of the site, *e.g.* Project Collaboration, Event Planning, Document Managing, etc.").)  The dedicated site is accessible through a standard web browser as a web page.  (Col. 3, ll. 39-49.)

*"receiving at least one communications address designated by the registered user, the at least one communications address corresponding to a user to receive a created community"*

The registered user of the '177 patent can also specify at least one communications address corresponding to a user to receive a created community.  The Court has construed "communications address" as "[t]he precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address."  February 29, 2008 Order at 5.

The '177 patent explains that the primary user can specify the communications addresses of other users who will be invited to join the dedicated website:  "[d]uring completion of the template, the primary user is prompted to identify the number and contact addresses of the group members . . ."  ('177 patent, Col. 4, ll. 61-65 (emphasis added).)  As explained in more detail in the next section, these communications addresses are used by the server to send messages to prospective group members (*e.g.*, by e-mail) inviting them to join and access the dedicated site.  (Col. 5, ll. 1-34.)

*"transmitting the created community based in part on the at least one communications*

---

[4]  The '629 patent uses the term "function" and "application object" synonymously.  *See, e.g.,* '629 patent, Col. 9, ll. 13-17 ("According to an embodiment of the invention, a configuration editor may present various standard community templates and application objects (or 'functions') to build a community, and various options or customizations for a creator to create a community."). (emphasis added.)

*address.”*

The system of the '177 patent transmits the created community, *i.e.* the dedicated site, based on the communications address(es) received from the primary user. The system disclosed in the '177 patent accomplishes this by communicating the existence of the dedicated website to the invited users, and then providing the website content to the users once they have joined. ('177 patent, Col. 2, ll. 21-34.) As explained in the '177 patent:

> The administration sub-system checks to see whether all the prospective group members identified by the primary user are listed on the existing intranet-user database (**190**). If a prospective group member is an existing intranet user, the server then sends details of the newly created dedicated site to that member of the group (secondary user) (**200**). In a presently preferred embodiment, the server automatically creates a link between each secondary user's personal workspace and the newly created dedicated site. Alternatively, the details of the web-site may be sent in the form of an E-mail message which provides each secondary user with the address of the dedicated site, an invitation to join the workgroup and, if applicable, the password required for gaining access to the site (see later).

('177 patent, Col. 5, ll. 1-26.) External users can also be notified of invitations by e-mail. (*See* Col. 7, ll. 49-53 and Col. 3. ll. 50-60.)

When an invited user accesses the dedicated site, the contents of the site are downloaded to the user via a web-browser. (*E.g.*, Col. 2, 32-34, col. 3, ll. 50-60.) "Once the approved secondary users have been notified of the existence of the dedicated site, the workgroup remains operational until all workgroup activities have been completed (**260**)." (Col. 5, ll. 34-37.)

### 2. The '177 Patent Anticipates Claim 2

Claim 2 recites: "The method according to claim 1, wherein the step of transmitting the created community further comprises transmitting the created community and a user interface." As explained in more detail above, the community created in accordance with the '177 patent is provided through a user interface and accessed through a standard Internet web browser. (*See* Col. 3, ll. 39-42 ("Both primary user 30 and secondary user 40 can communicate with server 10 by means of an HTML compliant client supporting a graphical user interface and internet browser, such as Netscape Navigator or Microsoft Explorer . . . .").) Users connect and

communicate with the community through a web browser, and the community appears to the user as an ordinary web page. (*See* Col. 3, ll. 46-49 ("Information on the [dedicated] site 25 is credited as a hypertext document and is thus displayed as a web page on the GVI of the user's web browser, with a link to this hypertext document."); Col. 2, ll. 32-34 (specifying step of "downloading contents of the dedicated intranet site to the second user via a web-browser installed at the second user").) Graphical screenshots of the user interface are shown in Fig. 3.

### 3. The '177 Patent Anticipates Claim 3

Claim 3 states: "The method according to claim 1, wherein the at least one communications address is an e-mail address." The '177 patent makes clear that an e-mail address can readily be used to designate users to receive a created community, *i.e.* the dedicated website. (*E.g.*, Col. 5, ll. 9-23 ("Alternatively, the details of the web-site may be sent in the form of an E-mail message . . . ."); Col. 8, ll. 12-14, col. 9, ll. 11-12 ("a messaging system for communicating existence of the dedicated network site to a selected ones of the list of secondary users," "wherein the messaging system comprises E-mail.").)

### 4. The '177 Patent Anticipates Claim 4

Claim 4 provides: "The method according to claim 1, wherein the selected at least one application object comprises at least one of," and then provides a list of fourteen (14) different types of application objects. These application objects include, by way of example, a "chat application object," an "instant message application object," "a calendar application object," "a bulletin board application object," and several others.

Although claim 4 requires that only one of the 14 listed application objects be present, the '177 patent discloses at least three of them; chat application object, calendar application object and bulletin board application object. (*See* '177 patent, Col. 6, ll. 14-19 ("Preferred workgroup activity applications of the present system include bulletin board, chat room, calendar . . . .").)

### 5. The '177 Patent Anticipates Claim 5

Claim 5 recites: "The method according to claim 1, further comprising the step of

receiving a selection to subscribe to at least one subscription object, wherein the at least one subscription object is accessed through one of the at least one application object." The '177 patent fully discloses the ability of users to subscribe to subscription objects as recited in claim 5.

The Court has construed the term "subscribe" as "select to be interacted with and/or accessed in one or more communities. . ." February 29, 2008 Order (Doc. No. 81) at 5. A subscription object is simply "[a]n object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item." *Id.* at 3. And the term "published" means "[m]ade available for others to interact with and/or access in one or more communities." *Id.* at 4.

The '177 patent discloses numerous application objects that allow users to select content for access or allow other users to publish content. With respect to the bulletin board application, for example, the '177 patent discloses: "A bulletin board is a common place for team members to post anything that might be of interest to the team. Discussion, file attachments, and broadcast main are available. Additionally, a number of views may be utilized to gain access to the information, including by date, by author, by type, etc." ('177 patent, Col. 6, ll. 21-26.) Additionally, the calendar and event planner applications in the '177 patent allow users to publish calendar items for other users to retrieve and view. (Col. 6, ll. 30-34, 41-45.) There are numerous other examples of applications that have similar publish-and-subscribe capabilities, including document management, a system for creating and viewing surveys, contact databases, project collaboration tools, and others. (*See generally*, Col. 6, ln. 34-col. 7, ln. 8; Fig. 3D)

### 6. The '177 Patent Anticipates Claim 6

Claim 6 is a dependent claim that recites: "The method according to claim 5, wherein the at least one subscription object is published by at least one of: a) at least one other community; b) at least one other user; and c) at least one vendor." As explained in connection with claim 5 above, the '177 patent discloses numerous examples of subscription objects that are published by other "team members."

### 7. The '177 Patent Anticipates Claim 7

Claim 7 recites: "The method according to claim 5, wherein accessing the at least one subscription object through the one of the at least one application object maintains all of the original features of the subscription object." There is nothing in the '629 patent explaining the meaning of the phrase, "maintains all of the original features of the subscription object," or providing an example of how this is achieved. XACP has interpreted this language to simply require that the system maintain (*e.g.*, not destroy) the content of the item.

There is nothing in the '177 patent to suggest that any of the items published by users do not maintain all of their original features when accessed. To the contrary, the '177 patent contemplates that users can publish items (to which other users can subscribe) without losing any content whatsoever. The '177 patent's document management tool, for example, allows users to "check-in" and "check-out" documents that have been placed on the server. (Col. 7, ll. 6-8.) The bulletin board and calendar applications allow users to publish information (including file attachments) for other users to access. (Col. 6, ll. 21-26, 30-33, 41-44.) It is clear that the applications specified in the '177 patent would not operate properly if they failed to maintain "all of the original features of the subscription object."

### 8. The '177 Patent Anticipates Claims 9-15

For purposes of this motion, there is no material difference between claims 1-7 discussed above and claims 9-15 of the '629 patent. Claims 9-15 purport to claim a system for creating a community, each claim reciting substantially the same elements as claims 1-7. Claim 9 reads in its entirety as follows:

> 9.   A system for creating a community for users with common interests to interact in comprising:
>
> a receiver module for receiving:
>
>> a)  a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community;
>>
>> b)  receiving community identification information from the registered user;

```
            c) receiving a selection of at least one application
            object from the registered user; and

            d) at least one communications address designated by
            the registered user, the at least one communications
            address corresponding to a user to receive a created
            community;

        a creation module for creating a community based on the
        community identification information and the at least one
        community function; and

        a transmitter for transmitting the created community based
        in part on the at least one communications address.
```

As shown above, the drafters of the '629 patent created claim 9 by surrounding the steps from claim 1 with specific structures (*i.e.* "receiver module," "creation module," and "transmitter"), but otherwise left the steps from claim 1 unmodified.

The Court has construed receiver module as "[a] section of a computer program that provides the function of receiving data," and creation module as "[a] section of a computer program that provides the function of creating a community." February 29, 2008 Order (Doc. No. 81) at 4-5. These structures will obviously be present in any computer-based prior art reference capable of receiving and transmitting data, and creating a community. In the '177 patent, these functions are performed by the web server and the programs running on it. (*E.g.*, '177 patent, Col. 3, ll. 24-28; Col. 2, ln. 56-col. 3, ln. 5, *passim*.) The remaining elements of claim 1 are fully disclosed by the '177 patent for the reasons expressed in Part III.B.1, *supra*.

Dependent claims 10-15 are substantially identical to method claims 2-7, respectively, except that they depend from system claim 9 rather than method claim 1. Each element of those claims is fully disclosed by the '177 patent for the reasons expressed in Part III.B.2-7, *supra*.

**9.     The '177 Patent Anticipates Claims 17-23**

There is also no material difference between claims 1-7 discussed above and claims 17-23 of the '629 patent for purposes of this motion. Claims 17-23 present yet another variant on the same method for creating a community that is described in claims 1-7. Claim 17 reads as follows:

```
17. A method for creating a community for users with common
interests to interact in, the method comprising the steps of:

transmitting a creation transmission, the creation transmission
indicating the desire to create a community;

transmitting community identification information;

transmitting at least one communications address corresponding to
a user to receive the created community; and

selecting at least one application object for inclusion in the
community,

whereby the community is created based on the community
identification information and the at least one application
object.
```

The steps of claim 17 shown above also appear in claim 1, except that claim 17 recites "transmitting" instead of "receiving" specified information.  This is because claim 1 was drafted from the perspective of the server computer (which *receives* information from the user to create a community), while claim 17 was drafted primarily from the perspective of the user computer (which *transmits* information to the server for its use in creating a community).  Not surprisingly, the steps in claims 1 and 17 have generally reciprocal, one-to-one relationships with each other.[5]

Because it simply purports to claim the community creation method from the user perspective, claim 17 does not present any unique issues for this motion.  The system described in the '177 patent fully describes the operation system from the perspectives of both the server and the user.  The user connects to the server using a web browser and directs the server to create a community.  *See* Part III.B.1, *supra*.  The same information that was "received" by the server in the '177 patent to create the community was "transmitted" by the user.  *See id.*

Dependent claims 18-23 are substantially identical to method claims 2-7, respectively, except that they depend from claim 17 rather than claim 1.  Each element of each of those claims is fully disclosed by the '177 patent for the reasons expressed in Part III.B.2-7, *supra*.

---

[5]  Two other differences, which are not significant to this motion, are that claim 17 does not require a "registered user," and claim 17 does not specifically require that the community be transmitted after it has been created.

### 10. The '177 Patent Anticipates Claims 25-31

There is also no material difference between method claims 17-24 discussed above and system claims 25-31 of the '629 patent for purposes of this motion. Claims 25-31 purport to claim essentially the same thing as method claims 17-24, but in the form of a system rather than a method. Claim 25 reads as follows:

```
25. A system for creating a community for users with common
interests to interact in, the system comprising:

a transmitter module for transmitting:

      a)    a creation transmission, the creation transmission
      indicating the desire to create a community;

      b)    community identification information;

      c)    at least one communications address corresponding to
      a user to receive the created community; and

      d)    a selection of at least one application object for
      inclusion in the community, whereby the community is
      created based on the community identification information
      and the at least one application object; and

a display module for displaying prompts for the community
identification information, the at least one communications
address, and the selection of at least one application object.
```

The Court has construed transmitter module from claim 25 as "[a] section of a computer program or device that provides the function of transmitting data," and has construed "display module" as "a device that displays on-screen information, such as a CRT display." February 29, 2008 Order (Doc. No. 81) at 3, 5. These structures do not add anything of significance and will obviously be present in any computer-based prior art reference capable of transmitting data and displaying information.

The "transmitter module" in the '177 patent is the user's computer and/or its web browser program, which are used to transmit data to the server. ('177 patent, Col. 3, ll. 39-45 The system also has a display module (*e.g.* user's computer display), which displays prompts for the community identification information, the communication address(es) and the application object(s). (*See* '177 patent, Col. 4, ll. 61-65.)

- 18 -

Dependent claims 26-31 are substantially identical to method claims 18-23, respectively, except that they depend from claim 25 rather than claim 17. Each element of each of those claims is fully disclosed by the '177 patent for the reasons expressed in Part III.B.2-7, *supra*.

### C.       The '629 Patent is Anticipated by U.S. Patent No. 6,750,881

America Online, Inc. ("AOL") is a well-known on-line service provider. One of its U.S. Patents provides invalidating prior art to the '629 patent: U.S. Patent No. 6,750,881 ("'881 patent") entitled "User Definable On-Line Co-User Lists." Weinstein Decl. Ex. D ('881 patent). The '881 patent qualifies as prior art under 35 U.S.C. § 102(e).

The '881 patent discloses a system known as the "Buddy List System" for allowing AOL users to keep track of the status of specified co-users, and interacting with them. Like the Involv '177 patent described earlier, the '881 patent discloses a system as in Fig. 1 in which users connect to the AOL server through the Internet or other network connection.



**FIG. 1**

The system shown in Figure 1 "includes a plurality of user stations **12** that preferably include a processor chassis **14** having a network link." ('881 patent, Col. 3, ll. 12-14.) Additionally, "[t]he communications link **16** couples each user station **12** as a 'client' to a logon system **24**, which is typically a software program executing on a remote server somewhere on a network. The logon system **24** communicates with a 'Buddy List System' **26**, which is preferably a software program executing on a server somewhere on the network. The Buddy List System **26** maintains a database **28** for storing user information." ('881 patent, Col. 3, ll. 20-27.)

- 19 -

The Buddy List System disclosed in the '881 patent includes a feature known as "Buddy Chat," which allows a user to create customized on-line communities. A user can, for example, use the Buddy Chat feature to create a private chat room that other users can be invited to join. ('881 patent, Col. 6, ll. 19-23, 36-43; Fig. 10.) The '881 patent discloses each and every limitation of claims 1-7, 9-15, 17-23 and 25-31 of the '629 patent, as explained below.

### 1. The '881 patent Anticipates Claim 1

*"receiving a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community"*

The first step in the AOL system for creating a community is for the registered user to log on to the AOL system. (*See, e.g.*, '881 patent, Col. 6, ll. 52-58 ("The Logon System performs normal logon procedures (e.g., requesting a user ID and/or a password) and notifies the Buddy List System about the User (i.e., passes the User's ID, address, or screen name to the Buddy List System (Step **202**).").) As explained above, all interactions between the user and AOL's servers take place through a public or private communications network. ('881 patent, Col. 3, ll. 10-25.)

Once the user is logged in, he or she can access the AOL Buddy List System as shown below in Fig. 3 of the '881 patent. ('881 patent Col. 6, ln. 58. col. 7, ln. 2.)



('881 patent, Figure 3.)

From this window, the user can initiate the process of creating a community by pressing the "Buddy Chat" button circled above in red, which indicates the desire to create a community. ('881 patent, Col. 6, ll. 19-23.) As explained in more detail below, the Buddy Chat feature allows the registered user to create a community and to invite other users to join.

*"receiving community identification information from the registered user;"*

After requesting to create a community, the registered user is next shown a window known as the Buddy Chat window, which allows the user to provide community identification information. This window is shown in Figure 10 of the '881 patent:



('881 patent, Fig. 10 (red circle added); Col. 6, ll. 18-19)

As shown in Figure 10 above, the user is prompted to provide a number of pieces of information about the new community that will be created. If the user wants to create a community with a Private Chat Room, it provides "community identification information" by typing a name for the community in the box shown above circled in red. (*See* '881 patent, Col. 6, ll. 36-40 ("To talk privately with the selected co-users, the user selects the Private Chat Room radio button and enters a "Buddy Chat Room Name" in the provided edit box.").) Alternatively, if the user wishes to create a community that directs users to other sites, he or she provides a keyword or other identifier in the same box. ('881 patent, Col. 6, ll. 44-49 ("To share those places a user likes best on the AOL system, the user selects the Keyword/Favorite Place radio button and enters a "Keyword" (i.e., a shortcut word defining an address) to a system site in the provided edit box, either manually or by using a "drag and drop" action from a list of the user's favorite places on the system.").)

*"receiving a selection of at least one application object from the registered user"*

The Buddy Chat window allows the registered user to select at least one application object. As shown in the circled portion of Figure 10 (above), the user can select either a "Private Chat Room" to talk privately (Col. 6. ll. 36-38) or a "Keyword/Favorite Place" to share places the user likes best (Col. 6. ll. 44-46) by clicking one of the radio buttons.[6] Both of these options qualify as "application objects" under the Court's construction. The Court's claim construction order explicitly lists "chat" as an example of an application object. *See also* February 29, 2008 Order at 3-4. Beyond the enumerated examples, an "application object" also includes "[a] computer program or module that functions to direct a user to specific information." *Id.* This is precisely what the Keyword/Favorite Place option does – it directs a user to a specific site or location on the AOL system (*e.g.* favorite place). ('881 patent, Col. 6, ll. 44-51.)

---

[6]  The term "radio button" refers to a user interface approach in which a user is presented with a list of alternatives, one of which may be selected by the user by selecting it with a mouse button.

***"creating a community based on the community identification information and the at
least one application object"***

When the user has completed the Buddy Chat form shown in Figure 10, he or she presses
the "Send" button, which causes the server to create the community based on the information the
user provided and the selection he made between "Private Chat Room" and "Keyword/Favorite
Place." ('881 patent, Col. 6, ll. 36-45.)

Regardless of whether the user chose to use a Private Chat Room or a Keyword/Favorite
Place, either clearly satisfies the definition of a "community" because each will include
"information and at least one function relating to a specific transaction, interaction, and/or
expression of interest," February 29, 2008 Order (Doc. No. 81) at 1, in that it includes at least the
information provided by the user (*e.g.*, name or keywords) and a function (*e.g.* either chat or
directing the user to a specific site within the AOL system).

***"receiving at least one communications address designated by the registered user, the
at least one communications address corresponding to a user to receive a created community"***

The system receives at least one communications address from the registered user, the
address corresponding to the user who will be invited to and receive a created community. In
particular, the patent discloses that the user can provide the "screen names" of other users who
will be invited to access the community: "The Buddy Chat window 110 [Fig. 10] is displayed,
allowing the user to add additional names to the Screen Names to Invite field either manually or
by selecting additional names from the Buddy List window **40** and again activating the BUDDY
CHAT button." ('881 patent, Col. 6, ll. 26-30.) The term "screen name" refers to a
communications address used within the AOL system to identify users within the AOL network.
('881 Patent, Col. 1, ll. 17-24 ("When a person 'logs on' to a network system, they are in effect
identifying themselves to the system and announcing their presence. On most systems, this
presence is unique to every user who is on the system. For example, on the AOL network this
presence is known as the 'screen name', but on other systems it could be an Internet Protocol
(IP) address or some other unique identifier."); *see also* Fig. 2a (showing that a screen name is

the same thing as an address).)[7]

*"transmitting the created community based in part on the at least one communications address"*

As described above, the system transmits the community to the users who have been identified.  In the case of a Private Chat Room, the users whose screen names were provided receive an invitation which, if accepted, takes the user to the private chat room.  ('881 patent, Col. 6, ll. 36-43 ("Upon selecting Send, each selected co-user will receive a message inviting them to access and display a Buddy Chat Room (chat rooms are an existing feature of the AOL system).").)  In the case of a Keyword/Favorite Place, each co-user is presented with a message that asks the user whether or not it wants to access and display the on-line site specified by the registered user.  (Col. 6, ll. 44-51.)

### 2.  The '881 patent Anticipates Claim 2

Claim 2 recites: "The method according to claim 1, wherein the step of transmitting the created community further comprises transmitting the created community and a user interface."  The created community transmitted by AOL necessarily includes a user interface.  (*See* '881 patent, Col. 6, ll. 40-43 ("Upon selecting Send, each selected co-user will receive a message inviting them to access and display a Buddy Chat Room (chat rooms are an existing feature of the AOL system)."); Col. 6, ll. 49-51 ("Upon selecting Send, each selected co-user will receive a message inviting them to access and display that online site.").)

### 3.  The '881 patent Anticipates Claim 3

Claim 3 states:  "The method according to claim 1, wherein the at least one communications address is an e-mail address."  One of ordinary skill in the art would have clearly appreciated that within the America Online (AOL) system, a "screen name" was an e-mail address.  This is confirmed by a contemporaneous textbook describing AOL.  *See* Weinstein Decl. Ex. E ("Whenever you're on AOL and you spot a screen name, whether it is in your Buddy

---

[7]  A contemporaneous publication describing the AOL service makes clear that the user's "screen name" also functions as his or her e-mail address.  *See* Weinstein Decl. Ex. E.

View window, in a chat room, or on a message board, you are also seeing that AOL member's email address. You could send him or her email from within AOL simply by addressing the message to that screen name.").)

### 4. The '881 patent Anticipates Claim 4

Claim 4 provides: "The method according to claim 1, wherein the selected at least one application object comprises at least one of," and provides a list of fourteen (14) different types of application objects. One of the application objects listed in claim 4 is a "chat application object," which is clearly disclosed by the Private Chat Room in the '881 patent. (*E.g.*, '881 patent, Col. 6, ll. 36-43.)

### 5. The '881 patent Anticipates Claim 5

Claim 5 recites: "The method according to claim 1, further comprising the step of receiving a selection to subscribe to at least one subscription object, wherein the at least one subscription object is accessed through one of the at least one application object." The '177 patent fully discloses the ability of users to subscribe to subscription objects as recited in claim 5.

The '881 patent discloses multiple application objects that allow users to select content to interact with or access (subscribe), or allow other users to publish content. In the context of a Private Chat Room, for example, users can publish chat content for other users who can subscribe to it by accessing and viewing it. In the context of a Keyword/Favorite Place, the user can subscribe by choosing to visit an online site or favorite place on the AOL system. ('881 patent, Col. 6, ll. 44-51 ("each selected co-user will receive a message inviting them to access and display that on-line site.").)

### 6. The '881 patent Anticipates Claim 6

Claim 6 is a dependent claim that recites: "The method according to claim 5, wherein the at least one subscription object is published by at least one of: a) at least one other community; b) at least one other user; and c) at least one vendor." As explained in connection with claim 5 above, the '881 patent discloses subscription objects that are published by other users.

### 7. The '881 patent Anticipates Claim 7

Claim 7 recites: "The method according to claim 5, wherein accessing the at least one subscription object through the one of the at least one application object maintains all of the original features of the subscription object." There is nothing in the AOL patents to suggest that any of the items published by users do not maintain all of their original features when accessed. In fact, the patents contemplate that users can publish items (to which other users can subscribe) without losing any content whatsoever. ('881 patent, Col. 6, ll. 44-51.)

### 8. The '881 patent Anticipates Claims 9-15

As explained in Part III.B.8, *supra*, there is no material difference between claims 1-7 discussed above and claims 9-15 of the '629 patent for purposes of this motion. Claims 9-15 purport to claim a system for creating a community reciting substantially the same elements as claims 1-7, but with the addition of a "receiver module," "creation module" and "transmitter." These structures are clearly present in the '881 patent in the form of computer programs that perform the function of receiving data, creating the community and transmitting data. ('881 patent, Col. 7, ll. 13-23 ("The invention may be implemented in hardware or software, or a combination of both. However, preferably, the invention is implemented in computer programs executing on programmable computers . . . ."); Col. 3, ll. 23-25 ("The logon system **24** communicates with a "Buddy List System" 26, which is preferable a software program executing on a server somewhere on the network.").) The remaining elements of claim 9 are fully disclosed by the AOL patent for the reasons expressed in Part III.C.1, *supra*. Dependent claims 10-15 are substantially identical to method claims 2-7, respectively, except that they depend from system claim 9 rather than method claim 1. Each element of each of those claims is fully disclosed by the AOL patent for the reasons expressed in Part III.C.2-7, *supra*.

### 9. The '881 patent Anticipates Claims 17-23

There is also no material difference between claims 1-7 discussed above and claims 17-23 of the '629 patent for purposes of this motion. As more fully explained in Part III.B.9, *supra*, claims 17-23 recite the same community creation method described in claims 1-7, but from the

- 26 -

perspective of the user who "transmits" information to the server to create the community. The system described in the '881 patent fully describes the system's operation from the perspectives of both the server and the user, and therefore discloses these elements. (*See* '881 patent, Col. 3, ll. 10-17, *passim*.) Dependent claims 18-23 are substantially identical to method claims 2-7, respectively, except that they depend from claim 17 rather than claim 1. Each element of each of those claims is fully anticipated for the reasons expressed in Part III.B.2-7, *supra*.

### 10. The '881 patent Anticipates Claims 25-31

There is also no material difference between method claims 17-23 and system claims 25-31 of the '629 patent for purposes of this motion. Claim 25 purports to claim essentially the same thing as method claim 17, but adds "transmitter module" and "display module" structures. These structures add nothing of significance and are clearly disclosed in the prior art. For example, the "transmitter module" in the AOL prior art is the user's computer and/or the computer programs used to transmit data to the server. ('881 patent, Col. 3, ll. 10-17; col. 7, ll. 13-23.) The "display module" is the display device that displays on-screen information for the user. ('881 patent, Col. 7, ll. 13-23 (output devices); Col. 3, ll. 12-19 and Figure 1 (display device 18).) Dependent claims 26-31 are substantially identical to method claims 18-23, respectively, except that they depend from claim 25 rather than claim 17. Each element of those claims is fully disclosed by the '881 patent for the reasons expressed in Part III.C.2-7, *supra*.

### D. The '629 Patent is Anticipated by U.S. Patent No. 6,608,636

U.S. Patent No. 6,608,636 B1 ("'636 patent"), entitled "Server Based Virtual Conferencing," discloses another community building system that allows users to interact and collaborate with one another through communities known as "conferences." Weinstein Decl. Ex. F ('636 patent). As explained in the Background section of the '636 patent: "The invention allows multiple persons, at different locations, to hold a conference, by providing many of the conveniences which the participants would have if present together in the same physical room." ('636 patent, Col. 1, ll. 19-23.) The conference is the "community" of the '629 patent, while the

- 27 -

conveniences are the "application objects." ('636 patent, Col. 1, ll. 34-49.)

The application for the '636 patent was filed on May 13, 1992, and the patent qualifies as prior art under 35 U.S.C. § 102(e). The '636 patent discloses each and every limitation of claims 1-7, 9-15, 17-23 and 25-31 of the '629 patent, as explained below.

### 1. The '636 Patent Anticipates Claim 1

***"receiving a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community"***

In order to create a new community (called a "conference" in the '636 patent), the user sends a signal to the server (known as the "host") indicating a desire to create a community. This is accomplished by the user clicking on an appropriate icon to create a new conference. (*See, e.g.,* '636 patent, Col. 3, ll. 22-28 ("Initiation of Conference. A person requesting a conference informs the host computer by appropriate means. For example, the Requester can "click" a pointing device onto a "conference icon," such as that shown in FIG. 2, on his display screen. In response, his local computer sends the proper signal to the host.) (emphasis added).) As explained above, the user and the host computers are located in different geographic locations and connected to each other through a communications network. ('636 patent, Col. 3, ll. 14-19.)

The user who is requesting the creation of a community (the "requester") is a "registered user" because the host has been provided with requested registration information. The '636 patent discloses that the host obtains a picture and name from the requester, information about how to connect to him or her, and other information. (*See, e.g.*, '636 patent, Col. 5, ll. 20-25, 31-34 and Fig. 3.)

***"receiving community identification information from the registered user;"***

In the '636 patent, the user specifies community identification information for the virtual meeting or conference room (community) that will be created. This takes the form of a name for the conference and other information. ('636 patent, Col. 9, ln. 61-col. 10, ln. 8 ("Meeting Facilitator (or Requestor) creates meeting room on a host computer which is accessible to all

- 28 -

Invitees. The meeting room door is accessible from a hallway which has doors to other meeting rooms. . . <u>On the outside of each door is the room name, selected by the room creator</u>. Names may reflect the nature of the room or simply provide an identity, such as the 'Sales Meeting Room' or the 'Einstein Room'. The door may also indicate if the room is occupied, the number of occupants, their identities, whether the current meeting is open or closed and the scheduled time for the meeting(s).") (emphasis added).)

> ***"receiving a selection of at least one application object from the registered user"***

The '636 patent also discloses receiving a selection of at least one application object from the registered user. In particular, the user creating the community is allowed to select the virtual "equipment" to be used in the conference/meeting room (community), such as a recorder, a virtual "table" or a virtual "notepad." ('636 patent, Col. 10, ll. 9-12 ("Room creation includes selection of location in hallway, color of doors and walls, equipment in room (i.e. table size, flip chart, file cabinet) and meeting tools (electronic secretary, brainstorming module, on-line databases)."); Col. 3, ll. 22-50 (user provides to the host a selection of recorder, notepads, table, etc. for the conference).) These tools and equipment are application objects because they are "computer program(s) or module(s) that . . . do something useful . . . ." February 29, 2008 Order (Doc. No. 81) at 3.

> ***"creating a community based on the community identification information and the at least one application object"***

In the '636 patent, the host creates the community based on the community identification information provided by the user's selection of at least one application object as discussed above. ('636 patent, Col. 7, ll. 30-34 ("Create Conference Room. Once these preliminary matters [room name and equipment selection] are established, the host creates the conference room.") The conference room is a community that includes the name and the application object(s) specified by the user. (Col. 9, ln. 61-col. 10, ln. 7; Col. 7, ll. 30-34, 55-56, col. 8, ll. 18-29 (conference room contains the virtual "equipment" such as the table and notepad).) The conference room is also persistently stored by the host/server. ('636 patent, Col. 12, ll. 16-25 ("Persistence of

- 29 -

Conference Room.  The conference room itself is actually a combination of stored data and computer programs. The data can include the recorded proceedings of the conference described above.  The data and the programs need not be destroyed after termination of a conference. . . That is, both the conference room and the proceedings of the conference have persistence in time.").)

*"receiving at least one communications address designated by the registered user, the at least one communications address corresponding to a user to receive a created community"*

The '636 system receives at least one communications address from the registered user, the address corresponding to a user who will be invited to and receive a created community. ('636 patent, Col. 1, ll. 53-56 ("For example, the host provides a system which allows a person to invite participants to the conference in a convenient manner, including some automated invitations features which will be described later.").)  For example, the user can designate communications addresses for participants by sending a list of participant names to the host. ('636 patent, Col. 3, ln. 63-col. 4, ln. 5.)  The user can also select communications addresses of individual participants through a graphical interface that allows the user to specify the participant based on its precise geographical location in the network (*e.g.* by choosing the state, building and office of the user).  ('636 patent, Col. 4, ll. 28-34, 47-59.)

*"transmitting the created community based in part on the at least one communications address"*

The system disclosed in the '636 patent then transmits the community to the users who have been identified.  As explained in the '636 patent:  "Once the host obtains the list, the host sends an invitation to each invitee, telling the date, time, place, subject, and any other relevant information about the meeting.  One way to send the invitations is by electronic mail, which is known in the art. A second way is for the host to leave an "invitation card," such as that shown in FIG. 3, on the screen of each local computer."  ('636 patent, Col. 4, ll. 21-27.)  Once the users have accepted the invitation, the community is available to each user.  ('636 patent, Col. 7, ll. 44-54 ("When time for the conference has arrived, the host computer takes roll of the participants as

- 30 -

each arrives. . . When all participants have arrived, the meeting begins. The table is a common display area which is shown to, and available for work by, each Invitee.").)

### 2. The '636 Patent Anticipates Claim 2

Claim 2 recites: "The method according to claim 1, wherein the step of transmitting the created community further comprises transmitting the created community and a user interface." The created community transmitted in the '636 patent necessarily includes a user interface, *e.g.* an invitation to join the conference and a virtual "table" that is provided to each invitee. (*See* '636 patent, Col. 5, ll. 46-65; Col. 7, ll. 30-56; Fig. 3.)

### 3. The '636 Patent Anticipates Claim 3

Claim 3 states: "The method according to claim 1, wherein the at least one communications address is an e-mail address." The '636 patent makes clear that the at least one communications address can be an e-mail address. ('636 patent, Col. 4, ll. 21-25 ("Once the host obtains the list, the host sends an invitation to each invitee, telling the date, time, place, subject, and any other relevant information about the meeting. One way to send the invitations is by electronic mail, which is known in the art."); Col. 12, ll. 46-48, 59-60 ("12. Commercially Available Equipment for use in Invention. The following equipment and software can be used to implement various component parts of the invention. . . Electronic mail software, such as 'cc:Mail,' is available from Lotus Development Corp., Boston, Mass.").)

### 4. The '636 Patent Anticipates Claim 4

Claim 4 provides: "The method according to claim 1, wherein the selected at least one application object comprises at least one of," and provides a list of fourteen (14) different types of application objects. Two of the application objects listed in claim 4 include an "instant messaging application object," and a "whiteboard application object." Both of these are clearly disclosed. The instant messaging object can be a private message that is sent through the virtual "notepad" tool to another user. The virtual "notepad" tool performs the function of an "instant messaging application object" disclosed in the '629 patent. ('636 patent, Col. 9, ll. 26-32

- 31 -

(describing notepad tool); Weinstein Decl. Ex. A ('629 patent), col. 18, ll. 35-53.)

The '629 patent-in-suit explains that the "instant message" application object allows a user to send a text message directly to another user. ('629 patent, Col. 18, ll. 35-38 ("A user may also select an instant message tab from tab interface **3010**, where a user may send a message that is immediately transmitted to just the selected recipient.").) This is precisely what the virtual "notepad" tool disclosed in the prior art '636 patent does. ('636 patent, Col. 9, ll. 26-32 ("Parties can pass notes. One person can write a note, on the enlarged 'NOTE' in FIG. 13, and drag it to the picture of another party. When the other party sees the note on his picture, as in FIG. 12, he can drag it to a private viewing area, double-click it, and read it. No other people are aware of the passed note.").)

The '636 patent also discloses a whiteboard application, which allows users to draw on a common display that is shown to all users. ('636 patent, Col 11, ll. 29-36 ("Public objects may be created within the room, such as blackboard or flip chart writings, notes or drawings."); Col. 8, ll. 1-18 ("Each Invitee can transmit a file (of any suitable kind: data, text, or graphic) to the host, and the host will place the file onto the table, where all participants can see it. To place a document on the table, an Invitee performs a 'drag-and-drop.' That is, the invitee shrinks the window of the conference room to the size shown in FIG. 10. . . Each Invitee can write on the document, using a 'paint'-type program and a pointing device. Each Invitee can stretch or shrink the document, as allowed by the 'Paint' program.").)

### 5.    The '636 Patent Anticipates Claim 5

Claim 5 recites: "The method according to claim 1, further comprising the step of receiving a selection to subscribe to at least one subscription object, wherein the at least one subscription object is accessed through one of the at least one application object." The '636 patent fully discloses the ability of users to subscribe to subscription objects as recited in claim 5.

As explained in connection with claim 4 above, the '636 patent discloses multiple application objects that allow users to select content to interact with or access, or allow other

- 32 -

users to publish content.  For example, it discloses virtual notepad and virtual table tools that allow users to publish content to which other users can subscribe.  ('636 patent, *e.g.*, Col 11, ll. 29-36 ("Public objects may be created within the room, such as blackboard or flip chart writings, notes or drawings."); Col. 8, ll. 1-18 ("To place a document on the table, an Invitee performs a 'drag-and-drop.' . . .  Each Invitee can write on the document, using a 'paint'-type program and a pointing device. Each Invitee can stretch or shrink the document, as allowed by the 'Paint' program.").)

### 6.      The '636 patent Anticipates Claim 6

Claim 6 is a dependent claim that recites: "The method according to claim 5, wherein the at least one subscription object is published by at least one of: a) at least one other community; b) at least one other user; and c) at least one vendor."  As explained in connection with claim 5 above, the '636 patent discloses that subscription objects are published by other users.

### 7.      The '636 patent Anticipates Claim 7

Claim 7 recites:  "The method according to claim 5, wherein accessing the at least one subscription object through the one of the at least one application object maintains all of the original features of the subscription object."  There is nothing in the '636 patent to suggest that any of the items published by users do not maintain all of their original features when accessed. In fact, the patents contemplate that users can publish items (to which other users can subscribe) without losing content.  ('636 patent, Col 11, ll. 29-36; Col. 8, ll. 1-18.)

### 8.      The '636 patent Anticipates Claims 9-15

As explained in Part III.B.8, *supra*, there is no material difference between claims 1-7 discussed above and claims 9-15 of the '629 patent for purposes of this motion.  The additional structures of the "receiver module," "creation module" and "transmitter" are clearly disclosed in the prior art in the form of computers running software for performing the functions of receiving data, creating the community and transmitting data.  ('636 patent, Col. 2, ln. 64-col. 3, ln. 19; Col. 9, ll. 1-25; Col. 9, ln. 46-col. 10, ln. 2, *passim*.)  The remaining elements of claim 1 are fully

disclosed by the '636 patent for the reasons expressed in Part III.D.1, *supra*. Dependent claims 10-15 are substantially identical to method claims 2-7, respectively, except that they depend from system claim 9 rather than method claim 1. Each element of each of those claims is fully disclosed by the '636 patent for the reasons expressed in Part III.D.2-7, *supra*.

### 9. The '636 patent Anticipates Claims 17-23

There is also no material difference between claims 1-7 discussed above and claims 17-23 of the '629 patent for purposes of this motion. As more fully explained in Part III.B.9, *supra*, claims 17-23 merely recite the same community creation method described in claims 1-7, but from the perspective of the user who "transmits" information to the server to create the community. The system described in the '636 patent fully describes the operation system from the perspectives of both the server and the user, and therefore discloses these elements. Dependent claims 18-23 are substantially identical to method claims 2-7, respectively, except that they depend from claim 17 rather than claim 1. Each element of each of those claims is fully disclosed by the '636 patent for the reasons expressed in Part III.D.2-7, *supra*.

### 10. The '636 patent Anticipates Claims 25-31

There is also no material difference between method claims 17-24 discussed above and system claims 25-31 of the '629 patent for purposes of this motion. Claims 25-31 purport to claim essentially the same thing as method claims 17-24, but add the "transmitter module" and "display module." These structures do not add anything of significance and are clearly disclosed in the '636 patent. For example, the "transmitter module" is the user's computer and/or the computer programs used to transmit data to the server. ('636 patent, Col. 2, ln. 64-col. 3, ln. 19; Col. 9, ll. 1-25; Col. 9, ln. 46-col. 10, ln. 2, *passim*.) The "display module" is the display device that displays on-screen information for the user. ('636 patent, Figure 1 (monitor on PC).) Dependent claims 26-31 are substantially identical to method claims 18-23, respectively, except that they depend from claim 25 rather than claim 17. Each element of each of those claims is fully disclosed by the '636 patent for the reasons expressed in Part III.D.2-7, *supra*.

- 34 -

### E. The '629 Patent Is Invalid For Obviousness

Obviousness provides yet another ground for declaring all claims of the '629 patent invalid on summary judgment.

A patent claim is invalid under 35 U.S.C § 103 if the differences between patented subject matter and the prior art are such that the subject matter as a whole would have been "obvious" to a person having ordinary skill in the art. A court assesses obviousness by considering the following factors: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. *See KSR Intern. Co. v. Teleflex Inc.*, ___ U.S. ____, 127 S.Ct. 1727, 1734 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)) ("*KSR*"). "Against this background the obviousness or nonobviousness of the subject matter is determined." *Id.* The ultimate determination of obviousness is a question of law for the court. *See Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008).

For purposes of the obviousness determination under § 103, "[t]he person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *accord In re Winslow*, 365 F.2d 1017, 1020 (C.C.P.A. 1966) ("We think the proper way to apply the 103 obviousness test . . . is to first picture the inventor as working in his shop with the prior art references – which he is presumed to know – hanging on the walls around him.").

The Supreme Court's landmark decision in *KSR* made clear that courts must employ "an expansive and flexible approach" in assessing whether an alleged invention was obvious. *See KSR*, 127 S.Ct. at 1739; *id.* at 1742-43 ("Rigid preventative rules that deny factfinders recourse to common sense . . . are neither necessary under our case law nor consistent with it."). *KSR* nonetheless set forth a number of rules and guidelines to follow when assessing the potential obviousness of an alleged invention. The Court held that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 1739. In other words, "when a patent 'simply arranges old elements

- 35 -

with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 1740 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). Additionally, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* Employing the expansive approach set forth in *KSR* leaves no doubt that all claims of the '629 patent are obvious.

### 1. Claims 1-7, 9-15, 17-23 and 25-31 Are Obvious

The obviousness analysis relating to the '629 patent is simple and straightforward. The scope and content of the prior art is vast. All elements of claims 1-7, 9-15, 17-23 and 25-31 are shown in the prior art '177, '881 and '636 patents, as shown in detail above. Each reference discloses techniques for creating communities using the exact steps claimed in the '629 patent, as shown in detail above. There can be no question that one having ordinary skill in the art would have found the alleged invention of the '629 patent to be entirely obvious in light of these three prior art references, either individually or in combination.[8]

### 2. Claims 8, 16, 24 and 32 Are Also Obvious

Dependent claims 8, 16, 24 and 32 are identical to each other except that they respectively depend from each of the previously discussed independent claims (*i.e.* claims 1, 9, 17 and 25). They add nothing more than the following unpatentable limitations:

```
8. The method according to claim 1, wherein community information
further comprises community fields, whereby the community
presents to a user at least at least [sic] one of:

    a) at least one other user having user fields;

    b) at least one other community having community fields;
    and
```

---

[8]  XACP and its expert witness have defined a person having ordinary skill in the art for purposes of the '629 patent as someone who would have taken undergraduate level courses in computer programming and networking and would have two to three years of practical experience. Although Facebook adopted a different formulation of who a person of ordinary skill in the art would be, it will adopt XACP's formulation for purposes of this motion because the invention is clearly obvious under that standard.

- 36 -

```
        c) at least one vendor product having vendor fields;

    wherein the presentation is based in part on a comparison of user
    fields, community fields and vendor fields.
```

This claim adds nothing more than the notion of comparing and matching information

fields in order to present something like a vendor product to a person using a community. *See*

'629 patent, Col. 22, ll. 1-38 (under the header "Field Matching"). But the idea of "field

matching" from information provided by a user is as old as the idea of filling out forms itself. It

is nothing more basic than comparing fields to see whether the information a user has input

matches the specific information of another user, community and vendor, and presenting the

match to the user.

"Field matching" was also completely described in U.S. Patent No. 6,029,195 (the '195

patent). *See* Weinstein Decl. Ex. G. This patent describes a system for delivering information

"based on determining the similarity between a profile for the target object and the profiles of

target objects for which the user (or a similar user) has provided positive feedback in the past."

('195 patent, Col. 6, ll. 39-43.) "Target objects" are digital media such as, but not limited to: "a

newspaper story of potential interest, a movie to watch, an item to buy [*i.e.* vendor product], e-

mail to receive, or another person to correspond with [*i.e.* another user]." (Col. 6, ll. 25-28.) In

the '195 embodiment, user information such as age and zip code are collected directly from the

user and user interests are compiled by the system based on whether the user likes or dislikes

certain "target objects." (Col. 4, ll. 55-58.) The primary objective of the described system is to

automatically match these user fields to the information it has about other products, users, or

communities and then present those matches to the user of a web page.

Claims 8, 16, 24 and 32 are merely an obvious combination of the prior art community

creation systems and the field matching system disclosed in the '195 patent. The need to

perform field matching to deliver targeted advertising to web pages on the Internet was explicitly

recognized and addressed in the '195 patent. ('195 Col. 7, ll. 29-40.) In light of the disclosures

of the '195 patent, it would be obvious to one skilled in the art to apply a targeted advertising or

field matching system to an on-line community focused on specific interests. These claims present a clear example of an instance in which "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S.Ct. at 1739.[9] The Court should declare these claims invalid for obviousness under 35 U.S.C. § 103.

### 3. The '629 Patent Is Obvious In Light of Prior Art Websites

This motion presents strong prior art that invalidates the the claims of the '629 patent. Those references do not, however, constitute the entire universe of prior art regarding community creation systems. In fact the world of prior art community building systems is far more vast. For example, well before the named inventors of the '629 patent filed for the claims at issue, there were at least three well-known community building systems that allowed users to create on-line communities; eGroups, Excite Communities and Yahoo! Clubs. These three highly relevant prior art systems provided websites that allowed users to create on-line communities that included various application objects, to which other users could be invited using e-mail. *See* Facebook's Motion for Summary Judgment of Inequitable Conduct filed, concurrently herewith. It would have been obvious to one of ordinary skill in the art to use the teachings of those systems in conjunction with any of the systems disclosed in the prior art cited in this brief. There is simply no question that the combination of any one of eGroups, Excite Communities and/or Yahoo! Clubs with the '177 patent, the '881 patent, the '636 patent or the '195 patent would render all claims of the '629 patent obvious. Therefore, summary judgment of invalidity is appropriate.

---

[9] The obviousness standard also includes a number of "secondary considerations" a court may consider, such as commercial success, long felt but unsolved needs and failure of others. *See KSR*, 127 S.Ct. at 1734. XACP has not come forward with any evidence relating to secondary considerations. Nor could any such evidence overcome the overwhelming evidence of invalidity. *See also Agrizap, Inc.*, 520 F.3d at 1344 (reversing jury verdict of validity and finding patent invalid; holding that substantial evidence of commercial success, praise and long-felt need did not overcome strong showing of obviousness). It is thus unnecessary to evaluate secondary considerations in this case.

## IV.    CONCLUSION

For the foregoing reasons, Facebook respectfully requests that its motion for summary judgment of invalidity be granted.


Dated: June 20, 2008                    By:    /s/ Heidi L. Keefe
                                               Heidi L. Keefe
                                               Mark R. Weinstein
                                               Craig W. Clark
                                               WHITE & CASE LLP
                                               3000 El Camino Real
                                               5 Palo Alto Square, 9th Floor
                                               Palo Alto, CA  94306

                                               Alfred W. Zaher
                                               Dennis P. McCooe
                                               BLANK ROME LLP
                                               130 N. 18th St.
                                               Philadelphia, PA  19103

                                               Attorneys for FACEBOOK, INC. and
                                               THEFACEBOOK, LLC

## CERTIFICATE OF SERVICE

This is to hereby certify that on this 20th day of June, 2008, I caused a true and correct copy of the foregoing document: Facebook's Motion for Summary Judgment of Invalidity to be served via this Court's Electronic Filing ("ECF") System, upon the following:

> Frederick A. Tecce, Esq.
> McShea/Tecce, P.C.
> The Bell Atlantic Tower – 28th Floor
> 1717 Arch Street
> Philadelphia, PA 19103
> ftecce@mcshea-tecce.com
>
> Thomas J. Duffy, Esq.
> Patrick J. Keenan, Esq.
> Duffy & Keenan
> One Liberty Place, 55th Floor
> 1650 Market Street
> Philadelphia, PA 19103
> pjk@duffykeenan.com
>
> Counsel for plaintiff
> Cross Atlantic Capital Partners, Inc.

_____/s/ Heidi L. Keefe_____
Heidi L. Keefe