IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CROSS ATLANTIC CAPITAL | : | CIVIL ACTION |
| PARTNERS, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, INC., and | : | |
| THE FACEBOOK, LLC | : | NO. 07-2768 |

## MEMORANDUM

**Padova, J.**                                                                                    **March 17, 2011**

## I.     INTRODUCTION

This patent infringement action brought by Plaintiff Cross Atlantic Capital Partners, Inc.

("XACP") concerns U.S. Patent No. 6,519,629 (the "'629 patent"), entitled "System for Creating a

Community for Users with Common Interests to Interact In."  The defendants are Facebook, Inc.,

and The Facebook, LLC (collectively "Facebook").  On February 29, 2008, we issued a Markman[1]

opinion construing numerous terms contained in the '629 Patent.  Cross Atlantic Capital Partners,

Inc. v. Facebook Inc., Civ. A. No. 07-2768,  2008 WL 564956 (E.D. Pa. Feb. 29, 2008) ("Markman

Opinion").  Thereafter, Facebook instituted an *inter partes* reexamination proceeding in the United

States Patent and Trademark Office ("PTO").[2]  The final decision of the Patent Examiner has led to

---

[1]Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

[2]See 35 U.S.C. § 311.  When Facebook filed for reexamination, it also moved to stay the
instant litigation pending the outcome of that proceeding.  We granted the motion on August 18,
2008.  Thereafter, XACP filed a motion to lift the stay, which we granted in an Order dated
November 22, 2010 ("Order Lifting Stay").  By that time, the reexamination had already consumed
over twenty-seven months and resulted in the issuance of a Right of Appeal Notice affirming the
patentability of the claims at issue in this litigation.  While noting that the parties had appealed the
Examiner's determination to the Board of Patent Appeals and Interferences, we concluded that the
Examiner's decision constituted "a substantial change in circumstances diminishing the basis for any

XACP filing a motion seeking to amend our construction of the patent term "transmitting the created community" (the "transmitting phrase"). In its response to XACP's motion, Facebook asks that we amend our construction of three other terms. We held a supplemental <u>Markman</u> hearing on February 18, 2011.[3]

## II. HISTORY OF LITIGATING THE "TRANSMITTING PHRASE"

A. The First <u>Markman</u> Proceeding

XACP seeks to amend our construction of the phrase "transmitting the created community" contained in claim 1 of the '629 Patent[4] to reflect the supplemental intrinsic record created during

---

further continuance of the stay." (Order Lifting Stay at 5.) We found that it would not be fair to continue to deny Plaintiff the opportunity to proceed with its claims, "after already waiting over two years, while concurrent proceedings continue before the BPAI and possibly the Federal Circuit." (<u>Id.</u>) Following the completion of briefing on the supplemental <u>Markman</u> motion, Facebook again moved to stay the litigation. We denied that motion by Order dated March 1, 2011.

[3]In our <u>Markman</u> opinion, we fully set out the law governing claim construction, <u>see</u> <u>Markman</u> Opinion, 2008 WL 564956, at *1-3, which we incorporate herein by reference.

[4]Claim 1 of the '629 Patent discloses:

A method for creating a community for users with common interests to interact in, the method comprising the steps of:

receiving a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community;

receiving community identification information from the registered user;

receiving a selection of at least one application object from the registered user;

creating a community based on the community identification information and the at least one application object;

receiving at least one communications address designed by the registered user, the at least one communications address corresponding to a user to receive a created community; and **transmitting the created community based in part on the at least**

-2-

the *inter partes* reexamination.[5]  It asks that we change our construction to read "*transmitting at least*

*one application object*[6] *of the community*.  (Pl. Mot. to Amend the Court's Claim Construction ("Pl.

Mot.") at 2.)[7]  In the first Markman proceeding, we construed several terms contained in the

transmitting phrase.  We initially held that the term "transmitting" meant "*electronically connecting,*

*sending out and/or communicating by any wireless or wire mechanism*."  Markman Opinion, 2008

WL 564956, at *6-7.  We later amended this construction to read *electronically connecting and/or*

*communicating by any wireless or wire mechanism*.[8]  Order, Apr. 3, 2008.  In reaching this

---

**one communications address**.

('629 Patent col. 30, line 65 - col. 31, line 17 (emphasis added).)

[5]Prosecution history includes the *inter partes* reexamination.  See Leviton Mfg. Co., Inc. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d 646, 658-59 (D.N.M. 2007) (considering *inter partes* results as intrinsic prosecution history); Fractus, S.A. v. Samsung Elecs. Co., Civ. A. No. 09-203, 2010 WL 5287531, at *5 (E.D. Tex. Dec. 17, 2010) (same); Atl. Research Mktg. Sys., Inc. v. Troy, 616 F. Supp. 2d 157, 169 n.3 (D. Mass. 2009) (same); see also C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 867-68 (Fed. Cir. 2004) (considering *ex parte* reexamination as part of prosecution history).

[6]The parties stipulated in the first Markman proceeding that an "application object" is "a computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board."  Markman Opinion, 2008 WL 564956, at *3 n.2. Facebook asks that we reexamine that construction.  We discuss that issue later in this opinion.

[7]In the first Markman proceeding, XACP argued that "transmitting" should be construed to mean *electronically connecting, sending out and/or communicating by any wireless or wire mechanism.*  (Pl. Mem. in Support of its Proposed Claim Construction ("Pl. Markman Br.") at 25.) The construction proposed by Facebook was *electronically sending.*  (Def. Mem. in Support of its Proposed Claim Construction ("Def. Markman Br.") at 23.)

[8]Facebook pointed out in a motion for reconsideration that we had discussed in the Markman Opinion that merely "sending" the created community was insufficient; that the term had to also include the concept of two-way interacting or communicating.  Because the original construction contained the disjunctive "or," it could be read to mean that "sending" alone was sufficient.  We

conclusion, we were focused upon whether the term "transmit" included "connecting" and "communicating," or just "sending," the primary difference between the parties' proffered constructions. Based exclusively on the intrinsic evidence of the Patent's specifications, rather than dictionary definitions, we concluded that the "transmitting" term requires a construction that includes the concept of "connecting" in its definition because the Patent requires two-way communication.[9] Markman Opinion, 2008 WL 564956, at *7.

We construed the term "community" to mean "information and at least one function, . . . and/or an expression of interest that may be accessed . . . through a communications network."[10]

---

agreed with Facebook and therefore amended the construction. Order, Apr. 3, 2008.

[9]We found that the specification disclosed a method for two-way communication by "interacting through a network" and allowing "widespread and rapid distribution of an electronic connection" between users. ('629 Patent col. 3, lines 16-19; 24-29.) In the Detailed Description of the Preferred Embodiments, the inventor described the embodiment as a "Network [that] may be any network that permits multiple users to connect and interact," which may be an internet service provider, a dial-up access or "other manner of connecting to a network." (Id., col. 5, lines 26-27; 32-34.)

We stated that numerous other parts of the specification made clear that interaction among users is the purpose of the invention. The method includes a "central controller module" with which a user must communicate to initiate the community (id., col. 26, lines 56-67), a "communications module" to enable communications with others (id., col. 6, lines 39-40), a chat application object permitting users to communicate (id., Col. 18, lines 20-33), and an instant messaging application object to permit users to communicate (id., col. 18, lines 37-54). As we explained, limiting "transmitting" to just "sending" would make these functions impossible. Markman Opinion, 2008 WL 564956, at *7.

[10]Relying on dictionary definitions, Facebook argued that "community" should be defined as: *A virtual place or electronic medium where people having common interests can interact, which can be accessed by a computer or other device.* (Def. Markman Br. at 11.) The dispute among the constructions was whether "community" was a "virtual place" or "information and at least one function . . . ." We rejected the contention that there was a "virtual place" requirement in the '629 Patent. We agreed with XACP that a "community" is "information and at least one function" because the language of the specifications made clear that the definition of community incorporated the concepts of "function" and "information." Markman Opinion, 2008 WL 564956, at *4-5.

Markman Opinion, 2008 WL 564956, at \*5. We held that a "created community" is "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, that was caused to come into existence, brought into being, made or originated."[11] Id.

B.      The *Inter Partes* Proceeding

The Examiner initially rejected Claims 1-32 of the '629 Patent as anticipated and/or made obvious by a prior art reference known as the "Tatham" patent.[12] (Ex. A to Decl. Of Elizabeth Stameshkin in Support of Defs.' Supplemental Claim Construction Br. ("Def. Ex. A") at 3, 5-6.) Tatham discloses a method whereby a user is invited to use a "private office suite" that "may be created on a server."[13] Later, the Examiner changed her decision and concluded that even though

---

[11]The parties agreed on the construction of the term "create." They agreed that to "create" means "to bring into existence." (Pl. Markman Br. at 14, Def. Markman Br. at 13.)

[12]U.S. Patent No. 6,223,177 (filed Apr. 24, 2001). The Examiner also found that certain claims were rendered obvious by Tatham in view of Hertz, U.S. Patent No. 6,029,195 (filed Feb. 22, 2000), and/or were anticipated by two other patents, Roseman, U.S. Patent No. 6,608,636 (filed Aug. 19, 2003) and Appelman, U.S. Patent No. 6,750,881 (filed June 15, 2004) and/or by three non-patent prior art references, *Yahoo! for Dummies* ("Yahoo!"), *AOL in a Nutshell* and Sarin et al., *Software for Interactive On-Line Conferences*. (See Def. Ex. A at 3.)

[13]Tatham discloses

> "[T]he dedicated site created in response to the initiate request can be thought of as being a private office suite within the semi-public intranet. The private office suite may be created on the server for a period of time desired by the primary user. . . ." The primary user is a registered user because the identity of the user is confirmed by the server.

(Def. Ex. A at 5 (quoting Tatham, col. 4, lines 19-22).) The Roseman prior art reference discloses a "system to provide a virtual conferencing system," incorporating, *inter alia*, a registered user,

the '629 Patent and Tatham contain similar elements, the '629 Patent is distinguishable from

Tatham:

> **Tatham** does not disclose or suggest *transmitting the created community to the at least* [one] *communication address* in combination with the other features set forth in [claim 1 of the '629 Patent].  **Tatham** expressly discloses:
>> "The private office suite may be created **on the server** for a period of time desired by the primary user, after which time the private suite can be erased to free-up system resources. . . ."
>
> . . . .  Accordingly, <u>claims 1, 9, 17, and 25</u> are patentably distinguished from **Tatham** because the user of **Tatham** is invited to use the private office suite *created on the server* whereas the **Harvey** ['629] patent transmits the created community, i.e. the private office suite, *to the user*.  As a result, the rejections of **<u>claims 1-32</u>** as being anticipated and/or obvious over **Tatham** are withdrawn.

(Ex. A to Pl. Mot. ("Pl. Ex. A") at 29 (emphasis in original).)[14]  This change was not made in

response to any argument presented by XACP.  In fact, the Examiner rejected all of the arguments

XACP presented to attempt to show that the patent in suit was not anticipated by Tatham,[15]

---

community identification information, and application objects.  (<u>Id.</u> at 15 (quoting Roseman, col. 1, line 26-27; col. 5, lines 20-25; col. 4, lines 21-23; col. 3, lines 42-50).)  The Appelman prior art reference discloses sending "an invitation to one or more co-users to a private 'chat room' or a favorite place in the system," incorporating *inter alia* a registered user and community identification information.  (<u>Id.</u> at 32 (quoting Appelman col. 6, lines 19-23, 36-38).)

[14]The Examiner similarly distinguished Roseman:

**Roseman** discloses creating a conference room and inviting participants to a meeting in the conference room.  However, **Roseman** does not teach or suggest, *"transmitting the created community based in part on the at least one communications address"* because the meeting participants 'arrive' at the meeting, i.e. the conference room, rather than having the conference room transmitted to them.

(Pl. Ex. A at 15.)  She distinguished Appelman because its disclosure of a "chat room" application was narrower that the "application object" disclosed in the patent in suit.  (<u>Id.</u> at 19-20, 22-23.)

[15]XACP tried to demonstrate that the patent in suit was not anticipated by Tatham by (1) contrasting the two patents' use of a "registered user," (2) arguing that Tatham is devoid of any clear or useful disclosure that a "primary user" is presented with applications to select, and (3) by contrasting when the created community is transmitted.  (Pl. Ex. A at 4-9.)

concluding "[i]n summary, none of [XACP's] arguments . . . were persuasive. Accordingly, **claims 1-32** remain rejected as being anticipated by **Tatham**."[16] (Pl. Ex. A at 9.) Even though she rejected each of XACP's arguments, she nonetheless altered her interpretation of the prior art reference *sua sponte* based upon her construction that, while the user of **Tatham** is invited to use the private office suite *created on the server*, the '629 patent transmits the created community, i.e., the private office suite, *to the user*.

## III. CONSTRUCTION OF "COMMUNITY" AND THE "TRANSMITTING PHRASE"

### A. "Community"

Preliminarily, Facebook contends that we cannot construe "transmitting the created community" without first reexamining the meaning of "community." (Def. Supp. Claims Construction Br. ("Def. Br.") at 5-6.) It asks that we change our prior construction, *information and at least one function* to now read *information and the at least one application object that was*

---

[16]Elsewhere in her decision, the Examiner changed her decision about whether the patent in suit was rendered obvious by Tatham, but again, not based on an argument that XACP had made:

> [XACP's] argument . . . is unpersuasive because adding a feature to permit selection of 'application objects' in the creation of a club does not necessarily decrease its 'simplicity.' Nonetheless, the rejection of **claims 1-16** as obvious over **Yahoo!** in view of **Tatham** is withdrawn because upon reconsideration of independent **claims 1 and 9**, the Examiner considers the disclosure of **Tatham** inadequate to teach *"receiving a selection of at least one application object from the registered user"* in combination with the other features set forth in independent **claims 1 and 9**.

(Pl. Ex. A at 18 (emphasis in original.) Facebook argues that this change of opinion was based upon XACP's amendment of claim 9 during the reexamination proceeding. While the claim originally disclosed a "creation module for creating a community based on the community identification information and the at least one **community function**" ('629 Patent at col. 32, lines 11-13 (emphasis added)), XACP changed the words **community function** to **application object** in its Revised Response to Office Action. (Ex. B to Decl. of Elizabeth Stameshkin in Support of Defs.' Supplemental Claim Construction Br. ("Def. Ex. B") at 2.)

*selected by the user*. It grounds its contention on the fact that during the *inter partes* proceeding, XACP modified claim 9 of the '629 Patent, replacing the phrase "community function" with "application object" to clarify that the community being created is based on "the at least one application object" selected by the registered user.[17] Because we originally construed "community" to mean "information and at least one function," and XACP has now expressed in its amendment to claim 9 that it meant the "at least one function" to be the "at least one application object" selected

_____

[17]Claim 9, which is an independent claim, originally discloses

A system for creating a community for users with common interests to interact in comprising:

a receiver module for receiving:

> a) a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community;
> b) receiving community identification information from the registered user;
> c) receiving a selection of at least one application object from the registered user; and
> d) at least one communications address designated by the registered user, the at least one communications address corresponding to a user to receive a created community;

a creation module for creating a community based on the community identification information and the at least one **community function**; and

a transmitter for transmitting the created community based in part on the at least one communications address.

('629 Patent at col. 31, line 65 - col. 32, line 17 (emphasis added).)  As noted in n. 16 *supra*, in XACP's Revised Response to Office Action, XACP changed the words **community function** to **application object** so that claim 9 now requires "a creation module for creating a community based on the community identification information and the at least one application object."  (Def. Ex. B at 2.)  XACP explained to the Examiner that claim 9 was amended to "clarify the antecedent basis for the claim term 'application object.'" (Id. at 15.)

by the registered user, Facebook urges that we change our construction of "community." (Def. Br. at 6-7.) We agree that the alteration is appropriate.

The parties previously stipulated that "application object" means a "computer program or module that **functions** to direct a user to specific information and/or enables a user to do something useful." Markman Order at 3-4 (emphasis added). Examples of an application object include "among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board." Id. XACP made clear in amending claim 9 that the application object **is** the functionality component of claim 9 that the registered user selects in order to create the community. Notably, claim 1 is also clear that "creating the community" is based on the "community identification information and the at least one application object" selected by the registered user. '629 Patent col. 31, lines 8-10.

The specifications also teach that the functional components of the community are its application objects. First, claim 1 requires that at least one application object be selected by a registered user in order to create the community. To accomplish this requirement, a user may be presented with "community related functions including community information, chat, instant messaging, discussion groups, classifieds and mailing lists." Id. col. 16, line 66 - col. 17, line 2. Other than "community information," which is accounted for separately in the definition of "community," each function described is itself an application object. Id. col. 17, line 31 - col. 19, line 23.

Accordingly, we conclude based upon XACP's amendment to claim 9 making clear that the antecedent basis of that claim is, like the antecedent basis of claim 1, the at least one application object that is selected by the user, the proper construction of "community" is, therefore, *information*

-9-

*and the at least one application object that was selected by the user relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site.*

B.    The Transmitting Phrase

XACP asks that we amend our construction of the transmitting phrase to clarify that the phrase means "transmitting at least one application object of the community." (Pl. Mot. at 2.) This construction, it contends, would be consistent with the Examiner's view that the "created community" that is transmitted is the application object, and that the '629 Patent transmits only the application object to the user. It argues that we have already held that a community is comprised of information, applications and functions, and rejected Facebook's contention that "community" relates to a specific location, such as on a computer server. (Id. at 5.) XACP asserts that the Examiner, in upholding the Patent's validity, also found that the Patent expressly distinguishes a community from a particular location on a server. She did so, XACP continues, because the specifications relate that users may interact with the community or with other users "using various application objects *downloaded to the user*." (Id. (citing '629 Patent, col. 5, lines 18-19 (emphasis added)).) XACP concludes that since users may interact with each other using application objects that are downloaded to the user after the community is created, users may interact with each other without going through a central controller. Thus, after a community is created, it is the application object of the community that is transmitted, not the community itself.

XACP points to several portions of the specifications to support its contention that it is the application object that is transmitted. It asserts that the Patent discloses a temporal sequence during

which (1) a community is first created; (2) the creator of the community then selects individuals to be invited to access the created community; (3) invitations are then distributed to the prospective members who, finally, if they accept membership in the community, may (4) download application objects of the community.[18]  Accordingly, XACP concludes, "transmitting the created community" – step (4) in the process – should be construed to mean "transmitting at least one application object of the community" to the user, not transmitting the community itself.  (Pl. Mot. at 7.)

Facebook responds that the transmitting phrase should not be separately construed because we have already construed each of the operative words contained in the phrase.  (Def. Br. at 9-10.) It also argues that changing "transmitting the created community" to mean transmitting something less, i.e., "transmitting **only** the at least one application object of the community" is undermined by the plain language of claim 1 because nothing in the claim language suggests that "transmitting the created community" means transmitting **less than the whole** community.  (Id. at 11 (emphasis added).)  In addition, Facebook contends that XACP's new construction contradicts its early claims

---

[18]See '629 Patent col. 3, lines 39-42 (stating the patented system "may employ a communication application to distribute and initiate invitation applications having an executable component and a message component."); col. 4, lines 47-58 (stating that the creator of the community selects individuals to be invited to access the community; a central controller then "sends a transmission, such as an e-mail, to the invited users based on the information provided by the creator.  The transmission includes a message component and an executable component."); col. 4, lines 65-67 ("Upon receipt of the transmission, a user executes the executable component . . . ."); col. 5, lines 7-10 ("At this point the program may or may not download additional content objects, application objects, and client software components to allow the user to interface with [the community] from outside the browser environment."); col. 5, lines 11-13 ("Using the user interface, the user can interact with the community through the central controller, other users, or both at appropriate times."); col. 5, lines 18-20 ("Interaction includes using the various application objects downloaded to the user, such as interacting with another user in the chat area.").  See also id. at '629 col. 31, lines 6-17.

construction positions.[19]  (Id. at 13-14.)

Facebook is correct that throughout the initial <u>Markman</u> proceedings, XACP never specifically argued that the transmitting phrase should be construed to mean transmitting the application object of the created community to a user, while also specifying that the community itself exists on a server.[20]  XACP argued in the first <u>Markman</u> proceeding that the '629 Patent "teaches that

---

[19]Facebook also asserts that statements by the Examiner that support XACP's position should carry little weight because they were raised by the Examiner *sua sponte* and were not based on any position taken by XACP.  (Def. Br. at 12-13.)  Its reliance on language from <u>Salazar v. Procter and Gamble Co.</u>, 414 F.3d 1342, 1345, 1347 (Fed. Cir. 2005) to support its contention regarding *sua sponte* comments, however, is selectively quoted.  While the Federal Circuit held that an examiner's unilateral remarks cannot alter the scope of a patent claim because "'[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO,'" <u>id.</u> at 1345 (quoting <u>3M Innovative Props. Co. v. Avery Dennison Corp.</u>, 350 F.3d 1365, 1373-74 (Fed. Cir. 2003), the Court went on to explain more fully that

> [a]lthough unilateral statements by an examiner do not give rise to a clear disavowal of claim scope by an applicant, it does not necessarily follow that such statements are not pertinent to construing claim terms.  Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed.

<u>Id.</u> at 1347.  We accord the Examiner's explanation this weight.

[20]In its appellate brief to the Board of Patent Appeals, XACP accepts the Examiner's construction and argues that its previous statements are consistent with the Examiner's construction that "'transmitting the created community' *includes* an application object of the created community, but not the entire community."  (Ex. 4 to Def. Resp. To Pl. Motion to Lift Stay at 9-10 (emphasis in original).)  XACP told the Board that

> [t]he Examiner has properly recognized that "transmitting the created community" requires more that [sic] sending content information generated by an application executed at a server, as described in *Tatham*.  Thus, the Examiner correctly concluded that *Tatham's* community (i.e. private office suite) is located on the server and, thus is not "transmitted" like the claimed "community."

(<u>Id.</u> at 11.)  XACP argued to the Board that the Examiner's construction is consistent with our own construction because we recognized that

-12-

a transmission of a created community includes users linking to a created community through an electronic connection with the **hosting** central controller module;" that the created community is "**stored** by a central controller module (e.g., multiple server computers configured to appear to the client as a single resource) is within the scope of the claim term ['transmitting'];" "the preferred embodiments . . . teach that created **communities may reside** on the servers of the central controller module;" and that the "central controller module also administers the **community that it is hosting**." (Pl. Markman Br. at 25-26, 28 (citing '629 Patent col. 6, lines 22-24, col. 7, lines 1-24 (emphasis added)).) As XACP's initial position made clear that the created community is stored on a server, resides on a server, or is hosted on a server, but did not specify that it is only the application object that is transmitted, it follows that its position here – that the Examiner's method of distinguishing Tatham by holding that "whereas the **Harvey** ['629] patent transmits the created community, i.e., the private office suite, *to the user*" – was not contemplated within its prior position.

Nonetheless, we agree that the construction of the transmitting phrase should be clarified to indicate that it is the application object that is transmitted for the following reasons. Consistent with the temporal sequence of the Patent, the transmission phrase speaks about the community in the past tense; it is already created and exists on a server. The community is created before the transmission

---

"transmitting" does not require sending an <u>entire</u> community. (Memorandum of Feb. 29, 2008 at p. 14.) Instead, a function connects or communicates the community to the user. . . . The court's definition of the claimed "transmitting" allows for the distribution of function to a user for connecting with a community. . . . Therefore, the court's understanding of "transmitting" is different from *Tatham's* system, which simply sends announcements or information content generated by a server. As such, the Examiner's interpretation of "transmitting the claimed community" does not contradict the court's claim construction.

Id. (internal citations omitted).

step; the transmission does not itself create the community. See '629 Patent, Figure 2, steps 202, 210, 230 (showing that a "community is launched" (step 230) after the user sets community identification information (step 202) and picks "look and feel from standard templates" (i.e., "user . . . build[s] a community, [and] designate[s] . . . application objects") (step 210); id. col. 8, line 65 - col. 9, line 1)); see also id. col. 13, lines 4-5 (stating that "at step **230**, a creator may launch a community. Other manners of creating communities may also be used.").

Facebook's construction ignores this temporal sequence apparent from the face of the patent. It is only **after** the community is created that "the program may or may not download additional content objects, application objects, and client software components to allow the user to interface with [the community] from outside the browser environment." Id. col. 5, lines 7-10. Thus, additional application objects may be transmitted without the rest of the "community" after the community – i.e., information and the at least one application object selected by the creator – is first created. It is only then that "the user can interact with the community through the central controller, other users, or both at appropriate times," id. col. 5, lines 11-13; "interaction" being defined to include "using the various application objects **downloaded to the user**, such as interacting with another user in the chat area." Id. col. 5, lines 18-20 (emphasis added).

Because the specifications that XACP cite make clear that the community is created first, additional application objects may then be downloaded to the user, and that users may interact directly with one another through these application objects downloaded to the user, they support XACP's construction that only the at least one application object is transmitted to the user at the transmitting stage. Accordingly, we hold that "transmitting the created community" means *transmitting at least one application object of the community.*

## IV.    OTHER TERMS IN DISPUTE

### A.    Registered User

In our first <u>Markman</u> Opinion we accepted XACP's proposed construction of the term "registered user" to mean *a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller.* <u>Markman</u> Opinion, 2008 WL 564956, at *8; (Pl. <u>Markman</u> Br. at 17.)  Facebook argued that the definition of "registered user" should be a plain meaning definition: *A person who has provided at least once, registration information (e.g., name, address, personal information, etc.).*  (Def. <u>Markman</u> Br. at 10.)  Thus, the primary dispute between the parties was whether to include in the construction the requirement that registration information be "requested," and the requirement that the registered user "forward" the information to a controller.   We decided that both the "request" element and the "forwarding" element were clearly stated in the specification.   (<u>Markman</u> Opinion, 2008 WL 564956, at *8 (citing '629 Patent, col. 5, lines 3- 5; col. 27 lines 1-7).)

As noted above, in the *inter partes* proceeding the Examiner initially rejected claims 1 - 32 of the '629 Patent as anticipated by Tatham.  (<u>See</u> Def. Ex. A at 5-14.)  As part of that determination, the Examiner found that Tatham's disclosure of a "primary user" anticipated the patent in suit's disclosure of a "registered user" "because the identity of the user is confirmed by the server. . . .  In order to confirm the identity, the user inherently has to be registered." (<u>Id.</u> at 6-7.)  XACP responded to the initial rejection by attempting to distinguish Tatham on the ground that Tatham's "primary user" could not anticipate the '629 Patent's "registered user" because Tatham had no requirement that the primary user register, only that the primary user be "confirmed by a server." (Def. Ex. B at 16.)  Asserting a plain meaning argument, XACP responded that to be registered meant "having the

owner's name listed in a register [a formal or official recording of names]." (Id.)  "In comparison," XACP continued, "'confirm' means 'to give approval to,' 'to make firm or firmer' or 'to give new assurance of the validity of.'" (Id. at 16-17 (citing *Merriam-Webster Online Dictionary*).)  The Examiner rejected this argument in the Action Closing Prosecution.  She determined that "confirmation would not be possible unless the user's identity was previously provided, the server would otherwise have no information against which to confirm the user's identity." (Pl. Ex. A at 5.) Ultimately, the issue became non-dispositive because the Examiner later determined that Tatham did not make obvious or anticipate the patent in suit because it failed to disclose the additional requirement of transmitting the created community.

Nevertheless, based upon XACP's argument to the Examiner that "registered user" should have the plain meaning of "having the owner's name listed in a register," Facebook asks that we amend our construction of that term to read *a user whose identification is known by the system*. (Def. Br. at 15.)  It adds, "[m]oreover, the only 'registered user' recited in the '629 patent is the 'registered user' who creates a community. . . .  The Court previously construed 'registered user' with reference to one exemplary embodiment. . . . But these passages describe the registration process for <u>users who are invited to join a community</u>, not the registration of the <u>creator</u> of the community – the 'registered user' at issue in the claims."  (Def. Br. at 16 (emphasis in original).) It argues that it was improper to apply a specification defining an invited user to construe the meaning of a registered user who creates a community because the specification teaches that "[o]ther manners for transmitting registration information may also be used."  (Id. (quoting '629 Patent col. 16, lines 18-19).)

XACP responds that it did not make admissions to the Examiner that are in conflict with its

prior positions here.  Rather, it argued that **either** under a plain meaning of "registered" **or** under our construction as supported by the specifications, Tatham did not disclose a "registered user" and ultimately asked the Examiner to interpret the term consistent with our <u>Markman</u> Opinion.  (Pl. Resp. in Opposition to Defs.' Claim Construction Arguments ("Pl. Reply Br.") at 15; Def. Ex. B at 17-18.)  It further observes that Facebook itself made a plain meaning argument to us in the first <u>Markman</u> proceeding, but now offers an inconsistent construction.  (Pl. Reply Br. at 15.)

First, we reject Facebook's assertion that the new intrinsic evidence arising out of the *inter partes* proceeding requires a reconsideration of our prior construction of "registered user."  While XACP discussed a plain meaning for the term in its attempt to distinguish Tatham, it clearly asserted to the Examiner that she should construe the term consistently with our construction in the first <u>Markman</u> Opinion, which was the construction XACP originally proposed.

Second, we reject Facebook's contention that our use of the description of how an invited user becomes a registered user was improper.  This is essentially a reassertion of its argument in the first round of <u>Markman</u> practice that the specification relied upon by XACP was merely a "design choice" included in the preferred embodiment and was not an expression of "manifest exclusion or restriction, representing a clear disavowal of claim scope."  <u>Conoco, Inc. v. Energy & Envtl. Int'l, L.C.</u>, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006).  We rejected this argument, finding as follows:

> The specification states that, after the registration is completed by the user, it "may then be sent" to a central controller module.  Facebook reads the word "may" to indicate that the requirement is optional or permissive.  We find, however, the specification cannot be read as permissive – as in it "may or may not be" sent.  Rather, we find, the inventor used the "may be sent" element as a time orientation: the registration is to be sent after it is completed by the user.  If forwarding was optional, the registration would never occur.  If the registration were forwarded before the registration information was completed, the registration would fail.  Thus, we find, the key concept in the "may then be sent" language is the word "then,"

setting forth the sequence of events.

Markman Opinion, 2008 WL 564956, at *8.  Because the provision of registration information is not optional or permissive for **any** user, whether that user is a community creator or a user invited to join an existing community, the registration requirement is an expression of manifest restriction regardless of the manner chosen for transmitting registration information.

Third, we must reject Facebook's proposed construction because, taken on its face, it renders an impossible result.  Limiting "registered user" to a user whose identity is **already** known by the system creates a causality dilemma.  To be "known," the user must already be registered; but to be registered, he must already be known.  Thus, it is unclear how the first creator/user of a community created by the system disclosed by the Patent could ever become a registered user.  "A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'"  Becton, Dickinson & Co. v. Tyco Healthcare Group, LP, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (quoting Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1357 (Fed. Cir. 2006); and citing Bd. of Regents of the Univ. of Texas v. BENQ Am. Corp., 533 F.3d 1362, 1370 (Fed. Cir. 2008) (declining to construe a claim to "effect [a] nonsensical result")).

Accordingly, we again hold that "registered user" means *a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller.*

B.      Application Object

Finally, Facebook asks that we modify our construction of "application object."   Our construction adopted a stipulation by the parties in the first Markman proceeding that an "application object" is *a computer program or module that functions to direct a user to specific information*

-18-

*and/or enables a user to do something useful, and may be, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.*  Markman Opinion, 2008 WL 564956, at *3 n.2.  Facebook asks that we modify the construction to read *a computer program or module that a user from within the community can choose to access that functions to direct a user to specific information and/or enables a user to do something useful.*  (Def. Br. at 17.)  It contends that its revision would do two things: (1) clarify that an application object is a computer program or module "that a user from within the community can choose to access," and (2) remove several purported examples that are undefined, ambiguous, or have nothing to do with the accused technologies.[21]  (Id.)  Facebook points to numerous places in the Patent where the inventor specifies

---

[21]Facebook asks us to alter the construction "in order to resolve claim interpretation issues that arose as a result of XACP's new infringement allegations."  (Def. Br. at 16.)  According to Facebook, "XACP's new infringement contentions against third-party Zynga games Farmville and Cityville suggest that a user selects an alleged 'application object' (functionality that sends emails), but the user cannot access that functionality from within the community.  As there is no principled reason why functionality that is unavailable to members of a community should qualify as an 'application object,' Facebook requests that the Court modify its proposed construction accordingly."  (Id. at 17.)  XACP responds that Facebook's reason for seeking the alteration is improper because it centers on infringement allegations.  We find that Facebook's reason for seeking the alteration is not itself improper.

The Federal Circuit recognizes that using awareness of the accused product to supply the parameters and scope of claims construction is not improper.  In Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322 (Fed. Cir. 2006), the Court described the line that may not be crossed:

> This court, of course, repeats its rule that "claims may not be construed with reference to the accused device."  NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985)  (en banc).  As noted earlier, that rule posits that a court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language.  Thus, the rule forbids a court from tailoring a claim construction to fit the dimensions of the accused product or process and to reach a preconceived judgment of infringement or noninfringement.

that a user first enters a community in order to have access to its application objects and other content that forms the community. (See, e.g., '629 Patent col. 16, lines 37-41 ("user may enter a community and access . . . application objects"); col. 27, lines 12-20 (once user's registration is validated, user has access to application objects); col. 9, lines 19-25 (standard application objects are available to all users); col. 19, lines 41-50 (users may initiate application objects).)

XACP responds that Facebook should not be permitted to alter the parties' stipulated construction of the term. It cites to the decision of the United States Court of Appeals for the Third Circuit in Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998) to support its legal contention that Facebook, having freely and fairly entered into the stipulation setting forth the construction should be bound by it. Id. at 616 (stating that "[i]t is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside" (quoting Kohn v. Am. Metal Climax, Inc., 458 F.2d 255, 307 (3d Cir. 1972)). We find, however, that Federal Circuit law must control this question. Applying that law, we find that the stipulation is not binding upon our construction of the claim term.

The Federal Circuit undertakes a choice of law inquiry to decide whether to establish or follow its own precedents or to apply the law of the appropriate regional circuit. Biodex Corp. v.

_____

> In other words, it forbids biasing the claim construction process to exclude or include specific features of the accused product or process. The rule, however, does not forbid awareness of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component. In other words, the "reference" rule . . . does not forbid any glimpse of the accused product or process during or before claim construction.

Id. at 1330 -1331 (internal citations omitted). Facebook's attempt to place its request for construction of the term in the context of the parties' evolving claims and defenses has not stepped over this line. It does not argue for its construction based upon the design of its own products, and limits its arguments completely to the intrinsic evidence contained in the patent specifications.

Loredan Biomedical, Inc., 946 F.2d 850, 856 (Fed. Cir. 1991) (outlining the reasons for determining whether Federal Circuit or regional circuit law applies and holding that "our initial inquiry in determining whether deference to regional circuit law is due has been to decide whether the law that must be applied, whether procedural or substantive, is one '. . . over which this court does not have exclusive appellate jurisdiction.'" (quoting Cicena Ltd. v. Columbia Telecomm. Gr., 900 F.2d 1546, 1548 (Fed. Cir. 1990))).  The Federal Circuit defers to regional circuit law when reviewing issues not unique to patent law.  See U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 702 (Fed. Cir. 1988) (applying regional circuit law to antitrust counterclaim).  The Federal Circuit will apply its own law "to both substantive and procedural issues 'intimately involved in the substance of enforcement of the patent right.'" Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004) (quoting Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996).[22] Because construction of patent terms clearly involves "the substance of enforcement of the patent right," see, e.g., Harris Corp. v. Ericsson Inc., 417 F.3d 1241 (Fed. Cir. 2005) (holding that Federal Circuit law controlled effect of waiver in claims construction process) it would be inappropriate to apply Third Circuit law to determine the binding force of a stipulation made during the Markman process.

    The applicable Federal Circuit law here is the admonition that claims construction is a matter of law which the district court has an independent obligation to resolve.  See Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995) ("[T]he trial judge has an independent

---

[22]A procedural issue that is not itself a substantive patent law issue is also governed by Federal Circuit law "if the issue pertains to patent law, if it bears an essential relationship to matters committed to our exclusive control by statute, or if it clearly implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction." Midwest Ind., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc).

obligation to determine the meaning of [patent] claims, notwithstanding the views asserted by the adversary parties.").  In exercising this obligation, district courts are not bound by the stipulation of parties concerning claim terms.  See Ultradent Prods., Inc. v. Hayman, Civ. A. No. 00-13402, 2002 WL 34477127, at *9 (C.D. Cal. Jan. 11, 2002) (holding that court was not bound by parties' claim construction stipulation "because claim construction is exclusively a question of law"); Comtech EF Data Corp. v. Radyne Corp., Civ. A. No. 06-1132, 2007 WL 5041159, at *5 (D. Ariz. Oct. 12, 2007) (holding that "claim construction is an obligation of the court that is independent of the views asserted by the adversary parties"); Boston Scientific Corp. v. Micrus Corp., 556 F.Supp.2d 1045, 1051 (N.D. Cal. 2008) (holding that "the court is not required to adopt a construction of a term, even if the parties have stipulated to it" (citation omitted)); see also Semiconductor Energy Lab. Co., Ltd. v. Chicago Mei Optoelectronics Corp., Civ. A. No. 04-4675, 2006 WL 6130994, at *6 (N.D. Cal. Mar. 27, 2006) (holding that an argument "that plaintiff had 'waived' its right to offer alternate constructions ha[d] no bearing on the court's ability to determine the proper construction as a matter of law" because the "court is free to accept either party's proposed construction, or to reject both if both are flawed" (citation omitted)).

We agree with Facebook's contention that an application object must be chosen from within the community.  In addition to specifications cited by Facebook above, we note that Figure 2 of the '629 Patent, which discloses how the community is created, shows that the creator chooses the applications when he designs the community.  ('629 Patent, Fig. 2 box 210, col. 8 line 66-col. 9, line 3 ("At step **210**, a configuration editor is presented to a creator.  A configuration editor may allow a user to build a community, and designate content and application objects . . . ."); see also col. 18, lines 15-18 (create function "may allow a user to create and design a community, select application

-22-

objects . . . available in a community and designate other features of a community.").)  After a community is created and launched by its creator, a "user may **enter** a community and access content objects, such as . . . application objects . . ." (Id. col. 16, lines 37-38 (emphasis added).)  Thereafter, registered users of the community are permitted "to access the application objects and the community."  (Id. col. 27, lines 13-16.)  To do so, the "user next **enters** the community at step **570**. The community includes a chat room and permits the user to select . . . other chat rooms application objects, and/or the application/game in which the user wishes to participate."  (Id. col. 27, lines 21-25 (first emphasis added).)

In addition, the inventor has specified that users may initiate new application objects only after they have entered a community.  (See id. col. 19, lines 45-65 ("A user may initiate an application object. . . .  Application platform module **4040** may further coordinate initiation and execution of various application objects.  By way of example, an application platform **4040** located on client **110**, may coordinate a user initiating a photo album application object and a whiteboard application object, such as by coordinating areas (e.g. "windows") **within a community** for a user to interact with the application object."  (last emphasis added).)  Because there does not appear to be any method by which the inventor permits a user to access or initiate a community's application objects from outside the community, we agree that an application object must be accessed or initiated from within a community.

Finally, we reject Facebook's additional request that we delete the examples of application objects from our construction.  It argues that the examples should be deleted because they are undefined, ambiguous, or have nothing to do with the accused technologies.  This argument is not rooted in any citation to the intrinsic evidence and notably, Facebook did not articulate the same

concerns when it stipulated to including the examples during the first <u>Markman</u> proceeding. More importantly, each type of application object is described by the inventor as a type of interaction that may be the basis for creating a community for users with common interests. Because the examples are amply supported by the intrinsic evidence and are necessary to explain what the patentee claims, we decline to delete them.

Accordingly, we hold that application object means *a computer program or module that a user from within the community can choose to access that functions to direct a user to specific information and/or enables a user to do something useful and may be, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.*

## V.    CONCLUSION

For the reasons we have expressed, we conclude that "community" means *information and the at least one application object that was selected by the user relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site.* "Transmitting the Created Community" means *transmitting at least one application object of the community.* "Registered User" means *a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller.* "Application Object" means *a computer program or module that a user from within the community can choose to access that functions to direct a user to specific information and/or enables a user to do something useful and may be, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group,*

*announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.*

An appropriate order will be entered.

BY THE COURT:

/s/John R. Padova

_____

John R. Padova, J.